1  Glen F. Olives, Esq. (SBN 196854)
   LAW OFFICES OF TED A. GREENE, INC.
2  1912 F Street, Suite 110
3  Sacramento, CA 95811
   (916) 442-6400
4  Fax: (916) 266-9285
5  golives@tedgreenelaw.com

6  Attorneys for Plaintiff,
7  GENET HABTEMARIAM

8              UNITED STATES DISTRICT COURT

9           EASTERN DISTRICT OF CALIFIFORNIA

10

11  GENET HABTEMARIAM,                    **CASE NO.** 2:16-CV-01189-MCE-AC

12              Plaintiff,                Magistrate Judge Allison Claire

13       vs.
                                          **MEMORANDUM OF POINTS AND**
14                                        **AUTHORITIES IN OPPOSITION TO**
    VIDA CAPITAL GROUP, LLC; US           **DEFENDANT PNC BANK, N.A.'s**
15  MORTGAGE RESOLUTION; PNC              **MOTION FOR SUMMARY**
    BANK, NATIONAL ASSOCIATION            **JUDGMENT OR PARTIAL**
16  S/B/M NATIONAL CITY                   **SUMMARY ADJUDICATION**
17  MORTGAGE; and DOES 1 to 50,
    inclusive,                            **Date:      July 9, 2020**
18                                        **Time:      2:00 p.m.**
19              Defendants.               **Courtroom: 7, 14th Floor**

20

21

22

23  / / /
24  / / /
25  / / /
26  / / /

27

28  ──────────────────────────────────────────────
                            I
    MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT PNC BANK, N.A.'s
    MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY ADJUDICATION

# **TABLE OF CONTENTS**

I.      INTRODUCTION                                                                          1

II.     STATEMENT OF MATERIAL FACTS IN DISPUTE
        AND PRIMARY ISSUES BEFORE THE COURT                                  2

III.    ARGUMENT
        A.      PNC's Contention that the Issuance of the 1099-C
                Was a Charge-Off for Accounting Purposes Only and
                Was Also a Mistake, is Logically Inconsistent to the
                Point of Unintelligibility.                                                  2

        B.      If it Walks Like a Duck: "Cancellation of Debt" is Just
                That, and Many Court Have Correctly Interpreted it, as
                Plaintiff Did, by its Plain Meaning, Not an Obscure
                Accounting Term of Art.                                                      3

        C.      If Continuous Illegal Collection Efforts by Debt Collectors
                On a Cancelled Debt Does Not Give Rise to a Triable Issue
                Of Material Fact for a Jury, then the Unfair Business Practices
                Act is Rendered Moot                                                         6

        D.      Plaintiff Detrimentally Relied on PNC's Cancellation of the
                Debt by Not Filing for Chapter 13 Bankruptcy Which Would
                Have "Stripped" PNC's Lien on the Property                              8

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT PNC BANK, N.A.'s
MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY ADJUDICATION

E.     Violation of California Civil Code §2942(a) Brings Rise to a
        Legitimate Negligence Claim, as Does PNC's New Admission that
        Issuance of the 1099-C Was a "Mistake" Which is Prima Facie
        Evidence of Negligence in and of Itself                                    10

F.     For the Same Reasons Set Forth Above – PNC's Cancellation
        Of the Debt – Plaintiff's Claim for Declaratory Relief is Valid            11

IV.    CONCLUSION                                                                    12

## **TABLE OF AUTHORITIES**

**Cases**

*Amtrust Bank v. Fossett*, 223 Ariz. 438, 224 P.3d 935 (2009)                      6

*City of Hope v. National Medical Center v. Genentech, Inc.*, 434 Cal.4th 375 (2008)   9

*FDIC v. Cashion*, 720 F.3d 169 (4th Circ. 2014)                                     4

*Jenkins v. JPMorgan Chase Bank*, N.A., 216 Cal.App.4th 497                          7

*Ladd v. County of San Mateo*, 12 Cal.4th 913 (1996)                                10

*Nymark v. Heart Federal Savings*, 231 Cal.App.3d 1089 (1991)                       10

*Parsons v. Bristol Development Co.*, 62 Cal.2d 861 (1965)                           8

*Philpott v. Superior Court*, 1 Cal.2d 512 (1934)                                    7

*In Re Reed*, 492 B.R. 261 (Bankr. E.D. Tenn. 2013)                                  6

*Silver v. Brown*, 63 Cal.2d 841 (1966)                                             5

**Statutes**

15 U.S.C. §§ 1692, *et seq.*                                                9

Bus. & Prof. Code §§ 17200, *et seq.*                                       9

Cal. Civ. Code § 1788                                                       9

Cal. Civ. Code § 2942(a)                                                 10, 11

**Other Authorities**

*Habtemariam v. Vida Capital Group, LLC, et al.*,
2017 WL 627404 at *5 (E.E. Cal. Feb. 14, 2017)                          5, 7, 10

1 Witkin, Contracts (10 ed. 2012 supp.) Nature of Restitution § 1013         7

**Treatises**

Graham Virgo, *The Principle of the Law of Restitution*,
New York: Oxford University Press (2006) (citing American
Jurisprudence 2d.)                                                           8

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT PNC BANK, N.A.'s
MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY ADJUDICATION

## MEMORANDUM OF POINTS AND AUTHORITIES

Plaintiff Genet Habtemariam ("Plaintiff") submits the following points and authorities in support of her Opposition to PNC Bank, N.A.'s ("PNC") Motion for Summary Judgement / Partial Summary Adjudication.

## I.   INTRODUCTION

The gravamen of Plaintiff's Second Amended Complaint, aside from causes of action for unfair business practices, negligence, declaratory relief, and breach of contract, is indeed the claim that the issuance and receipt of a Form 1099-C cancels or voids a debt. Plaintiff claims, as set forth below, that the issuance of the 1099-C is prima facie evidence of debt cancellation. Contrary to PNC's contention that it is "undisputed" (PNC Motion p. 1, 8-11) that PNC did not intend to cancel the debt, the issuance of the 1099-C which states in bold print "Cancellation of Debt" is in itself evidence of intent. Be that as it may, PNC's intent is irrelevant, and the Court must consider whether a reasonable person would conclude PNC cancelled the debt, as it is well established in California contract law that a person's detrimental reliance on an action by a party to enter into or cancel a contract is the relevant consideration for the trier of fact.

PNC, through a recursive series of loan buyers and debt collectors, sent correspondence inconsistent with the debt being cancelled; however, as set forth below, after Plaintiff provided evidence of the 1099-C, collection of the debt ceased (only to be taken up again years later by new PNC debt purchaser/servicer). Plaintiff not only relies on the 1099-C as evidence of cancellation of the Loan, but also the inaction of PNC in attempting to satisfy the debt over a period of years.

The evidence to be presented at trial will show an honest plaintiff attempting to do the right things during a deep global financial crisis by requesting a loan modification, only to be met with a labyrinth of banking bureaucracy, and a bank that denied the modification, then cancelled the debt, then after enjoying the tax benefits of cancelling the debt, continued to

attempt collection.

PNC further argues, for the first time, that the issuance of the 1099-C was also a "mistake." It is unclear from PNC's moving papers whether this is an alternative contention, or that the issuance of the 1099-C was both a charge-off for accounting purposes *and also* a "mistake."

## II.   STATEMENT OF MATERIAL FACTS IN DISPUTE AND PRIMARY ISSUE BEFORE THE COURT

The vast majority of facts in this case are not in dispute. The central question presented before this Court is the legal effect of the issuance of an IRS Form 1099-C. PNC contends that despite stating in bold print on the form itself "Cancellation of Debt" is nothing more than an accounting trick, and the debt can be collected and the Property can be subject to foreclosure for nonpayment at will, and at any time – even after years of cessation of collection activity – at the whim of the lienholder. Plaintiff contends that issuance of the 1099-C is prima facie evidence of debt cancellation, and further that PNC's cessation of collection efforts is additional evidence that PNC intended for the debt to be cancelled (DMF No. 1). PNC claims that its correspondence to Plaintiff was inconsistent with debt cancellation (UMF Nos. 46, 47, 48, 49, 50). PNC's intent, and more specifically, what a reasonable person would believe was PNC's intent, cannot be decided as a matter of law, but rather creates a triable issue of fact for a jury to determine.

## III.   ARGUMENT

### A.   PNC's Contention that the Issuance of the 1099-C was a Charge-Off for Accounting Purposes Only AND that the Issuance of the 1099-C Was also a Mistake, is Logically Inconsistent to the Point of Unintelligibility.

In PNC's declaration in support of the present Motion, it simply, guilelessly, and without any elaboration, concludes that "PNC's records indicate that the Form 1099-C was issued by mistake." (PNC declaration p. 3 ¶ 15.) While PNC has been consistent throughout the course of this litigation in claiming that the loan was charged off for accounting purposes with the lien to be retained, and indeed reiterates that claim in the same declaration (p. 2 ¶ 4),

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT PNC BANK, N.A.'s
MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY ADJUDICATION

1    this is the first time that in the course of years-long litigation that PNC claims the defense of

2    mistake. Notably, there is no record (no correspondence to Plaintiff, no notification to

3    Plaintiff, no claim anywhere in Plaintiff's deposition, no produced discovery) that PNC's

4    issuance of the 1099-C was a "mistake" (DMF No. 3). It is only now that the issue comes

5    before this Court, and PNC makes no claim that it ever tried to correct that mistake, or notify

6    subsequent loan services or debt collectors that the mistake was made.

7        While one might admire the tenacity with which a bank may defend its interest in

8    property owned by an elderly woman who had the temerity to believe "cancellation of debt"

9    meant just that, one may not ignore logically inconsistent legal positions. PNC is welcome to

10   bootstrap this additional argument in support of its motion, but it cannot both have its cake

11   and also and eat it.  The curious last-minute argument aside, the obvious question must be

12   asked: Can PNC credibly claim that it should enjoy the succor of legal authority in its favor

13   regarding cancellation of debt for accounting purposes only as well as the succor of legal

14   authority in its favor regarding the inadvertent/mistaken issuance of the 1099-C, when it in

15   fact never claimed it in the first instance? To be sure, the principal of judicial estoppel has not

16   yet attached, nevertheless, if respect for logic has any purchase in legal arguments, then PNC

17   must choose between which of the two sunless seas it wishes to march towards.[1]

18        **B.    If it Walks Like a Duck: "Cancellation of Debt" is Just That, and Many
             Courts Have Correctly Interpreted it, as Plaintiff Did, by its Plain
19           Meaning, Not an Obscure Accounting Term of Art.**

20        PNC correctly points out that there is a split of authority regarding whether the

21   issuance of a 1099-C supplies prima facie evidence of intent to discharge a debt. The minority

22   view requires the lender to rebut the presumption with evidence that the creditor did not

23   intend to cancel the debt, as opposed to the majority view that the Form 1099-C is simply a

24   means to satisfy a reporting obligation and not an instrument discharging a debt, thereby

25   making a debtor's claim of cancelation irrelevant, and not raising an issue of material fact to

26

27   [1] Plaintiff concedes that there may be some tortured tautology allowing for these inconsistent claims, but is presently at a
     loss to describe what that might be.

28
     MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT PNC BANK, N.A.'s
     MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY ADJUDICATION

be disputed at trial.

Plaintiff would like this Court to adopt the minority view. PNC would like this Court to adopt the majority view. The Ninth Circuit to date has been silent on the issue, and therefore in terms of precedent, what matters is what the correct view is, as opposed to the "majority view" or "minority view" is. To put it another way, where nonbinding precedent conflicts, the court may not simply tabulate the scorecard and decide the legal issue based on number of published opinions pro or con. Reasonable judges disagree. Correlation is not causation, and it is impossible to know if either view on the 1099-C issue of debt cancellation is meritorious: the operative facts of every case where a 1099-C is at issue is different, as are the number of cases filed in various jurisdictions.

With that throat clearing out of the way, courts in the majority view on this issue have relied heavily on Internal Revenue Service "Private Information Letters" for guidance, although IRS information letters are not law, do not apply to specific sets of facts, and are rather opinions of a non-judicial federal agency regarding often complex issues in federal tax law. Indeed, the IRS itself concedes that an Information Letter is "advisory only and has no binding effect on the Service." *Internal Revenue Manual*, § 32.3.1.1. In an IRS information letter cited by PNC in its Motion (p. 9, 20-23), the agency states that "[t]he Internal Revenue Service does not *view* a Form 1099-C as an admission by the creditor that it has discharged the debt ad can no longer pursue collection" (emphasis supplied). *I.R.S. Priv. Ltr. Rul. 2005-2007*, 2005 WL 3561135 (Dec. 30, 2005). The IRS has issued other private information letters expressing the same sentiment. They are, again, not law. Understandably, courts have used these letters as guidance in ruling in favor of creditor-defendants, such as in *FDIC v. Cashion*, 720 F.3d 169 (4th Cir. 2014). This court is not required to do so. Notably, while PNC relies heavily on *Cashion*, that court affirmed summary judgment against the borrower when the borrower offered no "proof of cancellation *except* the Form 1099-C itself." (Emphasis supplied.) *Id.*, at 181, n. 10.

In PNC's first iteration of its attempt to keep the facts of this case as far from a jury as possible by bringing a motion to dismiss, this Court noted that "those cases [the minority view] were often narrowly decided under circumstances where no evidence other than the cancellation itself supported a discharge." *Habtemariam v. Vida Capital Grp., LLC, et al.*, 2017 WL 627404 at *5 (E.D. Cal. Feb. 14, 2017).

The IRS deals in the complex vagaries of federal tax law and regulation. In the instant case, Plaintiff – a hard working home care worker and immigrant from Ethiopia – deals with a 1099-C that says in bold print "**Cancellation of Debt**" (emphasis original) while attempting to negotiate a mortgage loan modification. Federal and state courts deal with the palimpsest of law, fact, evidence, and intent, all in an imperfect effort to do substantial justice for all parties engaged in litigation. The cudgel of simply relying on a federal agency's opinion, while convenient in terms of simplifying the analysis, belies the role of our courts in society.

Indeed, the accounting fiction that a debt may be cancelled and written off, only then to be subject to later collection efforts, including foreclosure of a security interest, in this case a decade later, is an absurdity in itself.

Let us suppose, *arguendo*, that the IRS was in fact a national legislature on all things tax-related, and its Private Information Letters held the weight of law. Let us further assume that the language of the law is "the issuance of a 1099-C is not a cancellation of debt and creditors may at their discretion pursue collection of debt after issuance of a 1099-C in perpetuity." *Silver v. Brown*, 63 Cal.2d 841 (1966) and her progeny stand for the proposition that the plain meaning of a statute should be avoided if following the plain meaning would produce an absurd result. Indeed, this principle is a stalwart in American jurisprudence, and many injustices have been avoided by the wise application of this principle, including laws where following the plain meaning would have led to results that were "arbitrary and irrational," "conscious shocking," and "fundamentally unfair and unjust," among many other

manners of inequities.[2] Such a make believe law would shock the conscious and be fundamentally unjust, and yet we are not even dealing with a statute, but rather an ill-conceived opinion of a nameless bureaucrat.

It is not possible to know with any certitude how many predatory secondary mortgage lenders have issued 1099-Cs to debtors in a bad housing market when those debtors were upside down on their mortgages with no intent to collect on the debt, only to change their minds years later having discovered in an economic upturn has given their debtors sudden equity, only to then aggressively renew the pursuit of debt collection or foreclosure for debts that were previously written off. It seems unlikely that Ms. Habtemariam is the only one who has been dragged into this absurd predicament.

The reasoning in *In re Reed*, 492 B.R. 261 (Bankr. E.D. Tenn. 2013) plants a flag of both common sense and equity. There, the Court stated that "it is inequitable to require a debtor to claim cancellation of debt income as a component of his or her gross income and subsequently pay taxes on it while still allowing the creditor, who has reported to the Internal Revenue Service and the debtor that the indebtedness was cancelled or discharged, to then collect it from the debtor." *Id.* at 271.

Similarly, the Arizona Court of Appeals in *Amtrust Bank v. Fossett*, 223 Ariz. 438, 224 P.3d 935 (2009) found that the issuance of a 1099-C was prima facie evidence of debt discharge.

**C.     If Continuous Illegal Collection Efforts by Debt Collectors on a Cancelled Debt Does Not Give Rise to a Triable Issue of Material Fact for a Jury, then the Unfair Business Practices Act is Rendered Moot.**

PNC's assertion that Plaintiff lacks standing to bring an action under California Business and Professions Code § 17200 et seq. ("UCL") is without merit on several grounds. PNC asserts that because (1) PNC is not in possession of any of her money or property; (2) Plaintiff does not contend that PNC failed to account for any of her payments on the Loan;

---

[2] See, e.g., Glen Stazewski, "Avoiding Absurdity," 8 Ind.L.J. 1001, 1038 (2006) (citations omitted).

(3) Plaintiff failed to make any payments on the Loan after issuance of the 1099-C (4) Plaintiff is still in possession of the Property and PNC did not foreclose on the property; and (5) Plaintiff had not lost any money or property this is subject to disgorgement or restitution. These facts are undisputed. They are also immaterial in Plaintiff's UCL claim (MTN, p. 14).

PNC relies on *Jenkins v. JPMorgan Chase Bank, N.A.*, 216 Cal.App.4th 497, 522-23 (2013) in claiming that Plaintiff lacks standing as a matter of law to maintain her UCL claim. There, the court held that a plaintiff had to demonstrate a causal link between her economic injury and the alleged unlawful acts. Here, there is a direct and substantial causal link between PNC's illegal collection activities and economic injury to Plaintiff, including attorneys fees, missed work days resulting in economic loss, and among other items of damages, harm to her credit. Again, this Court in *Habtemariam*, supra at *5, in disposing of PNC's lack of standing claim, ruled that

> Plaintiff alleges PNC had received a benefit from a government program for voluntarily cancelling the debt attached to the SDOT [Second Deed of Trust], and PNC failed to record a release of lien with the trustee, and PNC received an additional benefit by assigning the cancelled deed to UMR. [Citation omitted.] According to Plaintiff, PNC's wrongful conduct of knowingly assigning a cancelled debt to third parties exposed her to the harm she now alleges. Therefore, Plaintiff has standing to bring a claim under the UCL.

PNC further argues in the alternative that Plaintiff is not entitled to relief under the UCL (MTN. p. 15, 4-14) by correctly citing 1 Witkin, Contracts (10th ed. 2012 supp.) Nature of Restitution § 1013 (relying on *Philpott v. Superior Court* (1934) 1 Cal.2d 512, 517) that restitution is "[d]esigned to restore the aggrieved party to his or her former position by return of the thing or its equivalent in money." Indeed it is. But PNC evasively eludes the very nature of restitution by ostensibly claiming that Plaintiff has not literally lost property or money, when she has (SDF No. 2). However, the restoration of Plaintiff to her former position must mean the position she was in when PNC cancelled the debt by issuing the 1099-C, and not solely and literally "money" or "property." The modern concept of restitution in American jurisprudence is very different from what is was in the 1930s.

1   *American Jurisprudence* 2d[3] notes that

> [t]he word "restitution" was used in the earlier common law to denote the
> return or restoration of a specific thing or condition. In modern legal usage,
> its meaning has frequently been extended to include not only the restoration
> or giving back of something to its rightful owner and returning to the status
> quo but also compensation, reimbursement, indemnification, or reparation for
> benefits derived from, or for loss or injury caused to, another. In summary,
> therefore, the word "Restitution" means the relinquishment of a benefit or
> return of money or other property obtained through an improper means to the
> person from whom the property was taken.

There is, too, another basis for restitution – the vindication of property rights

with which the defendant has interfered.[4] In sum, putting Plaintiff in the position she

was in on June 29, 2010 when Plaintiff's debt was cancelled pursuant to PNC's

issuance of the 1099-C.

### D.   Plaintiff Detrimentally Relied on PNC's Cancellation of the Debt by Not Filing for Chapter 13 Bankruptcy Which Would Have "Stripped" PNC's Lien on the Property.

PNC correctly relies on a point of contract law raised in *Bustamante v. Intuit, Inc.*, 141

Cal.App.4[th] 199, 208 (2006) that consent must be objectively based on "words and acts, and

not their unexpressed intensions or understandings." PNC then surmises that "her [Plaintiff's]

unilateral and subjective understanding of this document [1099-C] is not binding upon PNC

and cannot service as the basis for any modification (i.e. forgiveness) of the Note or Deed of

Trust." (MTN p. 8, 11-16.) However, while that may be true, neither is PNC's subjective

understanding of the effect of the issuance of the 1099-C binding upon Plaintiff. It is a

question for the trier of fact in this case, based on an objective standard, and based on the

conduct of the parties, and well as evidence presented at trial, such as the 1099-C itself.

While interpretation of a contract can be a matter of law for the court (*Parsons v.

Bristol Development Co.,* 62 Cal.2d 861 (1965)), it is a question of fact for the jury if

ascertaining the intent of the parties at the time the contract was executed depends on the

---

[3] John Bourdeau, *Restitution and Implied Contracts*, 66, OCLC 424543049.
[4] See, e.g., Graham Virgo, *The Principles of the Law of Restitution*, p.11, New York: Oxford University Press (2006).

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT PNC BANK, N.A.'s
MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY ADJUDICATION

credibility of extrinsic evidence. *City of Hope National Medical Center v. Genentech, Inc.*, 43 Cal.4th 375, 395 (2008).

Moreover, in March of 2015 Plaintiff contracted with attorney Malika Noel at Housing and Economic Rights Advocates ("HERA") who then corresponded with representatives of VIDA Capital Group, LLC and Diversified Loan Services, Inc. regarding the loan then-serviced by PNC (DMF No. 2). That series of correspondence ("HERA Letters") alleged violations of the Fair Debt Buying Practices Act (Ca. Civ. Code § 1788 et seq.), the Federal Fair Debt Collection Practices Act (15 U.S.C. § 1692 et seq.), and among statutes, the Rosenthal Act (Cal. Civ. Code § 1788 et seq.). On April 27, 2015, in response to VIDA's offer of the possibility of a loan modification, HERA wrote another letter, reiterating the state and federal debt collections violations while noting that Ms. Habtemariam had been contacted by U.S. Mortgage Resolution about the loan almost five years after the cancellation of the debt. On May 22, 2015 sent another letter to VIDA again reiterating their violations of the law, but offering $600.00 in settlement if VIDA agreed to cease foreclosure activity, record a reconveyance, and release Ms. Habtemariam from liability. Having heard nothing from VIDA for several months, attorney Noel from HERA sent a letter on behalf of Ms. Habtemariam to VIDA on July 7, 2015 with the express assumption that VIDA had abandoned collection efforts and would not be pursing foreclosure. In response to an apparent email, and emphasizing both that the 1099-C cancelled the debt and Ms. Habtemariam could simply file bankruptcy to strip Vida's lien on the mortgage that was upside down, a $2,500.00 settlement was offered.

Ultimately, after another interregnum of silence from VIDA, Plaintiff assumed that VIDA had given up on the notion that the 1099-C debt cancellation was not in fact a debt cancellation, and decided not to file for bankruptcy. In justifiably relying on VIDA's objective inaction in pursuing debt collection or foreclosure, Plaintiff decided not to file for bankruptcy, to her profound detriment.

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT PNC BANK, N.A.'s MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY ADJUDICATION

**E.     Violation of California Civil Code § 2942(a) Brings Rise to a Legitimate Negligence Claim, as Does PNC's New Admission that Issuance of the 1099-C was a "Mistake" Which is Prima Facie Evidence of Negligence in and of Itself.**

The prima facie standard for negligence in California requires the establishment of four elements: (1) the defendant had a legal duty to conform to a standard of conduct to protect Plaintiff; (2) the defendant failed to meet that standard of conduct; (3) the defendant's failure was the proximate or legal cause of the resulting injury, and (4) the Plaintiff was damaged. *Ladd v. County of San Mateo*, 12 Cal.4th 913, 917 (1996).

Plaintiff's cause of action for negligence is indeed predicated upon the fact that because PNC cancelled the debt through the issuance of the 1099-C and its objective actions were consistent with that cancellation, no lender-borrower relationship existed at the time of the filing of this lawsuit, and therefore PNC is not entitled to the protection of a negligence claim that would otherwise be afforded to it pursuant to *Nymark v. Heart Federal Savings*, 231 Cal. App. 3d 1089 (1991). When PNC then failed to record a release of the Deed of Trust within thirty days, it violated Civil Code §2941(a), causing Plaintiff damages pleaded in the second amended complaint.

As noted above, this isn't PNC's first rodeo. In *Habtemariam, supra* *5, this Court correctly addressed PNC's contention that it owed Plaintiff no duty under *Nymark* as follows:

> The fact that PNC cancelled Plaintiff's SDOT [second dead of trust], and therefore terminated its status as Plaintiff's lender, makes it impossible for PNC to now argue that any duty exception otherwise applicable to lenders applies in this case. Moreover, even if the Court were to consider PNC a lender for purposes of a duty analysis, PNC nonetheless acted outside the role of a conventional lender in taking the actions it allegedly took here, and consequently cannot argue that the exceptions applies [citations omitted]. Furthermore, a mortgagee is obligated to execute a certificate of discharge within thirty days after any mortgage has been satisfied. Cal. Civ. Code § 2941(a). In this case, PNC allegedly cancelled the debt, but failed to perform their duty of recording a release of lien on the subject property [citation

omitted]. Additionally, PNC sold an assignment to the cancelled SDOT, thereby exposing Plaintiff to illegal collection activities, and an illegal non-judicial foreclosure sale [citation omitted]. Therefore, Plaintiff properly alleged that PNC owed her a duty.

PNC now claims that the issuance of the 1099-C was a mistake, and notably, a mistake that PNC never corrected, attempted to correct, or notified the Plaintiff of having been made. If that claim is true, then it is first an admission of negligence, and if not, almost certainly having never corrected it, having never informed its servicers or debt collectors of this mistake's existence, is negligent in itself. What would remain is Plaintiff's proof of damages at trial resulting from this negligence.

If the issuance of the 1099-C was indeed a mistake, then PNC had the duty to, at minimum, inform Plaintiff that it was a mistake, or in the alternative, rescind completely or modify the 1099-C. It did neither. As it were, had PNC informed Plaintiff that the issuance of the 1099-C was a mistake, she would not have relied on it in her justified belief that the debt was cancelled, and would have filed for bankruptcy and stripped PNC's lien from the property. She did not, and a decade after the issuance of the 1099-C, continues to pay a very high economic and emotional price for PNC's negligence. As the HERA letters suggest, PNC's negligence and cavalier indifference were a substantial factor in causing harm to Plaintiff.

## F.   For the Same Reasons Set Forth Above – PNC's Cancellation of the Debt – Plaintiff's Claim for Declaratory Relief is Valid.

PNC asserts that because there is no actual controversy as to Vida's right to foreclose or the fact of Plaintiff's default under the Loan, and that because PNC did not cancel, discharge or forgive the Loan, and that it was under no obligation to release the Deed of Trust, it naturally follows that declaratory relief would be improper (MTN. p. 16, 19-22). That position only begs the ultimate question before this Court, and puts forth a circular straw man argument – because PNC's 1099-C position is the only possible correct one, then declaratory relief is impossible, attacking an argument that Plaintiff has obviously never made. Such an argument may be appropriate in a demurrer or a motion to dismiss, but here it

simply relies on the assumption that this Court will find that the 1099-C did not in fact operate as an instrument of debt cancellation.

## V.     <u>CONCLUSION</u>

PNC could have in good faith worked with Plaintiff to obtain a workable loan modification. Whether by inadvertence, negligence, neglect, or greed, and it did not. Plaintiff could have filed for Chapter 13 bankruptcy, effectively stripping PNC's security interest in the Property, and she did not (DMF No. 2). She justifiably relied on PNC's discharge of the debt to her detriment.

PNC's Motion for Summary Judgment or in the Alternative Partial Summary Adjudication is without merit, as there are multiple issues of material triable fact, and Plaintiff deserves her day in court before a jury of her peers. PNC's present motion should therefore be denied in its entirety.

Respectfully submitted,


Dated: June 15, 2020                    LAW OFFICES OF TED A. GREENE, INC.


                                        Glen F. Olives, Esq.
                                        Attorneys for Plaintiff Genet Habtemariam

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT PNC BANK, N.A.'s
MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY ADJUDICATION

Glen F. Olives, Esq. (SBN 196854)
LAW OFFICES OF TED A. GREENE, INC.
1912 F Street, Suite 110
Sacramento, CA 95811
(916) 442-6400
Fax: (916) 266-9285
golives@tedgreenelaw.com

Attorneys for Plaintiff,
GENET HABTEMARIAM

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFIFORNIA

| | |
|---|---|
| GENET HABTEMARIAM,<br><br>Plaintiff,<br><br>vs.<br><br>VIDA CAPITAL GROUP, LLC; US MORTGAGE RESOLUTION; PNC BANK, NATIONAL ASSOCIATION S/B/M NATIONAL CITY MORTGAGE; and DOES 1 to 50, inclusive,<br><br>Defendants. | CASE NO. 2:16-cv-01189-MCE-AC<br><br>**SEPARATE STATEMENT OF UNDISPUTED AND DISPUTED FACTS IN OPPOSITION TO DEFENDANT PNC'S MOTION FOR SUMMARY JUDGMENT / PARTIAL SUMMARY ADJUDICATION**<br><br>Date:        July 9, 2020<br>**Time:        2:00 p.m.**<br>**Courtroom: 7, 14th Floor** |

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

Pursuant to Local Rule 260(b), Plaintiff Genet Habtemariam ("Habtemariam") submits the following separate statement of admitted undisputed facts together with a statement of disputed facts, in support of its opposition to Defendant PNC Bank, N.A. ("PNC") Motion for Summary Judgement / Partial Summary Adjudication, pursuant to Federal Rule of Civil Procedure 56.

| PNC'S FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| **1.** Plaintiff purchased 7 Shipman Court, Sacramento CA 95823 (the "Property") in 2001 for $210,000. | **1.** Undisputed. |
| **2.** From 2001-2005 Plaintiff used the Property as a rental. | **2.** Undisputed. |
| **3.** In 2005, Plaintiff moved into the Property and has lived there ever since. | **3.** Undisputed. |
| **4.** Plaintiff obtained a first lien loan in favor of Gateway Bank in March 2007 for $348,000 (the "Gateway Loan"). | **4.** Undisputed. |
| **5.** The Gateway Loan went into default, and Plaintiff obtained a loan modification in September 2009 with a new balance of $389,999.65. | **5.** Undisputed. |
| **6.** Plaintiff obtained a second position Loan in favor of PNC (then National City Bank) in June of 2007 for $43,500.00 (the "Loan). | **6.** Undisputed. |
| **7.** Plaintiff admits that the Loan went into default in approximately April of 2009. | **7.** Undisputed. |
| **8.** Plaintiff admits that loan modification and short sale efforts for the Loan failed. | **8.** Undisputed. |
| **9.** Short sale attempts failed because the first lienholder, Gateway, did not consent to such a sale. | **9.** Undisputed. |
| **10.** Plaintiff admits that she knew she had to repay the Loan. | **10.** Undisputed. |
| **11.** Plaintiff admits that she knew she had to make monthly payments on the Loan until it was paid off in full. | **11.** Undisputed. |
| **12.** Plaintiff admits that she knew PNC | **12.** Undisputed. |

SEPARATE STATEMENT OF UNDISPUTED AND DISPUTED FACTS IN OPPOSITION TO DEFENDANT PNC'S MOTION FOR SUMMARY JUDGMENT / PARTIAL SUMMARY ADJUDICATION

| | |
|---|---|
| could foreclose upon the Property if she failed to make monthly payments on the Loan. | |
| **13.** Plaintiff understood that PNC could sell or transfer the Loan. | **13.** Undisputed. |
| **14.** Plaintiff understood that she was obligated to repay the Loan and make monthly payments even if she didn't receive collection notices or monthly statements from PNC. | **14.** Undisputed. |
| **15.** PNC sent a 1099-C Form to Plaintiff, which was received by Plaintiff in June of 2010. | **15.** Undisputed. |
| **16.** By issuing the 1099-C, PNC did not intend to cancel, void, discharge, or forgive the loan. | **16.** Disputed. As a matter of law, by issuing the 1099-C, PNC intended to cancel, void, discharge or forgive the loan. Habtemariam Depo., 38:21-25; 39:1. |
| **17.** On February 16, 2010, the Loan was approved to be charged off for accounting purposes, with the lien to be retained. | **17.** Undisputed. |
| **18.** PNC's internal records reflect that the Loan was designated as "charge off...with lien retained." | **18.** Undisputed. |
| **19.** PNC did not intend to release Plaintiff of her obligations under the Loan. | **19.** Disputed. Issuance of the 1099-C is prima facie evidence of PNC's intent to release Plaintiff of her obligations under the loan. |
| **20.** PNC never informed Plaintiff that it would release its lien secured by the Property. | **20.** Undisputed. |
| **21.** PNC never informed Plaintiff that the Loan was discharged, forgiven, void, or cancelled. | **21.** Disputed. PNC informed Plaintiff by conduct when it discontinued collection and/or foreclosure activity. Habtemariam depo. 29: 18-25. Habtemariam decl. ¶ 4. |
| **22.** PNC never instructed Plaintiff to claim the balance of the Loan as income. | **22.** Undisputed. |
| **23.** PNC never informed Plaintiff that she could cease making payments on the Loan. | **23.** Undisputed. |
| **24.** PNC's records indicated that the Form 1099-C was issued by mistake. | **24.** Disputed. Other than PNC's declaration, there is no evidence that the 1099-C was issued by mistake and |

|  | Plaintiff received no notice of any mistake. Habtemariam declaration ¶ 10. |
|---|---|
| **25.** Plaintiff never paid any taxes on the balance of the loan. | **25.** Undisputed. |
| **26.** Plaintiff solely bases her contention that she had to report the Loan balance as income upon receipt of the 1099-C. | **26.** Disputed. Unintelligible. |
| **27.** On April 26, 2010, PNC sent a letter to Plaintiff (the "April 2010 Letter"). Plaintiff received the letter on May 15, 2010. | **27.** Undisputed. |
| **28.** The April 2010 Letter states that PNC's investor indicated that PNC could stop trying to collect from Plaintiff on account of the Loan. | **28.** Undisputed. |
| **29.** The April 2010 Letter states that the decisions to cease collection activity "does not release [Plaintiff] from [her] obligation to pay off [the] loan." | **29.** Undisputed. |
| **30.** The April 2010 Letter, PNC stated that it may release its lien if the Property is foreclosed upon by the first lienholder. | **30.** Undisputed. |
| **31.** Plaintiff admits that per the terms of the April 2010 Letter, PNC was not going to release its lien. | **31.** Undisputed. |
| **32.** The April 2010 Letter further states that "PNC Mortgage will report this decision to the Credit Bureau as a code 97 ("unpaid balance reported as a loss by credit grantor")". | **32.** Undisputed. |
| **33.** Plaintiff admits that she did not dispute the credit reporting of the Loan, as outlined in the April 2010 Letter. | **33.** Undisputed. |
| **34.** Plaintiff agrees that the credit reporting on the Loan by PNC was accurate. | **34.** Disputed. Plaintiff stated that the credit reporting on the Loan by PNC was inaccurate. Habtemariam Depo., 62: 11-19. |
| **35.** Plaintiff did not contact PNC to arrange for payment of the Loan, as the April 2010 Letter instructed her to do. | **35.** Undisputed. |
| **36.** Plaintiff admits the April 2010 Letter does not state that the Loan was discharged. | **36.** Undisputed. |
| **37.** Plaintiff admits the April 2010 Letter | **37.** Undisputed. |

SEPARATE STATEMENT OF UNDISPUTED AND DISPUTED FACTS IN OPPOSITION TO DEFENDANT PNC'S MOTION FOR SUMMARY JUDGMENT / PARTIAL SUMMARY ADJUDICATION

| | |
|---|---|
| does not state that the loan was cancelled. | |
| **38.** Plaintiff admits the April 2010 Letter was forgiven. | **38.** Undisputed. |
| **39.** Plaintiff admits the April 2010 Letter does not state that she should claim the Loan balance as income. | **39.** Undisputed. |
| **40.** Plaintiff did not send any correspondence disputing the April 2010 Letter. | **40.** Undisputed. |
| **41.** Plaintiff admits that the phrase "an attempt to collect a debt" in the April 2010 Letter indicates the Loan was still in existence and that PNC Could collect on it. | **41.** Undisputed. |
| **42.** On May 5, 2012, PNC sent Plaintiff a letter stating that the servicing of the Loan would be transferred to BSI Financial Services, Inc. ("BSI"). | **42.** Undisputed. |
| **43.** Thereafter, the Loan was transferred to USMR. | **43.** Undisputed. |
| **44.** On July 17, 2012, USMR sent Plaintiff a Fair Debt Collection Practices Act debt validation notice. | **44.** Undisputed. |
| **45.** Plaintiff did not dispute the July 17, 2012 letter in writing within thirty (30) days. | **45.** Undisputed. |
| **46.** Plaintiff admits that the July 17, 2012 letter is inconsistent with the idea that the Loan was cancelled. | **46.** Undisputed. |
| **47.** USMR sent Plaintiff three loss mitigation letters dated July 23, 2012, July 23, 2012, and July 25, 2012. | **47.** Disputed. There were two loss mitigation letters date July 23, 2012 and July 25, 2012. Habtemariam Depo. 43-47. |
| **48.** Plaintiff concedes that the letters dated July 23, 2012, July 23, 2012, and July 25, 2012, appear to be attempts to collect on the Loan and are inconsistent with the idea that the Loan was cancelled. | **48.** Undisputed. |
| **49.** Diversified Loan Services ("DLS") sent letters to Plaintiff dated December 18, 2014, January 5, 2015, January 15, 2015, and February 17, 2015. | **49.** Undisputed. |
| **50.** Plaintiff concedes that the letters dated December 18, 2014, January 5, 2015, | **50.** Undisputed. |

SEPARATE STATEMENT OF UNDISPUTED AND DISPUTED FACTS IN OPPOSITION TO DEFENDANT PNC'S MOTION FOR SUMMARY JUDGMENT / PARTIAL SUMMARY ADJUDICATION

| | |
|---|---|
| January 15, 2015, and February 17, 2015, appear to be attempts to collect the Loan and are inconsistent with the idea that the loan was cancelled. | |
| **51.** No holder or servicer of the Loan ever told Plaintiff that the Loan was discharged. | **51.** Undisputed. |
| **52.** No holder or servicer of the Loan ever told Plaintiff that the Loan was forgiven. | **52.** Undisputed. |
| **53.** No holder or servicer of the Loan ever told Plaintiff that the Loan was cancelled. | **53.** Undisputed. |
| **54.** No holder or servicer of the Loan ever told Plaintiff that she could cease making payments on the Loan. | **54.** Undisputed. |
| **55.** No holder or servicer of the Loan ever told Plaintiff that they would release the lien on the Property. | **55.** Undisputed. |
| **56.** PNC never told Plaintiff it would cancel the Note. | **56.** Undisputed. |
| **57.** PNC never told Plaintiff it would cancel the Deed of Trust. | **57.** Undisputed. |
| **58.** PNC never told Plaintiff it could no longer sell or transfer the Lone. | **58.** Undisputed. |
| **59.** PNC never told Plaintiff she could sell the Property and not pay off the Loan. | **59.** Undisputed. |
| 60. Plaintiff solely bases her contention that the Loan was cancelled or void due to receipt of the 1099-C. | **60.** Disputed. Plaintiff also bases her contention that the Loan was cancelled or void due to the fact that collection efforts were halted. Habtemariam Depo., 29: 18-25; ¶¶ 4-7. |
| **61.** Plaintiff solely bases her contention that the Loan forgiven [sic] upon receipt of the 1099-C. | **61.** Disputed. Plaintiff also bases her contention that the Loan was cancelled or void due to the fact that collection efforts were halted. Habtemariam Depo., 37:20-25; Habtemariam Declaration, ¶¶ 4-7. |
| **62.** Plaintiff admits she has not received any notice related to any settlement involving PNC. | **62.** Undisputed. |
| **63.** Plaintiff has not received any settlement check, related to any settlement involving this Loan. | **63.** Undisputed. |
| **64.** Plaintiff has not received any release | **64.** Undisputed. |

| | |
|---|---|
| related to any settlement involving the Loan. | |
| **65.** Plaintiff has no evidence that the Loan was involved in any settlement whatsoever. | **65.** Undisputed. |
| **66.** Plaintiff estimates the value of the Property to have been $300,000 in early 2016. | **66.** Undisputed. |
| **67.** The balance of the Gateway Loan at the time of the sale was $372,000. | **67.** Undisputed. |
| **68.** PNC did not foreclose on the Property. | **68.** Undisputed. |
| **69.** PNC is not in possession of any of Plaintiff's money or property. | **69.** Undisputed. |
| **70.** Plaintiff did not make any payments to PNC after issuance of the 1099-C. | **70.** Undisputed. |
| **71.** Plaintiff does not contend that PNC failed to account for any of her payments on the Loan. | **71.** Undisputed. |
| **72.** Plaintiff is still in possession of the Property. | **72.** Undisputed. |
| **73.** Plaintiff never contacted PNC regarding the 1099-C. | **73.** Undisputed. |
| **DISPUTED MATERIAL FACT** | **SUPPORTING EVIDENCE** |
| 1. Plaintiff relied on *both* the 1099-C and the fact that PNC or its loan servicers/debt collectors/debt buyers/investors ceased collection efforts at various times, including between 6/29/2010 to 5/5/2012 in her reasonable belief that the debt had been cancelled. | Habtemariam depo., 84: 13-19, 87: 21-25, 88: 1-23, 89: 3-11, 15-19, 90: 16-25, 91: 9-17, 96: 3-9, 97: 21-25, 98: 1-3, 17-21; Habtemariam declaration, ¶¶ 3 – 6. |
| 2. Plaintiff detrimentally relied on the cancellation of the debt by not filing for Chapter 13 bankruptcy which would have stripped PNC's junior lien. | Habtemariam declaration, ¶ 9. |
| 3. Plaintiff was never notified by PNC or any other entity that the issuance of the 1099-C was a mistake, and never received a corrected 1099-C. | Habtemariam declaration, ¶ 10. |

1

Dated: _06/15/2020_

LAW OFFICES OF TED A. GREENE, INC.

2

3

4

Glen F. Olives, Esq.

5

Attorneys for Plaintiff Genet Habtemariam

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SEPARATE STATEMENT OF UNDISPUTED AND DISPUTED FACTS IN OPPOSITION TO DEFENDANT PNC'S MOTION
FOR SUMMARY JUDGMENT / PARTIAL SUMMARY ADJUDICATION

1   Glen F. Olives, Esq. (SBN 196854)
    LAW OFFICES OF TED A. GREENE, INC.
2   1912 F Street, Suite 110
3   Sacramento, CA 95811
    (916) 442-6400
4   Fax: (916) 266-9285
5   golives@tedgreenelaw.com

6   Attorneys for Plaintiff,
    GENET HABTEMARIAM
7

8              UNITED STATES DISTRICT COURT
9
10            EASTERN DISTRICT OF CALIFIORNIA

11  GENET HABTEMARIAM,                    CASE NO. 2:16-CV-01189-MCE-AC

12              Plaintiff,                Magistrate Judge Allison Claire
13
14      vs.                              **DECLARATION OF GLEN F. OLIVES
                                         IN OPPOSITION TO DEFENDANT
15  VIDA CAPITAL GROUP, LLC; US          PNC BANK, N.A.'s MOTION FOR
    MORTGAGE RESOLUTION; PNC             SUMMARY JUDGMENT OR
16  BANK, NATIONAL ASSOCIATION           PARTIAL SUMMARY
    S/B/M NATIONAL CITY                  ADJUDICATION**
17  MORTGAGE; and DOES 1 to 50,
18  inclusive,                           **Date:      July 9, 2020
                                         Time:       2:00 p.m.**
19              Defendants.              **Courtroom: 7, 14th Floor**
20

21      I, Glen F. Olives, state and declare as follows:

22      1.      I am an attorney at law duly licensed to practice before the U.S. District Court

23  for the Eastern District of California. I am an attorney at Law Offices of Ted A. Greene, Inc.,

24  attorneys of record for Plaintiff Genet Habtemariam ("Plaintiff").

25      2.      I have personal knowledge of the facts set forth herein and could and would

26  competently testify to them if called to do so in the court of law. As to all other matters, I

27  have conducted a diligent inquiry and can testify to such matters on information and belief.

28

                                            1
                        DECLARATION OF GLEN F. OLIVES

3.      Attached hereto as Exhibit 6, is a true and correct copy of relevant excerpts of the transcript of the deposition of Plaintiff Genet Habtemariam which took place on September 11, 2019.

I declare under the penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this document was executed on the 15 th day of June at Sacramento, California.

_____

GLEN F. OLIVES

2
DECLARATION OF GLEN F. OLIVES

# EXHIBIT 6

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

GENET HABTEMARIAM,                      )
                                        )
                Plaintiff,              )
                                        )
        vs.                             ) Case No.
                                        )
VIDA CAPITAL GROUP, LLC; US             ) 2:16-cv-01189
MORTGAGE RESOLUTION; PNC BANK,          ) -MCE-AC
NATIONAL ASSOCIATION S/B/M              )
NATIONAL CITY MORTGAGE and              )
DOES 1 to 50, inclusive,                )
                                        )
                Defendants.             )
_____ )

DEPOSITION OF GENET HABTEMARIAM

SACRAMENTO, CALIFORNIA

Wednesday, September 11, 2019

REPORTED BY:
Theresa Nadeau, CSR No. 10526

JOB NO.: 45212

GENET HABTEMARIAM

September 11, 2019

1     Q.   Did PNC ever inform you that it would release

2  its lien?

3     A.   No.

4     Q.   Did PNC ever tell you to stop making payments

5  on the loan?

6     A.   No.

7     Q.   Did PNC ever tell you to claim the balance of

8  the loan as income?

9         MR. ENGEBRETSON:  Objection, calls for

10  speculation and calls for a legal opinion.  You can

11  answer to the extent that you have -- to the extent that

12  you know.

13         THE WITNESS:  I have to ask you.

14         MR. CAHILL:  Would you like me to repeat?

15         MR. ENGEBRETSON:  Sorry about that.

16         THE WITNESS:  I'm sorry.

17  BY MR. CAHILL:  It's the nature of objections.

18     Q.   Did PNC ever tell you to claim the balance of

19  the loan as income?

20     A.   No.

21     Q.   Did PNC ever tell you that the loan had been

22  forgiven?

23     A.   Yes.

24     Q.   And when did they tell you that?

25     A.   They send me the 1099 with the cancellation of

GENET HABTEMARIAM

September 11, 2019

```
 1   debt.
 2        Q.    When did you receive that 1099?
 3        A.    In June 2010.
 4        Q.    Besides the 1099-C, has PNC ever told you that
 5   the loan had been forgiven?
 6        A.    No.
 7        Q.    Has PNC ever told you that the loan had been
 8   discharged?
 9        A.    Yes.   When I get the 1099-C.
10        Q.    And outside of the 1099-C, has PNC ever told
11   you that the loan has been discharged?
12        A.    No.
13        Q.    And outside of the 1099-C, has PNC ever told
14   you that the loan has been canceled?
15        A.    No.
16        Q.    Has PNC ever told you that the loan was
17   unenforceable?
18              MR. ENGEBRETSON:   Outside of the 1099-C?
19              MR. CAHILL:   Outside of the 1099-C.
20              THE WITNESS:   What does enforceable mean?
21   BY MR. CAHILL:
22        Q.    Good question.   I might need to break that
23   down.
24        A.    Okay.   I'm sorry.
25        Q.    Did PNC ever tell you that it no longer had a
```

```
 1      A.   Correct.

 2      Q.   So PNC is not in possession of any of your

 3 money or property, correct?

 4      A.   No.

 5      Q.   After the foreclosure sale held by Vida

 6 Capital, did you pull your credit report?

 7      A.   I did.

 8      Q.   Was the foreclosure reported on that credit

 9 report?

10      A.   No.

11      Q.   Earlier we discussed how PNC would report this

12 loan to the credit bureaus.  Do you remember that?

13      A.   Yes.

14      Q.   Do you believe that that reporting hurt your

15 credit rating?

16      A.   Yes.

17      Q.   Do you believe that that credit reporting was

18 inaccurate?

19      A.   Yes.

20      Q.   At the beginning of the day you stated that you

21 still lived in the property, correct?

22      A.   Correct.

23      Q.   So you have not been evicted from the property.

24      A.   No.

25      Q.   So I assume no personal property or personal
```

 1   Resolutions?

 2       A.   **No.**

 3       Q.   When you called U.S. Mortgage Resolutions, did

 4   they tell you that the debt was canceled?

 5       A.   **No.**

 6       Q.   Did they tell you that the debt was forgiven?

 7       A.   **No.**

 8       Q.   Did they tell you that the debt was discharged?

 9       A.   **No.**

10       Q.   Did they tell you that they were going to

11   release the lien?

12       A.   **No.**

13       Q.   And again, this letter would be inconsistent

14   with the debt being canceled, correct?

15       A.   **I don't know what it means.**

16       Q.   That's fair.  Let me rephrase.  If the debt

17   were canceled, this letter that you received would be

18   contrary to that, correct?

19       A.   **Correct.**

20       Q.   I'm going to hand you another document that we

21   will mark as Exhibit 11.

22            (Defendants' Exhibit 11 was marked for

23            identification.)

24   BY MR. CAHILL:

25       Q.   This is a letter dated July 23, 2012 from U.S.

GENET HABTEMARIAM

```
 1   Mortgage Resolution to yourself, correct?
 2        A.   Yes.
 3        Q.   Did you receive this letter?
 4        A.   Yes.
 5        Q.   Did you read this letter?
 6        A.   Yes.
 7        Q.   Under the section that says Take Action Now in
 8   bold, it states, "We hold your mortgage and we want to
 9   help."  Correct?
10        A.   Correct.
11        Q.   And then down at the bottom there's a
12   disclaimer, and in part it says, "We are a debt
13   collector," correct?
14        A.   Correct.
15        Q.   Did you respond to this letter?
16        A.   Well, I told them I got the 1099-C, the debt is
17   canceled, so I don't owe anything to U.S. Mortgage
18   Resolution.
19        Q.   Again, assuming that the loan was indeed
20   canceled, this letter would have been inconsistent with
21   that, correct?
22        A.   Correct.
23        Q.   And is it fair to say that the general content
24   of this letter is an offer to discuss a potential loan
25   modification?
```

```
 1          MR. ENGEBRETSON:  Objection, calls for
 2   speculation, but you can give your opinion.
 3          THE WITNESS:  Well, I was really -- I thought
 4   the debt was canceled so I don't have to worry about
 5   that loan anymore.
 6   BY MR. CAHILL:
 7      Q.   So I'm just asking as to the content of this
 8   letter, does it look like they want to discuss a loan
 9   modification?
10      A.   Yes.
11      Q.   I'm going to pass you another document that
12   we'll mark as Exhibit 12.
13          (Defendants' Exhibit 12 was marked for
14           identification.)
15   BY MR. CAHILL:
16      Q.   This is another letter dated July 23, 2012 from
17   U.S. Mortgage Resolutions to yourself, correct?
18      A.   Correct.
19      Q.   And it states in bold, "You're eligible for
20   U.S. Mortgage Resolution's fast track mediation
21   program," correct?
22      A.   Correct.
23      Q.   Right after that it states, "Your loan is in
24   default," correct?
25      A.   Correct.
```

```
 1      Q.   Further down on the page it says, "We are not a
 2   loan modification or debt settlement company.  We are
 3   your loan servicer."  Correct?
 4      A.   Correct.
 5      Q.   Again, at the bottom in the disclaimer they
 6   state that, "We are a debt collector," correct?
 7      A.   Yes.
 8           MR. ENGEBRETSON:  Down here.
 9           THE WITNESS:  Correct.
10   BY MR. CAHILL:
11      Q.   Did you respond in writing to U.S. Mortgage
12   Resolution to this letter?
13      A.   No.
14      Q.   Again, it seems that this letter -- in this
15   letter U.S. Mortgage Resolution wishes to discuss a
16   potential loan modification, correct?
17      A.   Correct.
18      Q.   And again, if we were to assume the loan had
19   been forgiven, this letter would have been inconsistent
20   with that, correct?
21      A.   Correct.
22      Q.   Hand you another document that we are going to
23   mark as Exhibit 13.
24           (Defendants' Exhibit 13 was marked for
25           identification.)
```

```
 1   BY MR. CAHILL:
 2        Q.   This is a July 25th, 2012 letter from U.S.
 3   Mortgage Resolution to yourself, correct?
 4        A.   Correct.
 5        Q.   And this appears identical to the prior
 6   exhibit, correct?
 7             MR. ENGEBRETSON:   Could she take a look at 12
 8   just to --
 9             THE WITNESS:   Yes.
10   BY MR. CAHILL:
11        Q.   And you received this letter?
12        A.   Yes.
13        Q.   Did you read it?
14        A.   I did.
15        Q.   And it seems that in this letter U.S. Mortgage
16   Resolutions is seeking to discuss a loan modification,
17   correct?
18        A.   Correct.
19        Q.   And again, assuming that this loan had been
20   canceled, this letter would have been inconsistent with
21   that, correct?
22        A.   Correct.
23        Q.   I'm going to hand you another document, mark it
24   as Exhibit 14.
25             (Defendants' Exhibit 14 was marked for
```

GENET HABTEMARIAM

September 11, 2019

```
 1      A.    Yes.   This is 2010.
 2      Q.    Yeah, April 26, 2010.  And then the first
 3  paragraph of the letter marked Exhibit 7, previously
 4  marked as Exhibit 7, it states that this letter serves
 5  as a notice that pursuant to investor approval, PNC
 6  Mortgage, a division of PNC Bank, NA, has been
 7  authorized to discontinue collection and/or foreclosure
 8  activity with respect to the property located at
 9  7 Shipman Court, Sacramento, California 95823.
10      A.    Correct.
11      Q.    And you understood that this paragraph
12  referenced the delinquency issues referenced in the
13  prior three letters that we discussed.
14      A.    Yes.
15      Q.    Correct?
16      A.    Correct.
17            MR. CAHILL:  I'm sorry, I didn't quite follow
18  that.
19  BY MR. ENGEBRETSON:
20      Q.    Let me see if I can rephrase it in a way that
21  draws out.  Exhibit 2, 3 and 4 which we just discussed.
22      A.    Yes.
23      Q.    Fair to say they deal with your delinquency on
24  the PNC loan for the subject property?
25      A.    Correct.
```

GENET HABTEMARIAM

```
 1        Q.    Then you receive -- I believe the next
 2   chronologically is Exhibit No. 7 dated April 26, 2010
 3   from PNC Mortgage to yourself.
 4        A.    Correct.
 5        Q.    And that letter states that they have -- that
 6   they are discontinuing collection and/or foreclosure
 7   activity, correct?
 8        A.    Correct.
 9        Q.    And that collection of foreclosure activity is
10   related to the property at 7 Shipman Court?
11        A.    Correct.
12        Q.    And that is the same property that is the
13   subject of Exhibit No. 4, which is the letter dated July
14   17th, 2009?
15        A.    Correct.
16        Q.    And that's the same property that is the
17   subject of Exhibit 3, the letter dated June 16th, 2009?
18        A.    Yes.
19        Q.    And again, the same property that was the
20   subject of Exhibit 2 dated April 8th, 2009.
21        A.    Yes.
22        Q.    So you understood that Exhibit 7 dealt with the
23   same set of issues as Exhibits 2, 3 and 4.
24        A.    Correct.
25        Q.    The next one chronologically is Exhibit No. 8,
```

1    which is a letter from -- appears to be a letter from

2    PNC Mortgage dated May 18th, 2010 to yourself; is that

3    accurate?

4         A.    Yes, it's accurate.

5         Q.    And you received this letter dated May 18th,

6    2010 after you received Exhibit No. 7 dated April 26,

7    2010.

8         A.    Correct.

9         Q.    And in the exhibit previously marked as number

10   eight, it says that PNC has reviewed your loan and found

11   that you are deficient and did not qualify for a loan

12   modification or payment plan at this time.  Do you see

13   that?

14        A.    Yeah, I do.

15        Q.    And that was your understanding of what the

16   content of this letter was at the time you received it.

17        A.    Correct.

18        Q.    So in Exhibit 7 they said they were

19   discontinuing collection activity, correct?

20        A.    Correct.

21        Q.    Exhibit 8 they said you don't qualify for

22   repayment or modification, correct?

23        A.    Correct.

24        Q.    The next --

25        A.    Repayment plan.

GENET HABTEMARIAM

September 11, 2019

1 Q. A repayment plan or loan modification, correct?

2 **A. Correct.  Yes.**

3 Q. And the next document that you received

4 chronologically appears to have been the previously

5 marked Exhibit No. 5, the 2010 1099-C, which has a date

6 canceled here of 6/29/2010.  Do you see that there?

7 **A. Yes.**

8 Q. To the best of your recollection, did you

9 receive Exhibit 5, the 1099-C, after the exhibits we

10 have just discussed which are two, three, four, seven

11 and eight?

12 **A. Yes.**

13 Q. Did you understand that the -- well, let me

14 strike that and try this again.

15  The property description in the 1099-C is

16 7 Shipman Court, Sacramento, California 95823, correct?

17 **A. Correct.**

18 Q. And that is the same property in these other

19 exhibits, correct?

20 **A. Correct.**

21 Q. And so it was your understanding that this

22 Exhibit 5 dealt with the same issues that have been

23 dealt with in Exhibits 8, 7, 4, 3 and 2?

24  MR. CAHILL:  Objection, vague and calls for

25 expert testimony.  What do you mean by issues?

GENET HABTEMARIAM

1    received it?

2        A.    Yes.

3        Q.    And the instructions for debtor were the back

4    side of the form 1099-C?

5        A.    Correct.

6        Q.    And was it your understanding at the time that

7    you received Exhibit 5 that the instructions for debtor

8    were part and parcel of the 1099-C?

9        A.    Yes.

10       Q.    And that they in fact referred to instructions

11   relevant to the 1099-C.

12       A.    Correct.  Yeah.

13       Q.    When you were -- when you first received

14   Exhibit 5, did your understanding of Exhibit 5 -- was it

15   informed in any manner by your prior communications from

16   PNC?

17       A.    Say it again for me.

18       Q.    Let me try that again.  You get Exhibit 5 in

19   the mail.

20       A.    Yes.

21       Q.    Right?  And you open it up and you look at it.

22   You're trying to figure out what it says, right?

23       A.    Uh-huh.

24       Q.    Let's start there.  Based on just the document

25   itself, is there anything in the walls of this document

GENET HABTEMARIAM

September 11, 2019

1  that helped you understand or form an opinion as to what

2  Exhibit 5 did?

3      A.   Well, I see it came from PNC Bank and I see in

4  the cancellation of debt, so in the amount, the address,

5  everything is mine, so I thought it's a cancellation of

6  debt that I was, you know, trying to get a modification

7  before, but now I got the cancellation of debt, so I

8  thought it resolves all the problem.

9      Q.   And let's -- I think you may have answered

10  this.  I'm pretty sure you've answered it for opposing

11  counsel, but in box two of Exhibit 5 it says amount of

12  debt canceled, and it's listed here as $46,134.46, and

13  is that to the best of your recollection approximately

14  the debt that was owed on the PNC loan at the time that

15  you received Exhibit 5?

16      A.   Yes.

17      Q.   Having received Exhibit 8, did you believe that

18  you were qualified for a loan modification from PNC?

19      A.   I was.  Because the interest rate was eight and

20  a half percent, so I asked to modify that loan for me.

21      Q.   I understand that you asked.  What I'm asking

22  is based on Exhibit 8, do you believe that you qualified

23  for a -- strike that horrible question.

24          Based on Exhibit 8, do you believe that PNC had

25  evaluated you to be qualified or eligible for a loan

GENET HABTEMARIAM
September 11, 2019

1     A.   Yes.

2     Q.   Based on that statement, do you believe that

3   PNC was going to give you a loan modification?

4     A.   No.

5     Q.   Based on that statement --

6     A.   I was denied.

7     Q.   Based on that statement do you believe that PNC

8   was going to give you a repayment plan?

9     A.   No.   They denied me.

10    Q.   So having received the 1099-C in Exhibit 5, my

11  understanding is that you contacted an attorney?

12    A.   Yes.   I wanted to know what it means and the

13  attorney told me that --

14    Q.   We're not going to discuss what he said.   I'm

15  just saying you talked to an attorney.

16    A.   Yes.

17    Q.   You talked to someone that helps you with your

18  taxes, correct?

19    A.   Yes.

20    Q.   And did that person give you any advice as to

21  filling out the 2010 Form 1040 U.S. Individual Income

22  Tax Return based on the receipt of the 1099-C?

23    A.   Yes.

24    Q.   And without getting into the details of what

25  she said, did you use that advice when completing the

```
 1    1040 U.S. Individual Income Tax Return for 2010,
 2    previously marked as Exhibit 6?
 3         A.   Well, I just gave her the 1099.  I don't know
 4    what she was doing, but I present the 1099 for that year
 5    I got the cancellation of debt.
 6         Q.   So you just gave the document to the tax
 7    person?
 8         A.   I did.  Yes.
 9         Q.   You eventually received the 1040 back, right?
10         A.   Yes.
11         Q.   And you previously discussed that under part
12    four you've reported the cancellation, but you offset it
13    so you paid no actual income tax on it, correct?
14         A.   I don't know how she did, but I took the 1099
15    and that's all I know, you know.  I wanted her to take
16    the responsibility to do whatever, you know.  So she
17    did.  I trusted her.  That's where I took my taxes all
18    the time.  So --
19         Q.   So let's just take a snapshot.  From the time
20    up to Exhibit 6, the time you filed your 1040 for
21    2020 -- or 2010, excuse me, it was -- was it your belief
22    at that time that the PNC loan debt had been canceled?
23         A.   Yes.
24         Q.   And that debt was -- and you based that belief
25    on the receipt of the 1099-C form in Exhibit 5?
```

GENET HABTEMARIAM

September 11, 2019

```
 1    go.  We previously examined Exhibit 9.  This is a Notice
 2    of Assignment, Sale or Transfer of Servicing Rights.
 3    You see that there?
 4         A.   Yeah.
 5         Q.   And it says that -- appears to say that your
 6    loan is being -- or the servicing of your loan is being
 7    transferred from PNC to BSI Financial Services.  Do you
 8    see that there?
 9         A.   Yes.
10         Q.   Then it says, "Effective with your next payment
11    due date on May 1, 2012."  You see that there?
12         A.   Yes.
13         Q.   Now, between receipt of the 1099-C on 6/29/2010
14    and the receipt of this letter which appears to be, I
15    think in the upper corner, May 5th, 2012.
16         A.   Yes.
17         Q.   Had you received any communication from PNC
18    attempting to collect on the loan?
19         A.   No.
20         Q.   Had you received any communication -- sorry.
21    In that same time period, had you received any
22    communication from PNC stating that the loan was still
23    valid or collectible?
24         A.   No.
25         Q.   Fair to say that this was the next
```

1   communication that you received regarding the loan?

2      A.   Yes.

3      Q.   If I understood your prior testimony

4   correctly -- well, let's not make that assumption.  When

5   you received this letter, what if any actions did you

6   take?

7      A.   **I didn't do anything because knowing that I**

8   **have the 1099-C, I thought it was some kind of**

9   **collector.  And the debt was canceled, so --**

10      Q.   So the next exhibit we have here is the

11   previously marked Exhibit 10 which is July 17th, 2012.

12   You see that there?

13      A.   Yes.

14      Q.   And this letter is two months after the letter

15   in Exhibit 9, correct?

16      A.   Yes.

17      Q.   And it appears that this is a letter from U.S.

18   Mortgage Resolution stating that it's a attempt to

19   collect on the debt from PNC.  Correct?

20      A.   Yes.

21      Q.   Now, just as a point of information, in line

22   one says as of July 17th, 2012 the principal amount of

23   debt is $42,846.54; is that correct?

24      A.   Correct.

25      Q.   And the amount of the debt canceled under the

GENET HABTEMARIAM

September 11, 2019

1    1099-C was $46,134.46, correct?

2        A.    Correct.

3        Q.    Those are not the same number, correct?

4        A.    They are not.

5        Q.    Now, you subsequently received Exhibits 11 and

6    12, and I'll represent that Exhibit 11 is dated July

7    23rd, 2012.  That's approximately five days after

8    Exhibit 10, correct?

9        A.    Yes.

10       Q.    You received Exhibit 12 also from U.S. Mortgage

11   Resolution also dated July 23rd, 2012.

12       A.    Okay.

13       Q.    You received a fourth letter from -- it says

14   Mortgage Resolution, but it has the same number and the

15   return address says U.S. Mortgage Resolution, on July

16   25th, 2012; is that correct?

17       A.    That's correct.  Yes.

18       Q.    So between the first letter which is Exhibit 10

19   to the last letter which is Exhibit 13, it's July 17th

20   to July 25th.

21       A.    Yes.

22       Q.    At some point, if I understand your prior

23   testimony correctly, in response to these letters you

24   contacted PNC or U.S. Mortgage Resolution.

25       A.    I contacted U.S. Mortgage Resolution.

1     Q.   And you did that via phone; is that correct?

2     A.   Yes.

3     Q.   And in sum what did you tell U.S. Mortgage

4  Resolution?

5     **A.   I told them that the amount of debt has been**

6  **canceled so I don't owe them anything.  So they asked me**

7  **for a copy of the 1099, so I mailed that out to U.S.**

8  **Mortgage Resolution.**

9     Q.   Do you recall the date that you sent the 1099-C

10  to U.S. Mortgage Resolution?

11    **A.   No, I don't.**

12     Q.   Do you think it may have been after the Exhibit

13  13 which is dated July 25th, 2012?

14    **A.   Definitely, yes.**

15     Q.   So it was after you received these four

16  letters, Exhibit 10, 11, 12 and 13, that you contacted

17  U.S. Mortgage Resolution and sent them the 1099-C.

18    **A.   Yes.**

19     Q.   After receiving the 1099-C, did you receive any

20  further letters or any letters from U.S. Mortgage

21  Resolution?

22    **A.   The last letter I got was in 2015 that the**

23  **servicing is transferred to Vida.**

24     Q.   Okay.  Fair enough.  After sending the 1099-C

25  to U.S. Mortgage Resolution in 2012, did U.S. Mortgage

GENET HABTEMARIAM

September 11, 2019

1   Resolution make any efforts to collect on the PNC debt?

2        A.    No.

3        Q.    After you sent the two thousand -- the 1099-C

4   to U.S. Mortgage Resolution in 2012, did U.S. Mortgage

5   Resolution attempt to foreclose on the property?

6        A.    No.

7        Q.    Do you have an opinion as to whether or not

8   U.S. Mortgage Resolution's failure to attempt to collect

9   on the debt after receiving the 1099-C is consistent

10  with the fact of the 1099-C canceled the debt?

11            MR. CAHILL:   Objection to the extent it calls

12  for expert testimony and a legal conclusion.

13  BY MR. ENGEBRETSON:

14       Q.    Fair to say that in July of 2012 U.S. Mortgage

15  contacts you and appears to be trying to collect on a

16  debt?

17       A.    Yes.

18       Q.    After receiving several letters you call them

19  and send them the 1099-C; is that correct?

20       A.    Correct.

21       Q.    After you send them the 1099-C, they stop

22  contacting you for collection.

23       A.    Yes.

24       Q.    And with the provision that you eventually get

25  another letter saying that the debt's been transferred

GENET HABTEMARIAM

September 11, 2019

1    to someone else, right?

2        A.    Correct.

3        Q.    But with the exception of that communication,

4    they made no further effort to collect on the debt,

5    correct?

6        A.    No.

7        Q.    Do you feel that that was because the 1099-C

8    was a cancellation of the debt?

9        A.    I thought so.  I thought they didn't know that

10    the debt was canceled, so once they get the copy they

11    stopped calling me or writing me.

12            MR. CAHILL:  Objection to the extent it's

13    speculation.

14    BY MR. ENGEBRETSON:

15        Q.    For your opinion did the fact that they stopped

16    after receiving -- the fact that they did not attempt to

17    collect on the debt after the 1099-C, did that reinforce

18    your opinion that the 1099-C was a cancellation of debt?

19        A.    Yes.

20        Q.    The fact that they did not attempt to

21    foreclose -- well, let's make sure.

22            You didn't pay them anything, right?

23        A.    I didn't pay anything.

24        Q.    So they asked you to pay, you didn't pay, they

25    didn't foreclose on you.  Did that reinforce your

GENET HABTEMARIAM

September 11, 2019

```
 1    opinion that the 1099-C was for a cancellation of debt?
 2        A.    Oh, yes.
 3            MR. CAHILL:  Objection, I'm just going to have
 4    a standing objection as to expert testimony and legal
 5    conclusions.
 6            MR. ENGEBRETSON:  Yeah, and I think we'll --
 7    for the record, I'm not submitting for its legal effect
 8    so much as for her state of mind in the context of.
 9            MR. CAHILL:  That's fine.  That's why I say
10    standing, so I'm not interrupting you all the time.
11    BY MR. ENGEBRETSON:  Dangerous outbreak of civility.
12        Q.    So the last of those four letters from U.S.
13    Mortgage Resolution was dated July 25th, 2012.  That's
14    Exhibit 13.  You see that there?
15        A.    Yes.
16        Q.    And then by date the next communication -- or
17    next exhibit, excuse me, is from BSI.  It's Exhibit 14
18    and it's dated December 23rd, 2013.  You see that there?
19        A.    Yes.
20        Q.    Is it accurate to say that between the receipt
21    of Exhibit 13 on or about July 25th, 2012 to the receipt
22    of the letter December 23rd, 2013 in Exhibit 14, there
23    was no further communication attempting to collect on
24    that debt?
25        A.    No.
```

GENET HABTEMARIAM

September 11, 2019

1      Q.   No one foreclosed on you in that time?

2      A.   **No.**

3      Q.   No one sent you a bill during that time?

4      A.   **No.**

5      Q.   Again, December 23rd, 2013 you receive Exhibit

6   14 which appears to be related to the PNC debt.  Do you

7   agree with that?

8      A.   **Yes.**

9      Q.   Did you contact BSI in response to this letter?

10      A.   **No.  I contacted PNC Bank.  I asked them I**

11   **get -- you know, like BSI is contacting me, but I have**

12   **this 1099 that you canceled the debt, and they said they**

13   **couldn't find any records there because my file is not**

14   **active.  But days later they send me a letter that my**

15   **loan is transferred to BSI from -- I have an image**

16   **there, I don't remember the date, but they mention that**

17   **from 2012 it's transferred to BSI.**

18           MR. CAHILL:  Just as commentary to clarify, in

19   Exhibit 20, which is the documents she produced, I

20   believe I saw a letter from PNC to her thanking her for

21   her inquiry and directing her to BSI.

22           MR. ENGEBRETSON:  Okay.  Thank you, Counsel.

23   Let me take a quick look and see if I can find that.

24           MR. CAHILL:  Perhaps I'm wrong.  It's been

25   known to happen.

GENET HABTEMARIAM
September 11, 2019

```
 1    transferred to BSI Financial Services effective May 1st,

 2    2012.  Please contact BSI Financial Services at, and

 3    there's a phone number included.  Enclosed is a copy of

 4    the servicing transfer notice letter dated April 13th,

 5    2012.  Okay.

 6              So at some point you contacted BSI.

 7        A.   Yes.  I contacted PNC.

 8        Q.   After you received -- after you contacted PNC,

 9    did you ever contact BSI directly?

10        A.   No.

11        Q.   Did you ever provide any documentation to BSI?

12        A.   No.

13        Q.   Did BSI ever conduct any foreclosure activities

14    on your property?

15        A.   No.

16        Q.   Did BSI ever submit any bills for the payment

17    of the PNC loan?

18        A.   No.

19        Q.   To the best of your knowledge, did you ever

20    present BSI with a copy of the 1099-C?

21        A.   I think so, but I'm not sure.

22        Q.   Speaking generally, with the exception of Vida,

23    after you received the 1099-C, did any entity to whom

24    you showed the 1099-C attempt to collect on the PNC

25    debt?
```

GENET HABTEMARIAM

September 11, 2019

1      A.    No.

2      Q.    Just Vida.

3      A.    Just Vida.

4      Q.    So separating out Vida as one category and

5  everyone else as another category, based on your

6  experience with loan servicers other than Vida in

7  response to the 1099-C, did that tend to confirm your

8  understanding of the PNC as a cancellation of the debt?

9      A.    Say it again one more time.

10     Q.    So you showed other loan companies the 1099-C.

11     A.    Yes.

12     Q.    And they didn't attempt any foreclosure

13  activity, correct?

14     A.    No.   Correct.

15     Q.    They didn't attempt any additional collection

16  activity, correct?

17     A.    Correct.

18          MR. CAHILL:   Objection, the witness has already

19  admitted that she received numerous correspondence from

20  U.S. Mortgage Resolution.

21          MR. ENGEBRETSON:   Okay.

22          MR. CAHILL:   Including a FDCPA notice.

23  BY MR. ENGEBRETSON:   Fair enough.   Let's just make sure

24  that we're clear on the record.

25     Q.    You received multiple letters from U.S.

GENET HABTEMARIAM

September 11, 2019

 1    Mortgage Resolution, correct?

 2        A.    Yes.

 3        Q.    I believe your prior testimony was you believe

 4    that it was after the fourth letter, which is Exhibit

 5    13, that you sent them a copy of the 1099-C.  Is that

 6    accurate?

 7        A.    **That's accurate.  At some point I send them**

 8    **that I got the 1099 and I don't owe anyone any money.  I**

 9    **filed it with my taxes, so they stopped calling.**

10        Q.    So to the best of your recollection with --

11    specifically to U.S. Mortgage Resolution, is it fair to

12    say that after you presented them with a copy of the

13    1099-C, they stopped any further collection activities?

14        A.    Yes.

15        Q.    Likewise, at some point the loan is apparently

16    sold to DLS.  Remember that?

17        A.    **They were servicers for Vida Capital Group.**

18        Q.    At some point Vida forecloses on the property,

19    correct?

20        A.    Yes.

21        Q.    And after Vida foreclosed on the property, did

22    you continue making payments to Gateway on the first

23    mortgage?

24        A.    **No, I didn't.**

25        Q.    Prior to Vida foreclosing on the property, had

1   you been making payments to Gateway?

2       A.   Yes.

3       Q.   Other than the foreclosure by Vida, was there

4   any other reason why you stopped making payments on the

5   first mortgage to Gateway?

6       A.   There's no other reason.

7       Q.   Is it fair to say that if Vida had not

8   foreclosed, you would have continued making payments to

9   Gateway?

10      A.   Correct.

11      Q.   You testified at various times in discussion of

12  the loan servicing as to whether anyone had told you

13  that the loan had been forgiven other than the 1099-C.

14  Remember that testimony?

15      A.   Yes.

16      Q.   And you also testified to or you responded to

17  the question about whether any of these entities had

18  expressly told you the loan had been canceled other than

19  the 1099-C.  Do you remember that?

20      A.   Yes, I remember.

21      Q.   So those questions were about express

22  statements, literally someone saying did they say this.

23  Do you believe that by conduct, by what they did, do you

24  think that any of these entities by their conduct said

25  that the loan was forgiven because of the 1099-C?

GENET HABTEMARIAM

September 11, 2019

```
1        A.     It's just my assumption because they didn't
2   call me back or they didn't try to foreclose, so that
3   was my belief, that they take the 1099, it was canceled.
4        Q.     So even though they didn't say that it was
5   canceled, their conduct led you to believe it was
6   canceled.
7        A.     Yes.
8        Q.     And likewise, if they didn't say the loan was
9   forgiven, did their conduct lead you to believe the loan
10  was forgiven?
11       A.     Say it again.
12       Q.     So we talked about whether or not it was
13  canceled, and I believe your testimony was though they
14  didn't say it was canceled, their conduct led you to
15  believe it was canceled.
16       A.     Correct.
17       Q.     Likewise, in terms of forgiveness of the loan,
18  even though they didn't say the loan was forgiven, did
19  their conduct lead you to believe that the loan was
20  forgiven?
21       A.     Yes.
22       Q.     You previously testified that no one told you
23  expressly not to make payments, correct?
24       A.     Correct.
25       Q.     Again, as to their conduct, did the conduct of
```

```
 1    STATE OF CALIFORNIA,        )
                                  :  ss.
 2    COUNTY OF MERCED            )

 3

 4              I, Theresa Nadeau, do hereby certify:

 5              That I am a licensed, Certified Shorthand

 6    Reporter, duly qualified and certified as such by the

 7    State of California;

 8              That prior to being examined, the witness

 9    named in the foregoing deposition was by me duly sworn

10    to testify to the truth, the whole truth and nothing but

11    the truth;

12              That the said deposition was by me recorded

13    stenographically at the time and place first therein

14    mentioned; and the foregoing pages constitute a full,

15    true, complete and correct record of the testimony given

16    by the said witness;

17              That I am a disinterested person, not being in

18    any way interested in the outcome of said action, nor

19    connected with, nor related to any of the parties in

20    said action, or to their respective counsel, in any

21    manner whatsoever.

22              Dated this 16th day of September, 2019.

23

24              _____

                Theresa Nadeau, CSR No. 10526
25
```

1  Glen F. Olives, Esq. (SBN 196854)
   LAW OFFICES OF TED A. GREENE, INC.
2  1912 F Street, Suite 110
3  Sacramento, CA 95811
   (916) 442-6400
4  Fax: (916) 266-9285
   golives@tedgreenelaw.com
5

6  Attorneys for Plaintiff,
   GENET HABTEMARIAM
7

8                    **UNITED STATES DISTRICT COURT**
9
10                 **EASTERN DISTRICT OF CALIFIFORNIA**

11  GENET HABTEMARIAM,                    **CASE NO.** 2:16-CV-01189-MCE-AC

12             Plaintiff,                 Magistrate Judge Allison Claire
13
14      vs.                              **DECLARATION OF PLAINTIFF**
                                          **GENET HABTEMARIAM IN**
15  VIDA CAPITAL GROUP, LLC; US          **OPPOSITION TO DEFENDANT PNC**
    MORTGAGE RESOLUTION; PNC             **BANK, N.A.'s MOTION FOR**
16  BANK, NATIONAL ASSOCIATION           **SUMMARY JUDGMENT OR**
    S/B/M NATIONAL CITY                  **PARTIAL SUMMARY**
17  MORTGAGE; and DOES 1 to 50,          **ADJUDICATION**
18  inclusive,
                                          **Date:      July 9, 2020**
19             Defendants.                **Time:      2:00 p.m.**
                                          **Courtroom: 7, 14th Floor**
20

21
22      I, Genet Habtemariam, declare as follows:

23      1.      I am the Plaintiff in the above-entitled matter, and this declaration is submitted
    in opposition to PNC's Motion for Summary Judgment.
24
25      2.      I have personal knowledge of the of the facts set forth herein, and if called to
    testify thereto, I would do so truthfully.
26
27      3.      I received an IRS From 1099-C from PNC Bank in June of 2010 which stated
28
                                          1

on it "Cancellation of Debt" and I believed and that time and still believe that that form cancelled my debt to PNC in the amount of $46,134.46, a true and correct copy of which is attached hereto as **Exhibit 1**.

4.      In April of 2010 I received a letter from PNC that said PNC Bank, NA, had been authorized to discontinue collection and/foreclosure activity for my home, 7 Shipman Court, Sacramento, CA 95823, a true and correct copy of which is attached hereto as **Exhibit 2**.

5.      I received another letter from PNC in May of 2012 saying that the loan was transferred to BSI Financial Services, a true and correct of which is attached hereto as **Exhibit 3**. I called PNC to ask them why the loan was transferred to someone else after it was cancelled and did not receive a reply.

6.      In July of 2010 I received 2 letters from US Mortgage Resolution about the same debt, true and correct copies of which are attached hereto as **Exhibit 4**. I called them and told them the debt was cancelled and I sent them the 1099-C, and they stopped contacting me.

7.      I received various other letters regarding the loan, including some from Diversified Loan Services; I sent them the 1099-C.

8.      I was confused because the debt was cancelled and this was a mistake so I sought help from attorneys at Housing and Economic Rights Advocates who wrote letters to VIDA Capital Group, LLC on March 19, 2015, April 27, 2015, May 22, 2015, July 27, 2015, and October 16, 2015, true and correct copies of which are attached hereto as **Exhibit 5**.

9.      The HERA lawyers told me the debt was cancelled but I could file for bankruptcy to get rid of the lien, so I offered VIDA $2,500.00, the cost of filing for bankruptcy (see **Exhibit 5**). They did not accept, so I relied on my belief and VIDA's/PNC's actions that the loan was cancelled and did not file for bankruptcy.

10.     I have never been notified at any time by PNC or another other entity that the issuance of the 1099-C was a mistake or was otherwise incorrect.

1    I declare under the penalty of perjury under the laws of the State of California that the

2  foregoing is true and correct and that this document was executed on the _15_ th day of June at

3  Sacramento, California.

4

5                                   _Genet Habtemariam_
                                    Genet Habtemariam
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

3

DECLARATION OF GENET HABTEMARIAM

# EXHIBIT 1



EXHIBIT 6
wm: *Habtemariam*
DATE: 9-11-1
Theresa Nedosi, CSR

## Instructions for Debtor

**Note.** You may not have to include in income all or a portion of certain qualified principal residence indebtedness canceled in 2010. See Pub. 4681 for more information.

If a federal government agency, certain agencies connected with the Federal Government, financial institution, credit union, or an organization having a significant trade or business of lending money (such as a finance or credit card company) cancels or forgives a debt you owe of $600 or more, this form must be provided to you. Generally, if you are an individual, you must include all canceled amounts, even if less than $600, on the "Other income" line of Form 1040. If you are a corporation, partnership, or other entity, report the canceled debt on your tax return. See the tax return instructions.

However, some canceled debts are not includible, or fully includible, in your income, such as certain student loans, certain debts reduced by the seller after purchase, qualified farm debt, qualified real property business debt, qualified principal residence indebtedness, or debts canceled in bankruptcy. See Pub. 4681. Do not report a canceled debt as income if you did not deduct it but would have been able to do so on your tax return if you had paid it. Also, do not include canceled debts in your income to the extent you were insolvent immediately before the cancellation of the debt. If you exclude a canceled debt from your income, file Form 982.

**Debtor's identification number.** For your protection, this form may show only the last four digits of your social security number (SSN), individual taxpayer identification number (ITIN), or adoption taxpayer identification number (ATIN). However, the issuer has reported your complete identification number to the IRS and, where applicable, to state and/or local governments.

**Account number.** May show an account or other unique number the creditor assigned to distinguish your account.

**Box 1.** Shows the date the debt was canceled.

**Box 2.** Shows the amount of debt canceled. Note: If you do not agree with this amount, contact your creditor.

**Box 3.** Shows interest if included in the canceled debt in box 2. See Pub. 525, to see if you must include the interest in gross income.

**Box 4.** Shows a description of the debt. If box 7 is completed, box 4 shows a description of the property.

**Box 5.** Shows whether you are personally liable for repayment of the debt. See Pub. 4681 for reporting instructions.

**Box 6.** If the box is marked, the creditor has indicated the debt was canceled in a bankruptcy proceeding.

**Box 7.** If, in the same calendar year, a foreclosure or abandonment of property occurred in connection with the cancellation of the debt, the fair market value (FMV) of the property will be shown, or you will receive a separate Form 1099-A. Generally, the gross foreclosure bid price is considered to be the FMV. For an abandonment or voluntary conveyance in lieu of foreclosure, the FMV is generally the appraised value of the property. You may have income or loss because of the acquisition or abandonment. If the property was your main home, see Pub. 523 to figure any taxable gain or ordinary income. See Pub. 4681 for information about foreclosures and abandonments.

---

☐ CORRECTED (if checked)

| CREDITOR'S name, street address, city, state, ZIP code, and telephone no. | | OMB No. 1545-1424 | |
| --- | --- | --- | --- |
| PNC BANK, NATIONAL ASSOCIATION<br>P.O. BOX 1820<br>DAYTON 45401-1820 | **1** Date canceled<br>06-29-10 | **2** Amount of debt canceled<br>$ 46,134.46 | **2010**<br>Form **1099-C** |
| CUSTOMER SERVICE: 1-800-822-5626 | **3** Interest if included in box 2<br>$ 0.00 | | **Cancellation of Debt** |
| DEBTOR'S name, street address (including apt. no.), city, state, and ZIP code | **4** Debt description<br>7 SHIPMAN CT<br>SACRAMENT CA 95823 | | **Copy B**<br>**For Debtor** |
| CREDITOR'S federal identification number<br>2-749-58462-0002732-001-1-000-000-000-000 | DEBTOR'S identification number<br>22-1148430 | ***-**-0720 | This is important tax information and is being furnished to the Internal Revenue Service. If you are required to file a return, a negligence penalty or other sanction may be imposed on you if taxable income results from this transaction and the IRS determines that it has not been reported. |
| GENET HABTEMARIAM<br>7 SHIPMAN CT<br>SACRAMENTO  CA 95823 | **5** Was borrower personally liable for repayment of the debt?<br>☒ Yes   ☐ No | **6** Bankruptcy (if checked) ☐<br>**7** Fair market value of property<br>$ 183,384.00 | |
| | Account number (see instructions) | 0005497500 | |

# EXHIBIT 2



**PNC**
**MORTGAGE℠**



U.S. Postal Service™
**CERTIFIED MAIL™ RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com®

| | |
|---|---|
| Postage | $ |
| Certified Fee | |
| Return Receipt Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ |

Postmark Here

Sent To

Street, Apt. No.; or PO Box No.

City, State, ZIP+4

PS Form 3800, June 2002                    See Reverse for Instructions

April 26, 2010

GENET HABTEMARIAM
7 SHIPMAN CT
SACRAMENTO CA 95823

RE: PNC loan    #    '0005497500

### IMPORTANT INFORMATION REGARDING YOUR MORTGAGE

Dear Mortgagor,

This letter serves as notice that pursuant to investor approval, PNC Mortgage, a Division of PNC Bank, NA has been authorized to discontinue collection and or foreclosure activity with respect to the property located at:

                    7 SHIPMAN CT
                    SACRAMENTO CA 95823

This means that we will no longer carry your loan on our books as an active account. This decision is a result of our loan review and:

                    your delinquency and your failure to enter into a satisfactory repayment
                    agreement with us to cure the delinquency or payoff the loan,
                    the lack of collateral value,
                    the first mortgage/lien holder has taken the property to foreclosure sale.

This does not release you from your obligation to pay off your loan, we may however release our lien against this property if the first mortgage/lien holder has taken the property to foreclosure sale.

The following is a report of your account status at the time of the investor approval:

| | | |
|---|---|---|
| Unpaid Principal Balance as of: | February 16, 2010 | $46,134.46 |
| Delinquent Interest as of: | February 16, 2010 | $0.00 |
| Escrow Advance* Balance as of: | February 16, 2010 | $0.00 |
| Attorney Fees and Costs Balance as of: | February 16, 2010 | $0.00 |

### This does not constitute a valid payoff figure.

                                        PNC 0001



EXHIBIT 7
WIT: Habtemariam
DATE: 9-11-19
Theresa Nadeau, CSR

PNC Mortgage will no longer be responsible for maintaining an active account relationship. The following is a report of your account status at time of write-off.

(X) Non-escrow account – PNC Mortgage has not been responsible for an escrow impound account at the time of write-off.

PNC Mortgage will report this decision to the Credit Bureau as a code 97 ("unpaid balance reported as a loss by credit grantor"). You may resolve this issue by contacting PNC Mortgage to arrange for payment in full.

If you need to discuss alternatives, please contact PNC Mortgage at 1-800-367-9305, between the hours of 8 a.m. and 5 p.m. and request to speak with a Specialist in the Loss Mitigation department.

Sincerely,

Demetrius Smith
Loss Mitigation Department
PNC Mortgage
a Division of PNC Bank

This is an attempt to collect a debt. Any information obtained will be used for that purpose. However, if you have received a Chapter 7 Bankruptcy discharge, and the loan was not reaffirmed in the bankruptcy case, PNC will only exercise its right against the property and is not attempting to collect the discharged debt from you personally. PNC Mortgage is a Division of PNC Bank, NA.

# EXHIBIT 3

05-05-12
MSP LETTERWRITER ACTIVITY FOR MONTH OF 04-12
PAGE222,555

LOAN= 0005497500   DATE=04-12 USER=AAO KEY=AT714 VERS=003 TITLE=BSI Pnel 5-1-12 pg1    lc FORM=WORD PRINTER=SZ9Y SECURITY=4
LINES-PER-PAGE=NO CONDITIONS=0

AT714 AAO

Genet Habtemariam
7 Shipman CT
Sacramento CA 95823

RE:  Loan No. 0005497500

NOTICE OF ASSIGNMENT, SALE OR TRANSFER OF SERVICING RIGHTS

You are hereby notified that the servicing of your mortgage loan, that
is, the right to collect payments from you, is being assigned, sold or
transferred from PNC Mortgage, a division of PNC Bank, National
Association to BSI Financial Services, Inc. effective with your next
payment due on or after May 1, 2012.

The assignment, sale or transfer of the servicing of your mortgage loan
does not affect any term or condition of the mortgage instruments, other
than terms directly related to the servicing of your loan.

Except in limited circumstances, the law requires that your present
servicer send you this notice at least 15 days before the effective date
of transfer or at closing.  Your new servicer must also send you this
notice no later than 15 days after this effective date or closing.

Your present servicer is PNC Mortgage, a division of PNC Bank, National
Association.

If you have any questions relating to the transfer of servicing from your
present servicer, call the PNC Mortgage Customer Service Department at
800-822-5626, Monday through Thursday, between 8:00 a.m. and 9:00 p.m.,
Friday 8:00 a.m. and 5:00 p.m. and Saturday between 9:00 a.m. and 2:00
p.m. (ET).  This is a toll free number.

Your new servicer will be BSI Financial Services, Inc.

The business address for your new servicer is:
314 South Franklin St., Titusville, PA  16354.

The toll-free telephone number of your new servicer is 888-798-3119. If
you have any questions relating to the transfer of servicing to your new
servicer, call the BSI Financial Services, Inc. Customer Service
Department toll-free at 888-798-3119, Monday through Wednesday, between
8:00 a.m. and 8:00 p.m., Thursday 8:00 a.m. and 6:00 p.m., Friday
8:00 a.m. and 5:00 p.m., and Saturday 10:00 a.m. and 2:00 p.m. (Eastern
Time).

EXHIBIT ___7___
WIT: *Habtemariam*
DATE: *9-11-19*
Theresa Nadeau, CSR

05-05-12

MSP LETTERWRITER ACTIVITY FOR MONTH OF 04-12

PAGE222,556

LOAN= 0005497500   DATE=04-12 USER=AAO KEY=AT714 VERS=003 TITLE=BSI Fncl 5-1-12 pg1        1c FORM=WORD PRINTER=SZ9Y SECURITY=4
LINES-PER-PAGE=NO CONDITIONS=0

PNC 0226

LOAN= 0005497500   DATE=04-12 USER=AAO KEY=AT715 VERS=001 TITLE=BSI Fncl 5-1-12 pg2      1c FORM=WORD PRINTER=SZ9Y SECURITY=4
LINES-PER-PAGE=NO CONDITIONS=0

The date that your present servicer will stop accepting payments from
you is May 1, 2012.  The date that your new servicer will start
accepting payments from you is May 1, 2012.  Send all payments due
on or after that date to your new servicer.

> BSI Financial Services, Inc.
> P.O. Box 517
> Titusville, PA  16354

If your monthly payment is currently being automatically drafted from
your checking or savings account by PNC Mortgage, this service will be
discontinued.  Please make your monthly payment directly to BSI Financial
Services Inc.  If you are interested in reestablishing this service with
BSI Financial Services, Inc., please contact them for more information.
However, if your payment is being automatically drafted by a third party
(i.e. Equity Accelerator), please notify them of your new account number
and payment mailing address.

The transfer of servicing rights may affect the terms of or the continued
availability of mortgage life or disability or any other type of optional
insurance in the following manner: this service will be discontinued;
and you should take the following action to maintain coverage: you may
wish to contact your insurance carrier directly to inquire about direct
billing to you.

You should also be aware of the following information which is set out in
more detail in Section 6 of the Real Estate Settlement Procedures Act
(RESPA) (12 U.S.C. 2605):

During the 60-day period following the effective date of the transfer of
the loan servicing, a loan payment received by your old servicer before
its due date may not be treated by the new loan servicer as late, and a
late fee may not be imposed on you.

Section 6 of RESPA (12 U.S.C. 2605) gives you certain consumer rights.
If you send a "qualified written request" to your loan servicer concerning
the servicing of your loan, your servicer must provide you with a written
acknowledgement within 5-business days of receipt of your request.  A
"qualified written request" is a written correspondence, other than
notice on a payment coupon or other payment medium supplied by the
servicer, which includes your name and account number, and your reasons
for the request.  If you want to send a "qualified written request"
regarding the servicing of your loan, it must be sent to this address:

> BSI Financial Services, Inc.
> 314 South Franklin St.
> Titusville, PA  16354

No later than 30-Business Days after receiving your request, your servicer
must make any appropriate corrections to your account, and must provide you
a written clarification regarding any dispute.  However, a 15-day extension
is permitted if the servicer notifies you before the end of the 30-day
period and provides the reason for the delay in responding. During this
30-Business Day period, your servicer may not provide information to a
consumer reporting agency concerning any overdue payment related to

PNC 0227

05-05-12

LOAN= 0005497500   DATE=04-12 USER=AAO KEY=AT715 VERS=001 TITLE=BSI Fncl 5-1-12 pg2     lc FORM=WORD PRINTER=SZ9Y SECURITY=4
LINES-PER-PAGE=NO CONDITIONS=0

PNC 0228

05-05-12                    MSP LETTERWRITER ACTIVITY FOR MONTH OF 04-12                          PAGE222,559

LOAN= 0005497500    DATE=04-13 USER=AAO KEY=AT716 VERS=001 TITLE=BSI Fncl 5-1-12 pg3        lc FORM=WORD PRINTER=SZ9Y SECURITY=4
LINES-PER-PAGE=NO CONDITIONS=0

such period or qualified foreclosure if proper grounds exist under the
mortgage documents.

A Business Day is a day on which the offices of the business entity are
open to the public for carrying on substantially all of its business
functions.

Section 6 of RESPA also provides for damages and costs for individuals or
classes of individuals in circumstances where services are shown to have
violated the requirements of that Section.  You should seek legal advice
if you believe your rights have been violated.

                        PNC Mortgage, a division of PNC Bank,
                        National Association
                        April 13, 2012

AT716    AAC

PNC 0229

LOAN= 0005497500   DATE=04-13 USER=AAO KEY=AT716 VERS=001 TITLE=BSI Fncl 5-1-12 pg3        1c FORM=WORD PRINTER=S29Y SECURITY=4
LINES-PER-PAGE=NO CONDITIONS=0

PNC 0230

# EXHIBIT 4

Y121454BF9

2701 Renaissance Blvd, 4th Floor
King of Prussia PA 19406-2781
ADDRESS SERVICE REQUESTED

# US Mortgage Resolution

**2701 Renaissance Blvd, 4th Floor
King of Prussia, PA 19406-2781
Phone: (877) 808-4767**

July 17, 2012

Creditor: US MORTGAGE RESOLUTION FUND 2 LLC
Acct No: 11F27186HABT
Balance: $42,846.54

000080200024806313633229563375220T—Y121454BF9 17
000004623 - FDN - 17
GENET HABTEMARIAM
7 SHIPMAN CT
SACRAMENTO CA 95823-7522



US Mortgage Resolution
2701 Renaissance Blvd, 4th Floor
King of Prussia PA 19406-2781

---

*** Detach Upper Portion And Return With Payment ***

17-CIUSMR10-FDN-1/06/10

---

Re:  US MORTGAGE RESOLUTION FUND 2 LLC vs. GENET HABTEMARIAM
7 SHIPMAN CT
SACRAMENTO CA 95823-7522

### NOTICE REQUIRED BY THE FAIR DEBT COLLECTION
### PRACTICES ACT, 15 U.S.C. SECTION 1692, et seq.

This notice is being sent to you with regard to the mortgage on your property referenced above. The following information is provided to you as required by the Federal Fair Debt Collections Practices Act:

1. As of July 17, 2012, the principal amount of the debt is $42,846.54

2. The creditor to whom the debt is owed is US MORTGAGE RESOLUTION FUND 2 LLC.

3. The Fair Debt Collection Practices Act entitles you to dispute the debt, or any portion thereof, within thirty (30) days of your receipt of this letter. If you do not dispute the debt within the time provided, it will be assumed to be valid. The law also entitles you to request that we provide you the name of the original creditor if the original creditor is different from the current creditor, US MORTGAGE RESOLUTION FUND 2 LLC.  If you chose to dispute the debt, or any portion thereof, or if you choose to request the name of the original creditor, you must notify us in writing within thirty (30) days of the date you receive this letter.

4. If you notify us within thirty (30) days of the date you receive this letter that you are disputing the debt or any portion thereof, or if you notify us in writing within thirty (30) days of the date you receive this letter that you want to know the name of the original creditor if that is different from US MORTGAGE RESOLUTION FUND 2 LLC, then we will obtain and mail to you verification of the debt and/or the name and address of the original debtor.

5. The Fair Debt Collections Practices Act does not require that we wait until (30) days from the date you receive the letter before filing a lawsuit to foreclose your mortgage. In the event we do file a lawsuit to foreclose your mortgage, within thirty (30) days of the date you receive this letter, you still retain the right to dispute the debt, or any portion thereof and you also retain the right to request the name of the original creditor if it is different from the current creditor, US MORTGAGE RESOLUTION FUND 2 LLC.

6. If you request proof of the debt or any portion thereof or if you request the name of the original creditor within thirty (30) days from the date you receive this letter, the Fair Debt Collection Practices Act requires us to suspend our efforts to foreclose the mortgage on your property, even if we have already filed the lawsuit, until we mail you the information validating the debt and/or until we provide you with the name of the original creditor.

Because of interest, late charges and other charges that may vary from day to day, the amount due on the day you pay may be greater. Hence, if you pay the amount shown above, an adjustment may be necessary after we receive your check, in which event we will inform you before depositing the check for collection. For further information, call (877) 808-4767.

Any written requests should be addressed to your loan servicer:

US Mortgage Resolution LLC
2701 Renaissance Blvd, 4th Floor
King of Prussia, PA 19406

> EXHIBIT   *10*
> WIT: *Habtemariam*
> DATE: *9-11-19*
> Theresa Nadeau, CSR

PURSUANT TO THE FAIR DEBT COLLECTION PRACTICES ACT, YOU ARE ADVISED THAT WE ARE A DEBT COLLECTOR. ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.



**US Mortgage Resolution**

2701 Renaissance Blvd, 4th Floor
King of Prussia, PA 19406-2781
Phone: (877) 808-4767

Y121E88D39

2701 Renaissance Blvd, 4th Floor
King of Prussia PA 19406-2781
ADDRESS SERVICE REQUESTED

July 23, 2012

Acct No: 11F27186HABT

060802002400635568889583375207—Y121E88D39 17
000004623 - CAS - 17
GENET HABTEMARIAM
7 SHIPMAN CT
SACRAMENTO CA 95823-7522



US Mortgage Resolution
2701 Renaissance Blvd, 4th Floor
King of Prussia PA 19406-2781

---

*** Detach Upper Portion And Return With Payment ***      17-CIUSMR10-CAS-1/06/10

---

Acct No:    11F27186HABT

Dear GENET HABTEMARIAM,

Donna was loving life. She came to America from Eastern Europe to create a better life for her family. She did it! Married, children, house in the suburbs, a great education and a terrific job helping people – she achieved the American dream. Then things changed.

Donna's marriage fell apart. Her mother in Europe died. Then, as a single mother, she lost her job and was forced to take another job with less pay. She fell behind on her payments. She lost her car and was in danger of losing her home. This all happened in the blink of an eye.

Despite her struggles, Donna was fortunate to have her mortgage with US Mortgage Resolution. She contacted Joe at US Mortgage Resolution. Joe, listened to Donna and helped her craft a payment plan that fit her new situation without a drawn out, complicated process like other servicers. In less than two weeks, with little paperwork, Donna was back on track, making payments, building equity in her home and providing for her family.

Here's the key – Donna took **action**. She contacted US Mortgage Resolution, and together, they crafted a payment plan that worked. Now Donna has less stress and greater hope for a better future for her family.

**Take action NOW** to help yourself and your family. Contact US Mortgage Resolution at (877) 808-4767 anytime. We hold your mortgage and we want to help you like we helped Donna. But you have to contact us.

Sincerely,

US Mortgage Resolution
Workout Team
(877) 808-4767

EXHIBIT _11_
WIT: _Habtemariam_
DATE: _9-11-19_
Theresa Nadeau, CSR

**PURSUANT TO THE FAIR DEBT COLLECTION PRACTICES ACT, YOU ARE ADVISED THAT WE ARE A DEBT COLLECTOR. ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.**

Y121E891B2
2701 Renaissance Blvd, 4th Floor
King of Prussia PA 19406-2781
ADDRESS SERVICE REQUESTED



**US Mortgage Resolution**

2701 Renaissance Blvd, 4th Floor
King of Prussia, PA 19406-2781
Phone: (877) 808-4767

July 23, 2012

Acct No: 11F27186HABT
Balance: $42,846.54

008020024006355695895823752207—Y121E891B2 87
000004623 - FTM - 87
GENET HABTEMARIAM
7 SHIPMAN CT
SACRAMENTO CA 95823-7522



US Mortgage Resolution
2701 Renaissance Blvd, 4th Floor
King of Prussia PA 19406-2781

---

*** Detach Upper Portion And Return With Payment ***

87-CIUSMR10-FTM-1/06/10

---

Dear GENET HABTEMARIAM,

Please read this important letter from your Loan Servicer as it contains valuable and time-sensitive information that <u>will benefit you</u> if you take action.

Loan Servicers throughout the country are participating in federal and state government programs designed to quickly modify defaulted loans in favor of distressed borrowers facing foreclosure.

**You are eligible for US Mortgage Resolution's Fast Track Mediation Program.**  Your loan is in default.  Under the terms of this program, you may be eligible for a number of money-saving changes to your mortgage that can cure your default, including:

1. partial or full forbearance of missed payments and late fees

2. reduction in interest rate

3. reduction in principal owed

4. discounted payoff settlement and forgiveness of balance

Taking advantage of this program is as simple as calling your assigned Mediation Specialist at **877-808-4767 x102.**  Once you contact and provide your Mediation Specialist with basic financial information, they are required to complete your mediation in **less than one week.**  Your Mediation Specialist is also required to follow specific guidelines to adjust your mortgage to make it **affordable for you.**

We are **NOT** a loan modification or debt settlement company.  We are your LOAN SERVICER, so contact your Mediation Specialist TODAY to take advantage of this program at **877-808-4767 x102.**

Sincerely,

Fast Track Mediation Coordinator

US Mortgage Resolution
2701 Renaissance Blvd.
4th Floor
King of Prussia, PA 19406
877-808-4767 x102



EXHIBIT ___12___
WIT: _Habtemariam_
DATE: _9-11-19_
Theresa Nadeau, CSR

PURSUANT TO THE FAIR DEBT COLLECTION PRACTICES ACT, YOU ARE ADVISED THAT WE ARE A DEBT COLLECTOR. ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.

# EXHIBIT 5

# HERA

**housing and
economic
rights advocates**

March 19, 2015

*Via U.S. Mail*

ATTN: Malcom Durham
Vida Capital Group, LLC
228 Hamilton Avenue 3rd Floor
Palo Alto, CA 94301

Diversified Loan Services, Inc.
259 E. Cambell Avenue
Cambell, CA 95008

**RE:   Genet Habtemariam and account listed as either Loan No. 214-048; Loan No.
        F211718HAB; or Loan No. 0005497500**

To Whom It May Concern:

I am writing on behalf of Genet Habtemariam in order to request information related to the
above referenced account.  I am also writing to notify you of your violation of state and federal law,
including but not limited to the Fair Debt Buying Practices Act (Cal. Civ. Code § 1788.50, *et seq*);
the Federal Fair Debt Collection Practices Act (15 U.S.C § 1692, *et seq.*); and the Rosenthal Act
(Cal. Civ. Code § 1788, *et seq.*).  Attached, please find a third party authorization form, signed by
Ms. Habtemariam, authorizing me to contact you on her behalf.

The loan in question was serviced by PNC Bank.  On April 26, 2010, Ms. Habtemariam
received a letter from PNC informing her that it was discontinuing collection and foreclosure
activity.  Thereafter, she received a Form 1099-C from PNC indicating that her debt was cancelled as
of June 29, 2010 in the amount of $46,134.  A true and accurate copy of the 1099-C is attached.  In
late 2012, Ms. Habtemariam was contacted by U.S. Mortgage Resolution about the loan, but when
she informed them of the 1099-C and the cancellation of the debt, they did not contact her further.

Ms. Habtemariam heard nothing thereafter regarding this alleged debt until she was contacted
by Vida Capital Group, LLC ("Vida Capital") and its apparent agent Diversified Loan Services, Inc.
("Diversified").  She received a copy of a Notice of Default and Election to Sell Under Deed of
Trust, dated January 7, 2015, and purportedly recorded on January 12, 2015, a copy of which is

phone   510.271.8443
fax     510.868.4521

p.o. box 29435   oakland ca 94604

attached.  The Notice of Default claimed that, as of January 6, 2015, Ms. Habtemariam owed Vida Capital an amount of $24,449.25.  However, on February 17, 2015, Ms. Habtemariam received a letter from Diversified, presumably Vida Capital's servicer, indicating that she owes an obligation in the amount of $700.96. A copy of this letter is also attached.

## Federal Fair Debt Collection Practices Act and California's Rosenthal Fair Debt Collection Practices Act

Diversified Loan Services sent correspondence to Ms. Habtemariam on behalf of Vida Capital Group that violates both the federal Fair Debt Collection Practices Act ("federal FDCPA") and California's Rosenthal Fair Debt Collection Practices Act ("Rosenthal Act").  Both of these laws have rules governing the conduct of debt collectors like Vida Capital Group and Diversified Loan Services. 15 U.S.C. § 1692a; Cal. Civ. Code § 1788.2.

Specifically, the February 17, 2015 letter from Diversified Loan Services constituted several violations of both the federal FDCPA and the Rosenthal Act, including, but not limited to the following:  (1) misrepresenting the character and legal status of the debt as one that is collectable when in fact the debt referenced was cancelled; (2) misrepresenting the amount of the debt; (3) attempting to collect fees that are no longer authorized; (4) threatening to take action, including foreclosure and credit reporting, that is not legal in light of the cancelled status of the debt; (5) failing to comply with the disclosure requirements of 15 USC § 1692g, which is incorporated in the Rosenthal Act through Cal. Civ. Code § 1788.17;  and (6) failing to abide by the additional California state disclosure requirements delineated in Cal. Civ. Code § 1812.700.

## Fair Debt Buying Practices Act, SB233

Furthermore, it is my understanding that Vida Capital Group is a "debt buyer" as defined by Cal. Civ. Code § 1788.50.  A debt buyer is therein defined as a "person or entity that is regularly engaged in the business of purchasing charged-off consumer debt for collection purposes, whether it collects the debt itself, hires a third party for collection, or hires an attorney-at-law for collection litigation."

Under § 1788.52, Vida Capital Group may not engage in any collection efforts on an account unless it possesses specified information and documents related to the account.  **Therefore, pursuant to § 1788.52, Ms. Habtemariam formally requests that Vida Capital Group provide her with sufficient information and/or documentation to establish the following:**

(1) That Vida Capital is the sole owner of the debt at issue or has authority to assert the rights of all owners of the debt;
(2) The debt balance at charge off and an explanation of the amount, nature, and reason for all post-charge-off interest and fees, if any, imposed by the charge-off creditor or any

subsequent purchasers of the debt (e.g. a detailed account statement and payment history);

(3) The date of default or the date of last payment;

(4) The name and an address of the charge-off creditor at the time of charge off, and the charge-off creditor's account number associated with the debt. The charge-off creditor's name and address must be in sufficient form so as to reasonably identify the charge-off creditor;

(5) The name and last known address of the debtor as they appeared in the charge-off creditor's records prior to the sale of the debt. If the debt was sold prior to January 1, 2014, the name and last known address of the debtor as they appeared in the debt owner's records on December 31, 2013, are sufficient.

(6) The names and addresses of all persons or entities that purchased the debt after charge off, including Vida Capital Group. The names and addresses must be in sufficient form so as to reasonably identify each such purchaser.

(7) A copy of the contract evidencing the debtor's agreement to the debt.

**Pursuant to § 1788.52(c), Vida Capital Group must provide the foregoing information and/or documents within <u>15 calendar days</u> of its receipt of this written request. If it cannot do so, Vida Capital Group <u>must cease all collection efforts</u>, <u>including foreclosure</u>, until it is able to provide the requested information and/or documents. <u>Please note</u> that Vida Capital Group was required to give specified written notice to Ms. Habtemariam of her right to request this information but failed to do so in violation of Cal. Civ. Code § 1788.52(d).**

<u>Real Estate Settlement Procedures Act</u>

This letter also constitutes a "Request for Information" and "Notice of Error" under the provisions of the Real Estate Settlement Procedures Act (RESPA) pursuant to 12 USC § 2605(e), 12 CFR 1024.36, and 12 CFR 1024.35. RESPA applies to "federally related mortgage loans", which includes any loan secured by a first or subordinate lien on residential property having one to four units. 12 USC § 2602.

A servicer must respond to a written request for information from a borrower so long as that request includes the name of the borrower, the mortgage loan account number, and the information the borrower is requesting with respect to that mortgage account loan. 12 CFR 1024.36. All relevant information appears on the face of this letter, therefore, **Ms. Habtemariam reaffirms the aforementioned request for documents and information enumerated in items 1 through 7 as a formal qualified written request for information under the provisions of RESPA. Furthermore, Ms. Habtemariam requests proof that the Notice of Default referenced above was in fact recorded.**

Furthermore, this letter constitutes a formal "notice of error" under 12 CFR 1024.35. Under that provision, any errors relating to the servicing of a borrower's mortgage loan, including wrongful

foreclosure, is a violation of RESPA. **Therefore, Vida Capital/Diversified is hereby notified that any efforts to foreclose on the home associated with the above-referenced account(s) is in error due to the cancellation of the debt in question, as evidenced by the Form 1099-C attached.**

Vida Capital/Diversified loan services must respond to a notice of error by either: (1) correcting the error identified by the borrower and providing the borrower with a written notification of the correction, the effective date of correction, and contact information, including a telephone number, for further assistance; or by (2) conducting a reasonable investigation and providing the borrower with a written notification that includes a statement that the servicer has determined that no error occurred, a statement of the reason or reasons for this determination, a statement of the borrower's right to request documents relied upon by the servicer in reaching its determination, information regarding how the borrower can request such documents, and contact information, including a telephone number, for further assistance. 12 CFR 1024.35(e).

Conclusion

Given that Ms. Habtemariam received a 1099-C cancelling the loan in question as of June 29, 2010; that a previous servicer of the loan stopped communicating with Ms. Habtemariam once they learned of 1099-C and debt cancellation; and that both Vida Capital and Diversified have failed to provide Ms. Habtemariam with evidence that either has any rights against her, Vida Capital's initiation of foreclosure against Ms. Habtemariam is wrongful.

**If Vida Capital Group and/or Diversified Loan Services cannot provide the legally required documentation verifying its right to collect, as requested in items 1 through 7 above, by law Vida Capital/Diversified <u>may not</u> proceed with the foreclosure and must cease all collection efforts.** Therefore, in light of the foregoing, Ms. Habtemariam requests that both organizations cease all collection efforts against her, close the above-referenced account, cancel the Notice of Default, and notify the Credit Reporting Agencies that this account is enclosed.

Please direct any mailing of information and documents to me at the address listed below. **We are demanding that you respond within 15 days of the receipt of this letter**. If you wish to discuss the matter, you can reach me by phone number or email address listed below.

Sincerely,

Malika Noel
Staff Attorney, Housing and Economic Rights Advocates (HERA)
P.O. Box 29435
Oakland, CA 94604
Phone. (510) 271 8443 ext. 305
Email. mnoel@heraca.org

Page 4 of 5

**HERA**

housing and
economic
rights advocates

April 27, 2015

*Via U.S. Mail and Fax*

Christopher L. Bauer, Esq.
The Law Offices of Michelle Ghidotti
51020 E. La Palama Ave. , Suite 206
Anaheim Hills, CA 92807

RE:    Genet Habtemariam
        7 Shipman Court, Sacramento, CA 95823
        Your file No. 4103-0025.1
        Account listed as either Loan No. 214-048; Loan No. F211718HAB;  Loan No. 0005497500

Dear Mr. Bauer:

This is a letter regarding your client, Vida Capital Group ("Vida Capital") and the above-referenced account.  I am writing in response to the correspondence you sent me, dated April 2, 2015.  I tried calling you to discuss the matter over the phone, but was unable to reach you.

Malcom Durham, who has said he is a representative of your client, has reached out to me on more than one occasion regarding the possibility of a loan modification.  Although I am willing to discuss the situation with him, I have been unable to get in touch with you to see if I have the authorization to speak with him directly.

Furthermore, pursuant to Cal. Civ. Code § 1788.52, <u>Vida Capital may not engage in any collection efforts on an account unless it possesses *all* of the following specified information and documents related to the account</u>:

    **(1) Proof that Vida Capital is the sole owner of the debt at issue or has authority to assert the rights of all owners of the debt;**

    **(2) The debt balance at charge off and an explanation of the amount, nature, and reason for all post-charge-off interest and fees, if any, imposed by the charge-off creditor or any subsequent purchasers of the debt (e.g. a detailed account statement and payment history);**

    **(3) The date of default or the date of last payment;**

(4) The name and an address of the charge-off creditor at the time of charge off, and the charge-off creditor's account number associated with the debt. The charge-off creditor's name and address must be in sufficient form so as to reasonably identify the charge-off creditor;

(5) The name and last known address of the debtor as they appeared in the charge-off creditor's records prior to the sale of the debt. If the debt was sold prior to January 1, 2014, the name and last known address of the debtor as they appeared in the debt owner's records on December 31, 2013, are sufficient.

(6) The names and addresses of all persons or entities that purchased the debt after charge off, including Vida Capital Group. The names and addresses must be in sufficient form so as to reasonably identify each such purchaser.

(7) A copy of the contract evidencing the debtor's agreement to the debt.

Pursuant to Cal. Civ. Code § 1788.52(c), Ms. Habtemariam has a right to request the above-listed information/documents and receive it within 15 days of Vida Capital's receipt of her request. As you recall, in our March 19, 2015 letter to Vida Capital, Ms. Habtemariam invoked this right and formally requested all of the enumerated items. My records show that Vida Capital received this request on March 26th, therefore, it is well past the 15-day deadline.

Although you provided us with a few documents, much of the information our client is entitled to is still missing. Your letter states that you are under no obligation to provide this information because the provisions of California's Rosenthal Act do not apply to Vida Capital. However, we are not requesting the foregoing information pursuant to Rosenthal, but instead pursuant to the Fair Debt Buying Practices Act, Cal. Civ. Code §1788.52.

The Fair Debt Buying Practices Act is a separate and relatively new law that defines a "debt buyer" as a "person or entity that is regularly engaged in the business of purchasing charged-off consumer debt for collection purposes, whether it collects the debt itself, hires a third party for collection, or hires an attorney-at-law for collection litigation". Cal Civ. Code § 1788.50. The Act clearly states that a debt buyer shall not make any written statement to a debtor in an attempt to collect a consumer debt unless the debt buyer possesses the information we are requesting above. Cal. Civ. Code §1788.52. In addition, in Vida Capital's first written correspondence to Ms. Habtemariam, it was required to make her rights under the Fair Debt Buying Practices Act clear (Cal. Civ. Code §1788.52(d)(1)), but it nevertheless failed to do so.

Moreover, Ms. Habtemariam also requested this information pursuant to the Real Estate Settlement and Procedures Act (RESPA). As you recall, our March 19, 2015 letter to your client constituted a "Request for Information" and "Notice of Error" under the provisions of the RESPA pursuant to 12 USC § 2605(e), 12 CFR 1024.36, and 12 CFR 1024.35. RESPA applies to "federally related mortgage loans", which includes any loan secured by a first or subordinate lien on residential property having one to four units. 12 USC § 2602.

You are also incorrect that the provisions of the Rosenthal Act do not apply to your client. In fact, recent decisions have confirmed that its provisions apply to both mortgage debt and debt collectors like your client. *See, e.g., Tirabassi v. Chase Home Fin., LLC.* Case No. 14-08790-BRO, Case No. 2015 U.S. Dust. LEXIS 43730 (C.D. Cal. 2015), *see also Vanduzen v. Homecomings Financial,* Case No. 09-cv-01237-GEB, 2010 U.S. Dist. LEXIS 46106 (E.D. Cal. 2010). Furthermore, the plain language of Rosenthal Act allows for no other conclusion other than that it applies to entities collecting mortgage debt.

In addition, the documents you provided do not prove the existence of the debt as required by Cal. Civ. Code § 1788.52. The note you provided shows no indication that it was assigned to Vida Capital. The other documents you provided, which I assume you allege are assignment documents, only purport to assign the deed of trust, but not the underlying note.

Furthermore, it is still Ms. Habtemariam's contention that the debt was cancelled with the issuance of the 1099-C in 2010. Even if it is true that the IRS requires financial institutions to issue a 1099-C as a reporting requirement, several courts have disagreed with the notion that the issuance of a Form 1099-C does not operate to extinguish a debt. *See, e.g., In re Reed,* 492 B.R. 261 (Bankr. E.D. Tenn. 2013). The Court in *In re Reed* stated that "it is inequitable to require a debtor to claim cancellation of debt income as a component of his or her gross income and subsequently pay taxes on it while still allowing the creditor, who has reported to the Internal Revenue Service and the debtor that the indebtedness was cancelled or discharged, to then collect it from the debtor." *Id* at 271. Furthermore, cancellation of debt income is not required to be reported to the Internal Revenue Service unless one of the express "identifiable events" occurs (*see,* 26 CFR § 1.6050P-1), so it follows that if a financial institution submits a 1099-C to the IRS, an identifiable event, and therefore cancellation a debt, has in fact occurred. *Id.*

Again, Ms. Habtemariam received a Form 1099-C from PNC indicating that her debt was cancelled as of June 29, 2010 in the amount of $46,134. She reported this amount on her 2010 federal tax returns. In late 2012, Ms. Habtemariam was contacted by U.S. Mortgage Resolution about the loan, but when she informed them of the 1099-C and the cancellation of the debt, they did not contact her further. Ms. Habtemariam heard nothing thereafter regarding this alleged debt until she was contacted by your client and its apparent agent, Diversified Loan Services, Inc., almost 5 years after the cancellation of her debt.

Lastly, please note that we still have not received a <u>recorded stamped</u> copy of the Notice of Rescission Vida Capital and your office have provided us. To the extent that a Notice of Default was recorded, it is my understanding that it has been rescinded. If my understanding is at all incorrect, please let me know as soon as possible.

In sum, without proof of all of the items listed above, which Ms. Habtemariam is entitled to pursuant to RESPA and Cal. Civ. Code §1788.52, your client may not pursue collections. Furthermore, Vida may not collect this alleged debt because it was cancelled, as evidenced by the 1099-C issued back in 2010.

Therefore, in light of all the foregoing, please provide our offices with
1. Proof of the seven enumerated items listed above;
2. A recorded-stamped Notice of Rescission; and
3. The authorization to communicate with your client directly if you wish for me to do so.

Any response to this letter can be directed to me at the fax number, email address, or mailing address listed below. I look forward to hearing from you.

Sincerely,

Malika Noel
Staff Attorney, Housing and Economic Rights Advocates (HERA)
P.O. Box 29435
Oakland, CA 94604
Phone. (510) 271 8443 ext. 305
Fax. (510) 280 2553
Email. mnoel@heraca.org



**HERA**

housing and
economic
rights advocates

May 22, 2015

*Via U.S. Mail and E-mail*

Christopher L. Bauer, Esq.
The Law Offices of Michelle Ghidotti
51020 E. La Palama Ave., Suite 206
Anaheim Hills, CA 92807

Malcom Durham
Vida Capital Group, LLC
228 Hamilton Avenue 3rd Floor
Palo Alto, CA 94301

RE:   **Genet Habtemariam and account listed as either Loan No. 214-048; Loan No.
F211718HAB; or Loan No. 0005497500**

Dear Mr. Bauer,

After reviewing the document that your client, Vida Capital Group ("Vida Capital"), recently provided, I
must re-emphasize that Vida Capital has no present right to collect anything from my client, Genet
Habtemariam.  I am including Malcom Durham, representative of Vida Capital, on this correspondence
after receiving your permission to communicate with him directly in an e-mail dated May 15, 2015.

The document Malcom Durham sent to me via e-mail, entitled "Genet-NOD Arrears/Amt Owed", does
not comply with the provisions of the Fair Debt Buying Practices Act, Cal. Civ. Code § 1788.50 et seq.  I
have already delineated the requirements of this statute to you, as well as explained why it applies to Vida
Capital, both over the phone and in two prior written correspondences.  The document Mr. Durham
provided does not state any loan or account number; fails to state the balance of the loan at charge off;
does not provide a detailed statement of payments, interest, and fees accrued each month since charge-off;
nor does it even state my client's property address or full name.  In short, it is by no means a detailed
account statement that satisfies the requirements of Cal. Civ. Code § 1788.52.

Furthermore, the amount stated as the "Total NOD Amount" differs from the other amounts Vida Capital has previously claimed is owed. In the Notice of Default purportedly recorded on January 12, 2015, Vida Capital claimed that the total amount owed as of January 6, 2015 was $24,449.25. The February 17, 2015 letter from Vida Capital's agent, Diversified Loan Services, claimed that the total amount owed was $700.96, which apparently included past due payments and late fees in the amount of $19.84 a month.

Malcom Durham has informed me that he is moving forward with re-filing a Notice of Default against Ms. Habtemariam's property. It is still our contention that any foreclosure action against the property would be wrongful in light of the 1099-C issued in 2010, which cancelled the debt Vida Capital claims to own. As I have already explained, Ms. Habtemariam reported the cancelled debt amount on her federal income tax returns, an act which many courts have found invalidates the debt as a matter of equity. Ms. Habtemariam provided a copy of the 1099-C to U.S. Mortgage Resolution and they promptly stopped their collection activities. She heard nothing thereafter until Vida Capital emerged claiming to own a debt 5 years after it was cancelled.

**Moreover, and most importantly, your client currently has nothing to gain from moving forward with a foreclosure. The home is underwater and any funds resulting from a foreclosure sale would go to pay the senior lien holder on the property. With the current value of the property as it is, Vida Capital would receive nothing.**

In addition, please be advised that Ms. Habtemariam is considering filing for bankruptcy. If she does so, the bankruptcy court will strip any junior liens from the property, in which case your client would receive nothing.

In order to avoid any further emotional distress, Ms. Habtemariam is prepared to offer Vida Capital $600 so long as it agrees to (1) cease and desist any foreclosure activity; (2) record a reconveyance; and (3) release her from any monetary liability. Please let me know as soon as possible what your client's intended course of action is.

Sincerely,

Malika Noel
Staff Attorney, Housing and Economic Rights Advocates (HERA)
Phone. (510) 271 8443 ext. 305
Fax. (510) 280 2553
Email. mnoel@heraca.org



**HERA**

housing and
economic
rights advocates

July 7, 2015

*Via U.S. Mail and E-mail*

Christopher L. Bauer, Esq.
The Law Offices of Michelle Ghidotti
51020 E. La Palama Ave., Suite 206
Anaheim Hills, CA 92807

Malcom Durham
Vida Capital Group, LLC
228 Hamilton Avenue 3rd Floor
Palo Alto, CA 94301

RE:    Genet Habtemariam and account listed as either Loan No. 214-048; Loan No.
       F211718HAB; or Loan No. 0005497500

Dear Mr. Bauer,

This is a letter to follow-up on the correspondence I sent to you via e-mail and regular mail, dated May 22, 2015, a copy of which is attached here. As of the date of this letter, I have not received a response from you or your client, Vida Capital Group ("Vida"). I am including Malcom Durham, representative of Vida, on this correspondence after receiving your permission to communicate with him directly in an e-mail dated May 15, 2015.

Since my client and I have not heard from you, we are assuming that you have decided to abandon collection of the above-referenced account and that you are not moving ahead with a foreclosure. As of the date of this letter, there is no indication that a Notice of Default or a Notice of Sale has been recorded with Sacramento County. If either of the foregoing statements is untrue based on your knowledge or belief, it is my understanding that you will let me know as soon as possible.

Sincerely,

Malika Noel
Staff Attorney, Housing and Economic Rights Advocates (HERA)
Phone. (510) 271 8443 ext. 305
Email. mnoel@heraca.org



**HERA**

housing and
economic
rights advocates

October 16, 2015

*Via U.S. Mail and E-mail*

Malcom Durham
Vida Capital Group, LLC
228 Hamilton Avenue 3rd Floor
Palo Alto, CA 94301

Christopher L. Bauer, Esq.
The Law Offices of Michelle Ghidotti
51020 E. La Palama Ave., Suite 206
Anaheim Hills, CA 92807

RE:   **Genet Habtemariam; the property located at 7 Shipman Court, Sacramento, CA;  and the account listed as either Loan No. 214-048, Loan No.  F211718HAB, or Loan No. 0005497500**

Dear Mr. Durham,

I am writing to you on behalf of Genet Habtemariam. Attached, please find a third party authorization form. A copy of this correspondence has also been sent to your counsel, Christopher L. Bauer, who in an email dated May 15, 2015, authorized me to communicate with you directly.

Ms. Habtemariam is in receipt of the Notice of Default recently recorded by Assured Lender Services on Vida Capital Group's behalf.  As I mentioned to you in previous letters, the document you sent me entitled "Genet-NOD Arrears/Amt Owed", does not comply with the provisions of the Fair Debt Buying Practices Act, Cal. Civ. Code § 1788.50 et seq.  Moreover, Ms. Habtemariam maintains that that any foreclosure action against the above-referenced property would be wrongful in light of the 1099-C issued in 2010, which cancelled the debt Vida Capital claims to own. Most importantly, you currently have nothing to gain from moving forward with a foreclosure. The home is underwater and any funds resulting from a foreclosure sale would go to pay the senior lien holder on the property.  With the current value of the property as it is, Vida Capital would receive nothing.

**Please be advised that Ms. Habtemariam is fully prepared to go into bankruptcy to strip any junior liens from the property. However, to avoid bankruptcy, she is willing to offer Vida Capital Group what a bankruptcy case would cost her - $2,500 - so long as Vida Capital agrees to (1) cease and desist any foreclosure activity; (2) record a reconveyance; and (3) release her from any monetary liability.**

Please let me know as soon as possible what your client's intended course of action is. You can respond to me via email, or at the address listed below. If I do not hear from you by October 26 at 5:00 pm PST, I will assume that Vida Capital is not interested in this offer and will advise Ms. Habtemariam accordingly.


Sincerely,


Malika Noel
Staff Attorney, Housing and Economic Rights Advocates (HERA)
Phone. (510) 271 8443 ext. 305
Fax. (510) 280 2553
Email. mnoel@heraca.org
Address.  P.O. Box 29435, Oakland, CA 94604

1  Glen F. Olives, Esq. (SBN 192594)
   LAW OFFICES OF TED A. GREENE, INC.
2  1912 F Street, Suite 110
3  Sacramento, CA 95811

4  Attorneys for Plaintiff
   GENET HABTEMARIAM
5

6                 UNITED STATES DISTRICT COURT

7                 EASTERN DISTRICT OF CALIFORNIA

8

9
   GENET HABTEMARIAM,                    CASE NO. 2:16-CV-01189-MCE-AC
10
                   Plaintiff,            Magistrate Jude Allison Claire
11
         v.
12                                       PROOF OF SERVICE REGARDING:
   VIDA CAPITAL GROUP, LLC; US
13 MORTGAGE RESOLUTION; PNC                 • **MEMORANDUM OF POINTS**
   BANK, NATIONAL ASSOCIATION                 **AND AUTHORITIES IN**
14 S/B/M NATIONAL CITY MORTGAGE;             **OPPOSITION TO DEFENDANT**
   and DOES 1 to 50, inclusive              **PNC BANK, N.A.'s MOTION FOR**
15                                            **SUMMARY JUDGMENT OR**
                   Defendants.               **PARTIAL SUMMARY**
16                                            **ADJUDICATION**
                                          • **SEPARATE STATEMENT OF**
17                                            **UNDISPUTED FACTS IN**
                                              **OPPOSITION TO DEFENDANT**
18                                            **PNC BANK, N.A.'s MOTION FOR**
                                              **SUMMARY JUDGMENT OR**
19                                            **PARTIAL SUMMARY**
                                              **ADJUDICATION**
20                                        • **DECLARATION OF GLEN F.**
                                              **OLIVES IN OPPOSITION TO**
21                                            **DEFENDANT PNC BANK, N.A.'s**
                                              **MOTION FOR SUMMARY**
22                                            **JUDGMENT OR PARTIAL**
                                              **SUMMARY ADJUDICATION**
23                                        • **DECLARATION OF PLAINTIFF**
                                              **GENET HABTEMARIM IN**
24                                            **OPPOSITION TO DEFENDANT**
                                              **PNC BANK, N.A.'s MOTION FOR**
25                                            **SUMMARY JUDGMENT OR**
                                              **PARTIAL SUMMARY**
26                                            **ADJUDICATION**

27

28
                              1

**SERVICE LIST**
**HABTEMARIAM v. VIDA CAPITAL GROUP/PNC BANK, N.A., et al.**
**United States District Court, Eastern District of California**
**Case No. 2:16-cv-01189-MCE-AC**

**Attorney for Defendant**
**VIDA CAPITAL GROUP, LLP**
Christopher L. Bauer
LAW OFFICES OF CHRISTOPHER L. BAUER
17500 Red Hill Avenue, Suite 230
Irvine, CA 92641

**Attorney for Defendant**
**PNC BANK, N.A.**
Jonathan C. Cahill
Wolfe & Wyman LLP
980 9th street, Suite 1750
Sacramento, CA 95814

**Attorney for Defendant**
**VIDA CAPITAL GROUP, LLP**
Michael R. Brooks
HUTCHINSON & STEFFEN, LLC
10080 West Alta Drive, Suite 200
Las Vegas, NV 89145

3

**PROOF OF SERVICE**

I am employed in the County of Sacramento, State of California.  I am over the age of 18 and not a party to the within action.  My business address is 1912 F Street, Suite 110, Sacramento, California 95811.

On June 15, 2020, I served the document(s) described below:

- **MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT PNC BANK, N.A.'s MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY ADJUDICATION**
- **SEPARATE STATEMENT OF UNDISPUTED FACTS IN OPPOSITION TO DEFENDANT PNC BANK, N.A.'s MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY ADJUDICATION**
- **DECLARATION OF GLEN F. OLIVES IN OPPOSITION TO DEFENDANT PNC BANK, N.A.'s MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY ADJUDICATION**
- **DECLARATION OF PLAINTIFF GENET HABTEMARIM IN OPPOSITION TO DEFENDANT PNC BANK, N.A.'s MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY ADJUDICATION**

on all interested parties in said action by placing a true copy thereof in a sealed envelope addresses as stated on the ATTACHED SERVICE LIST.

[X]   **BY ELECTRONIC ACCESS** Pursuant to the Federal Electronic Filing Court    Order, I hereby certify that the above document(s) was/were uploaded to the *Habtemariam v. Vida Capital* and will be posted on the website by the close of the next business day and the webmaster will give e-mail notification to all parties

[X]   **FEDERAL** as follows: I declare that I am employed in the offices of a member of the State Bar of this court at whose direction the service was made.

Executed on June 15, 2020, at Sacramento, California.

Leah Kology

2