EXHIBIT A

EXHIBIT A

1  ANDREW S. ELLIOTT (State Bar No. 254757)
   ase@severson.com
2  BENJAMIN J. HOWARD (State Bar No. 320682)
   bjh@severson.com
3  SEVERSON & WERSON
   A Professional Corporation
4  595 Market Street, Suite 2600
   San Francisco, California 94105
5  Telephone: (415) 398-3344
   Facsimile: (415) 956-0439
6
7  Attorneys for Defendant PNC BANK, N.A. (sued
   as "PNC BANK, NATIONAL ASSOCIATION
   S/B/M NATIONAL CITY MORTGAGE")
8

9              UNITED STATES DISTRICT COURT

10       EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION

11

12  GENET HABTEMARIAM,                    Case No. 2:16-CV-01189-DC-AC

13              Plaintiff,                **NOTICE OF PNC BANK, N.A.'S MOTION
                                          FOR SUMMARY JUDGMENT;**
14      vs.                               **SUPPORTING MEMORANDUM**

15  VIDA CAPITAL GROUP, LLC; US           *Filed concurrently with Statement of*
    MORTGAGE RESOLUTION; PNC BANK,        *Undisputed Facts, Declarations of Michael*
16  NATIONAL ASSOCIATION S/B/M            *Bivens and Andrew S. Elliott*
    NATIONAL CITY MORTGAGE and DOES
17  1 to 50, inclusive,                   Date:      _____, 2025
                                          Time:      1:30 p.m.
18              Defendants.               Crtrm.:    8, 13th Floor

19

20                  <u>**NOTICE OF MOTION AND MOTION**</u>

21         Please take notice that on _____, 2025, at 1:30 p.m. or as soon thereafter as counsel

22  may be heard in Courtroom 8 of the above-entitled Court at 501 I Street, 13th Floor, Sacramento,

23  CA 95814, Defendant PNC BANK, N.A., sued as PNC BANK, NATIONAL ASSOCIATION

24  S/B/M NATIONAL CITY MORTGAGE ("PNC), will and it hereby does move for summary

25  judgment against Plaintiff Genet Habtemariam ("Plaintiff") or in the alternative for partial

26  summary judgment on Plaintiff's fourth cause of action for negligence.

27  / / /

28  / / /

1       This motion is made under Fed. R. Civ. P. 56 on the ground that, to the extent they plead

2   otherwise actionable claims against PNC, Plaintiff's causes of action are barred by the applicable

3   statutes of limitations.

4       This motion is based on this notice, the attached memorandum of points and authorities,

5   the accompanying statement of undisputed facts, declarations of Michael Bivens and Andrew S.

6   Elliott, and the other papers and records on file in this action.

7   Certification by Counsel

8       The undersigned counsel meet and conferred with Plaintiff's counsel before submitting the

9   September 3, 2024 Joint Status Report (Dkt. No. 177) and September 23, 2024 Joint Status Report

10  (Dkt. No. 180), to discuss both PNC's Motion to Modify the Scheduling Order and anticipated

11  Motion for Summary Judgment.  The parties' meet and confer efforts were exhausted and no

12  agreements were reached.

13

14  DATED:  October 14, 2024         SEVERSON & WERSON
                                A Professional Corporation

15

16                                  By:      */s/ Andrew S. Elliott*

17                                          ANDREW S. ELLIOTT

18                                  Attorneys for Defendant PNC BANK, N.A. (sued as
                                "PNC BANK, NATIONAL ASSOCIATION S/B/M

19                                  NATIONAL CITY MORTGAGE")

20

21

22

23

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## INTRODUCTION

All of Plaintiffs' claims against PNC in this case are premised upon a single erroneous contention:  that  PNC "canceled" her  loan by sending her an IRS-mandated 1099-C form in 2010 and then "wrongfully"  treated the loan as existent.  Plaintiff also asserts claims against defendant Vida Capital Group, LLC which – after a series of assignments resulting in ownership by Vida – foreclosed in 2016.

Plaintiff responded by filing this action in April 2016.  By then, however, the applicable statutes of limitations had expired as to her putative claims against PNC.  Importantly, the evidence adduced in discovery makes clear that Plaintiff knew in 2010  PNC was reporting her loan to credit reporting agencies as in default and therefore treating it as a valid, existing loan. The following year, 2011, Plaintiff claims she suffered appreciable harm as a result.  Specifically, Plaintiff testified at her deposition that she was unable to rent property for her business  because of her poor credit score allegedly due to PNC's negative reporting of her loan.

In other words, the evidence makes clear that Plaintiff's claims against PNC accrued in 2011, when she became aware of the harm to her credit allegedly caused by PNC's  reporting of her supposedly "canceled" loan.  Plaintiff cannot rely on the delayed discovery doctrine to postpone accrual of her claims beyond 2011 because Plaintiff was already aware *at that time* that PNC was treating her loan as still in existence—that is, not canceled.

As explained below, the longest statute of limitations potentially applicable to any of Plaintiff's claims is four years.  Hence, the applicable limitations periods expired, at the latest, in 2015, well before Plaintiff filed this suit in April 2016.  Accordingly, the Court should enter summary judgment in PNC's favor and against Plaintiff on all her claims.[1]

---

[1]    Alternatively, the Court should grant PNC a partial summary judgment on Plaintiff's fifth cause of action for negligence.  That claim is subject to a two-year statute of limitations (Code Civ, Proc., § 339(1)), which began to run, at the latest, in May 2012 when Plaintiff received a letter from PNC stating that it was assigning the servicing of Plaintiff's loan to a third party—an act that clearly showed that PNC was not treating the loan as canceled.

**II.**

**STATEMENT OF FACTS**

In 2001, Plaintiff bought the house at 7 Shipman Court, Sacramento (the "Property"). Statement of Undisputed Facts ("SUF"), # 1.

Plaintiff obtained a first deed of trust loan from Gateway Bank in March 2007, and a second deed of trust loan from National City Bank ("National City Loan") in June 2007. SUF, # 2, 3.  PNC merged with National City Bank in 2009, thereby acquiring the National City Loan.  SUF # 4.

Plaintiff defaulted on the National City Loan in April 2009.  SUF # 5.  In February 2010, PNC charged off the National City Loan.  SUF # 6.  In June 2010, Plaintiff received an IRS-mandated 1099-C form from PNC.  SUF # 7  A 1099-C form is titled "Cancellation of Debt," and the copy PNC sent Plaintiff showed $46,134.46 as the "amount of debt canceled."  *Ibid.*

Since 2010, Plaintiff has checked her credit at least annually, and often more frequently. SUF # 8.  In 2010 and thereafter, Plaintiff knew that PNC was reporting negative information to credit reporting agencies about the National City Loan.  SUF # 9.  Indeed, apart from an earlier dispute with her senior lender,[2] PNC's reporting of the National City Loan was the only negative credit information reflected on Plaintiff's credit report.  SUF # 12.  In fact, PNC reported the National City Loan as "180 days past due," along with the outstanding balance—facts plainly inconsistent with treating the National City Loan as canceled.  SUF # 10.

Also, after receiving the 1099-C form, Plaintiff expected PNC to send her "some sort of clearance to give [her] deed [of trust] back".  SUF # 14.  PNC never sent her one.  *Ibid.*

In 2011, Plaintiff attempted to rent a different property for her business but was unable to do so because of her "poor credit," which included PNC's negative reporting of the National City Loan.  SUF # 13.

/ / /

---

[2]    Plaintiff resolved her dispute with her the senior lender in 2009 by entering into a modification agreement with Gateway Bank.  SUF # 12.

1      In May 2012, Plaintiff received a letter from PNC stating that the servicing of the Loan

2 would be transferred to BSI Financial Services, Inc.  SUF # 15.  PNC later sold the National City

3 Loan to U.S. Mortgage Resolution, which, in turn, sold it to Vida Capital Group, LLC ("Vida").

4 SUF # 16.  Vida foreclosed on the Property in 2016 and a trustee's deed upon sale was recorded

5 conveying the Property to Vida.  SUF # 17.

6      Plaintiff filed this action in state court on April 19, 2016.  SUF # 18.

7 **III.**

8 **LEGAL STANDARD ON SUMMARY JUDGMENT**

9      A party may move for summary judgment upon a showing that there is no genuine dispute

10 as to any material fact and that the party is entitled to judgment as a matter of law." Fed. R. Civ. P.

11 56(a); see also *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A party may also file a motion

12 for partial summary judgment on a particular claim upon a similar showing as to that claim.  *See*

13 Fed. R. Civ. P. 56(a); *see also Allstate Ins. Co. v. Madan*, 889 F. Supp. 374, 378-79 (C.D. Cal.

14 1995).

15      A party moving for summary judgment bears an initial burden of informing the court of the

16 basis for the motion and identifying the portions in the record "which it believes demonstrate the

17 absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. If the moving party satisfies

18 that burden, the burden then shifts to the opposing party to establish that a genuine issue as to any

19 material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574,

20 586-87 (1986).

21      To establish the existence or non-existence of a genuine factual dispute, the party must

22 support its assertion by citing to particular parts of materials in the record, including depositions,

23 and other discovery, or by showing that the opposing party cannot produce admissible evidence to

24 support a material fact.  Fed. R. Civ. P. 56(c)(1).

25      To successfully oppose a summary judgment motion, the opposing party must not only

26 produce evidence to establish the existence of a disputed fact, but also show that the dispute is

27 genuine (i.e., the jury could find for the opposing party on that fact under the applicable burden of

28 proof) and that the fact is material (i.e., it might affect the suit's outcome under applicable law).

1    *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 251-52 (1986); *Owens v. Local No. 169,*

2    *Assoc. of W. Pulp and Paper Workers*, 971 F.2d 347, 355 (9th Cir. 1987).

**IV.**

**THE COURT SHOULD GRANT SUMMARY JUDGMENT IN FAVOR OF PNC BECAUSE ALL OF PLAINTIFF'S CLAIMS ARE BARRED BY THE STATUTE OF LIMITATIONS**

**A.    Plaintiff's Claims Against PNC Are Governed By A Four-Year Limitations Period**

7    "To determine the statute of limitations which applies to a cause of action [under Califor-

8    nia law] it is necessary to identify the nature of the cause of action, *i.e.*, the 'gravamen' of the

9    cause of action." *Hensler v. City of Glendale*, 8 Cal. 4th 1, 22 (1994) (citations omitted). "[T]he

10   nature of the right sued upon and not the form of action nor the relief demanded determines the

11   applicability of the statute of limitations under our code." *Maguire v. Hibernia S. & L. Soc.,*

12   23 Cal. 2d 719, 733 (1944). "What is significant for statute of limitations purposes is the primary

13   interest invaded by defendant's wrongful conduct." *Barton v. New United Motor Manufacturing,*

14   *Inc.*, 43 Cal. App. 4th 1200, 1207 (1996).

15   Here, the Court's order on PNC's previous summary judgment motion identifies the grava-

16   men of Plaintiff's claims against PNC; namely, that by issuing Plaintiff a 1099-C form, PNC

17   allegedly "canceled" the debt and then "wrongfully" treated the National City Loan and deed of

18   trust as still valid and enforceable. *See* ECF No. 122, pp. 1, 7-12; *see also* ECF No. 44, ¶¶ 12-14,

19   19-20, 24, 36, 41, 42, 48. And the gravamen of Plaintiff's claims constitutes the predicate

20   wrongful act for each of her individual causes of action.

21   Plaintiff's claims against PNC are for (1) cancellation of recorded instruments, (2)

22   violation of California's Unfair Competition Law, (3) negligence, and (4) declaratory relief. And

23   the primary interest invaded by PNC's allegedly wrongful conduct, *i.e.*, the predicate act, is

24   Plaintiff's alleged rights to be released from the National City Loan and to have the deed of trust

25   reconveyed.

26   / / /

27   / / /

28   / / /

1    In its prior Memorandum and Order on PNC's first summary judgment motion, the Court

2    found that Plaintiff's claims are properly governed under a contractual modification analysis.[3]  See

3    ECF No. 122, pp. 7-12.  Thus, because Plaintiff's claims rely on the terms of the written 1099-C

4    form, they are subject to the four-year limitations period applicable to claims for breach of a

5    contract in writing.  Code Civ. Proc., § 337(a); *see JPMorgan Chase Bank, N.A. v. Ward*, 33 Cal.

6    App. 5th 678, 686 (2019) ["[A] claim is founded upon a writing … when it 'relies upon the

7    language within a written instrument or contract.' "]; *Smeaton v. Fidelity National Title*, 72 Cal.

8    App. 4th 1000, 1004 (1999).

9    But even if Plaintiff's claims were not viewed under a contractual modification analysis,

10    and instead governed by the statute of limitations for each of her enumerated claims, the

11    limitations period for each of Plaintiff's causes of action do not exceed four years.  For example,

12    four-year statutes of limitation govern claims for cancellation of instruments and for violation of

13    California's Unfair Competition Law ("UCL"; Bus & Prof. Code, § 17200, et seq.)  Code Civ.

14    Proc., § 343; *Keppler v. Bank of New York Mellon*, 815 Fed. Appx. 184, 185 (9th Cir. 2020)

15    (*citing Moss v. Moss*, 20 Cal. 2d 640, 644 (1942)); Bus. & Prof. Code, § 17208.[4]

16    Declaratory relief actions are governed by the same limitations period as the underlying

17

18    [3]    As discussed in its Motion to Modify Scheduling Order filed on October 14, 2024, PNC's
second motion for summary judgment is based on Plaintiff's unanticipated testimony at her July
19    26, 2024 deposition which revealed for the first time that she had, no later than 2011, both
discovered that PNC was still treating her loan as due and unpaid despite the 1099-C form she had
20    received and that she had suffered harm as a result.  ECF No. 183.

21    [4]    Plaintiff's claim for wrongful foreclosure is against Vida only.  However, were the court to
consider that claim, a wrongful foreclosure cause of action is governed by the statute of limitations
22    applicable to the underlying wrong which allegedly rendered the foreclosure wrongful.  *See, e.g.*
*Flores v. Fed. Home Loan Mortg. Corp., No.* 18-cv-1311, 2018 WL 6184778, at *3 (C.D. Cal.
23    Sept. 10, 2018); *Ancheta v. Mortg. Elec. Registration Sys., Inc.,* No. 16-cv-6520, 2017 WL
1164288, at *2 (N.D. Cal. Mar. 29, 2017) (3-year statute governs wrongful foreclosure claim
24    based on violation of non-judicial foreclosure statutes).  *See also Engstrom v. Kallins*, 49 Cal.
App. 4th 773, 781-83 (1996) (3-year statute governs wrongful foreclosure claim based on
25    noncompliance with statutory notice requirements); *Hatch v. Collins*, 225 Cal. App. 3d 1104, 1110
(1990) (3-year statute governs wrongful foreclosure claim based upon alleged fraudulent
26    conspiracy); *Susilo v. Wells Fargo Bank, N.A.*, 796 F. Supp. 2d 1177, 1195 (C.D. Cal. 2011) (3-
year statute applies to wrongful foreclosure claim whether based on fraud, fraudulent conspiracy,
27    or breach of statutory duty).

28

1  legal or equitable claim. *JPMorgan Chase Bank, N.A. v. Ward*, 33 Cal. App. 5th 678, 686 (2019);

2  *Bank of New York Mellon v. Citibank, N.A.*, 8 Cal. App. 5th 935, 943 (2017).  Hence, Plaintiff's

3  fifth cause of action is governed by the same four-year statute as her wrongful foreclosure claim.

4         If properly considered separately, Plaintiff's negligence claim is governed by the shorter

5  two-year limitations period of Code of Civil Procedure § 339(1).  *Dougherty v. Bank of Am., N.A.*,

6  177 F. Supp. 3d 1230, 1244 (E.D. Cal. 2016) (2-year statute applies to general negligence claims);

7  *see also Burt v. Irvine Co.,* 237 Cal. App. 2d 828, 865 (1965).

8  **B.    Plaintiff's Claims Against PNC Accrued In 2011 When She First Suffered Injury**

9         Under California law, "a cause of action accrues at 'the time when the cause of action is

10  complete with all its elements." *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797, 806 (2005).

11  That is to say, "the statute of limitations runs from 'the occurrence of the last element essential to

12  the cause of action." *Aryeh v. Canon Business Solutions, Inc.*, 55 Cal.4th 1185, 1191 (2013).  "As

13  used in this context, the elements of a cause of action are the generic elements of wrongdoing,

14  causation, and injury." *NBCUniversal Media, LLC v. Superior Ct.*, 225 Cal. App. 4th 1222, 1231

15  (2014) (internal quotes and citation omitted).

16         When damages are the last element to occur, "the infliction of appreciable and actual harm,

17  however uncertain in amount, will commence the statutory period. … [N]either uncertainty as to

18  the amount of damages nor difficulty in proving damages tolls the period of limitations." *Davies*

19  *v. Krasna*, 14 Cal. 3d 502, 514 (1975); *Bennett v. Ohio Nat'l Life Assurance Corp*., 92 Cal. App.

20  5th 723, 729 (2023).

21         In this case, Plaintiff alleges  PNC failed to release its lien (deed of trust) after issuing the

22  1099-C, which consequently harmed her credit.  ECF No. 44, ¶¶ 37, 44, 49.  Plaintiff's recent

23  deposition testimony confirms she incurred actual and appreciable harm from PNC's allegedly

24  wrongful act—the asserted resurrection of her allegedly "canceled" National City Loan—in 2011

25  when Plaintiff was unable to rent property for her business due to her low credit score which had

26  been impaired by PNC's negative reporting of the National City Loan.  SUF # 11.  That harm was

27  the last element of her claim to occur.  It gave Plaintiff an actionable claim under California's

28  Consumer Credit Reporting Agencies Act (Civ. Code, §§ 1785.25, 1785.31).

1    Even before then, Plaintiff also had a fully accrued, actionable claim against PNC for fail-

2  ure to cause recordation of a reconveyance of her second deed of trust.  Civ. Code, § 2941(a), (d).

3  Actual damage is not a required element of the cause of action under §2941.  A borrower may sue

4  and recover a statutory award of $500 without proof of any actual damage from late- or non- re-

5  cordation of the reconveyance.  Code Civ. Proc., § 2941(d); *Dixon v. Grossman*, 22 Cal. App. 3d

6  941, 944 (1972).  Hence, ordinarily, a claim under § 2941 accrues 31 days after the secured loan is

7  repaid or otherwise satisfied or canceled.  Code Civ. Proc., § 2941(a).

8    Absent some exception, Plaintiff's claim accrued, and the statute of limitations clock

9  started ticking, in 2010 (30 days after PNC issued the 1099-C form) or 2011 (when her rental

10  application was denied based on PNC's credit reporting).  Consequently, Plaintiff's claims expired

11  under the relevant statute of limitations in 2014 or, at the latest, in 2015—well before she initiated

12  this action on April 19, 2016.

13  **C.    Plaintiff Cannot Rely On Delayed Discovery To Postpone Accrual**

14    "The most important exception to the general rule regarding accrual of a cause of action is

15  the discovery rule [which] postpones accrual of a cause of action until the plaintiff discovers, or

16  has reason to discover, the cause of action."  *NBCUniversal Media, LLC*, 225 Cal. App. 4th at

17  1232 (internal quotes and citations omitted).

18    A plaintiff has reason to discover a cause of action upon inquiry notice, after which he or

19  she is required to conduct a reasonable investigation:

20        The discovery rule only delays accrual until the plaintiff has, or
        should have, inquiry notice of the cause of action. … [P]laintiffs are
21      charged with presumptive knowledge of an injury if they have infor-
        mation of circumstances to put [them] on inquiry or if they have the
22      opportunity to obtain knowledge from sources open to [their] inves-
        tigation.  In other words, plaintiffs are required to conduct a reason-
23      able investigation after becoming aware of an injury, and are
        charged with knowledge of the information that would have been
24      revealed by such an investigation.

25  *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797, 807-08 (internal quotes, citations and footnote

26  omitted).  "Under the discovery rule, suspicion of one or more of the elements of a cause of action,

27  coupled with knowledge of any remaining elements, will generally trigger the statute of

28  / / /

1    limitations period." *Id.*  For delayed discovery purposes, " 'elements' of a cause of action …

2    refer[] to the 'generic' elements of wrongdoing, causation, and harm." *Id.*

3         By 2011, Plaintiff had two reasons to know that PNC had not treated the National City

4    Loan as "canceled"—the underlying act on which her claims are based.  First, PNC had not sent

5    Plaintiff a reconveyance or other document reflecting satisfaction of her loan—which she testified

6    she expected to receive from PNC.  SUF # 12.  Second, Plaintiff checked her credit score and

7    knew it had been negatively impacted due to PNC's reporting the National City Loan as "180 days

8    past due."  SUF # 9, 10, 12.

9         Plaintiff also knew, by 2011 at the latest, that she had suffered harm.  She knew

10   immediately that she was harmed when her application to rent a house to conduct her care-giving

11   business was declined.   SUF # 13.

12        And Plaintiff knew then (in 2011) the cause of that harm:  her poor credit score.  *Id.*

13   Further, Plaintiff was aware in 2011 that it was PNC's negative reporting of her National City

14   Loan that had impaired her credit score.  She knew the low credit score included PNC's reports

15   about that loan.  *Id.*  And she knew she had no other "credit problems or issues" that would have

16   lowered her credit score.  SUF # 12.

17        In other words, because Plaintiff had knowledge of two elements of her claim and reason

18   to suspect – if not actual knowledge of – the remaining one no later than 2011, she cannot rely on

19   the discovery rule to postpone accrual of her claim beyond that year. Stated succinctly, in 2011,

20   Plaintiff had information regarding circumstances sufficient to put her on inquiry notice—the non-

21   receipt of an expected reconveyance and diminished credit score due to PNC's reporting of the

22   National City Loan as "180 days past due."  Plaintiff was, therefore, required – at the time – to

23   conduct a reasonable investigation.  Had Plaintiff conducted that reasonable investigation – as she

24   was legally obligated to do in 2011 – she would have discovered affirmatively that PNC's

25   negative reporting of the National City Loan and its failure to reconvey the deed of trust led to a

26   singular ineluctable conclusion:  the Loan was valid, existent and enforceable (*i.e.*, not

27   "cancelled").

28   / / /

**D.      The Limitations Period Is Not Postponed Or Restarted By Later, Different Injury**

The fact that Plaintiff has allegedly suffered a different and greater harm in 2016 due to Vida's foreclosure on the Property does not postpone or restart the limitations clock as to PNC. "[T]he extent of damage is not an element of a cause of action in tort" or contract. *Miller v. Lakeside Vill. Condo. Assn*., 1 Cal. App. 4th 1611, 1623 (1991). And, "if the statute of limitations bars an action based upon harm immediately caused by defendant's wrongdoing, a separate cause of action based on a subsequent harm arising from that wrongdoing would normally [be disallowed as it] amount[s] to splitting a cause of action." *Id.* at 1622 (citation omitted).

Plaintiff also cannot rely on either the continuing wrong or continuous accrual doctrines to save her otherwise time-barred claims as to PNC. The continuing wrong doctrine applies when "injuries are the product of a series of small harms, any one of which may not be actionable on its own." *Aryeh v. Canon Bus. Sols., Inc*., 55 Cal. 4th 1185, 1197 (2013) (citation omitted). Here, as in *Aryeh*, "nothing in the operative complaint alleges the presence of factors that might warrant application of the continuing violation doctrine. The complaint identifies a series of discrete, independently actionable alleged wrongs," not a course of wrongful conduct that became actionable only through the accumulation of a series of wrongful acts. *Id.* at 1198; *see Morgan v. Davidson,* 29 Cal. App. 5th 540, 560 (2018)*, disapproved on other grounds, Conservatorship of O.B.,* 9 Cal. 5th 989, 1010 n. 7 (2020). Instead, Plaintiff alleges only one or, at most two, discrete wrongful acts, revival of the allegedly canceled National City Loan and assignment of that loan to a third party. ECF No. 44, ¶¶ 13, 19, 20.

Under the continuous accrual doctrine "separate, recurring invasions of the same right can each trigger their own statute of limitations." *Aryeh*, 55 Cal.4th at 1198. "[C]ontinuous accrual applies whenever there is a continuing or recurring obligation." *Id.* at 1199. For example, the continuous accrual doctrine applies to a lender's claim for a borrower's breach of the monthly obligation to make payments on a home loan. *Piedmont Cap. Mgmt., L.L.C. v. McElfish*, 94 Cal. App. 5th 961, 969 (2023). By contrast, in this case, Plaintiff claims that PNC breached a single, indivisible duty to cancel her National City Loan. ECF No. 44, ¶¶ 13, 19, 20. And, after assigning the loan and second deed of trust to a third party, PNC had nothing further to do with

1    Plaintiff or the National City Loan.  So, the fact that Plaintiff suffered additional injury in 2016

2    from *Vida's* foreclosure did not revive Plaintiff's time-barred claim against PNC or restart the

3    limitations period applicable to that claim.

4        In short, Plaintiff's claims against PNC are time-barred.  The longest possible four-year

5    statute of limitations began to run no later than 2011 and expired in 2015, well before Plaintiff

6    filed this suit in April 2016.  Plaintiff cannot rely on the delayed discovery rule or the later harm

7    she suffered to avoid that time bar.  Accordingly, PNC is entitled to summary judgment on

8    Plaintiff's claims against it.

9                                      **V.**

10    **ALTERNATIVELY, PNC IS ENTITLED TO PARTIAL SUMMARY JUDGMENT**

11        If, for any reason, the Court denies summary judgment as to all of Plaintiff's claims against

12    PNC, it should grant partial summary judgment on Plaintiff's fifth cause of action for negligence.

13        As already stated, that claim is governed by a two-year statute of limitations.  Code Civ.

14    Proc., § 339(1); *Dougherty*, 177 F. Supp. 3d at 1244.  At the very latest, the negligence claim

15    accrued in May 2012.  In that month, Plaintiff received PNC's letter stating that it had transferred

16    the servicing of the National City Loan to a third party.  SUF # 15.  Transfer of loan servicing

17    rights in the National City Loan was plainly inconsistent with PNC's allegedly having canceled

18    that loan.  So, Plaintiff unquestionably "discovered" her claim against PNC upon receipt of that

19    letter.

20        As already pointed out, apart from delayed discovery, Plaintiff's claim accrued no later

21    than 2011 when she suffered harm from PNC's revival of the National City Loan or earlier when

22    Plaintiff had an actionable claim under Civil Code section 2941 even without proof of actual

23    damage.

24        Thus, the two-year limitations period began to run on Plaintiff's negligence claim in 2011

25    at the latest and expired in 2013, well before Plaintiff filed this action in 2016.

26    / / /

27    / / /

28    / / /

1

**VI.**

2

**CONCLUSION**

3      For the reasons stated above, the Court should grant this motion and enter summary judg-

4  ment against Plaintiff and in favor of PNC.  Alternatively, the Court should grant partial summary

5  judgment on Plaintiff's fifth cause of action for negligence.

6

7  DATED:  October 14, 2024            SEVERSON & WERSON
                                       A Professional Corporation
8

9                                      By:  _____*/s/ Andrew S. Elliott*_____

10                                           ANDREW S. ELLIOTT

11                                     Attorneys for Defendant PNC BANK, N.A. (sued as
                                       "PNC BANK, NATIONAL ASSOCIATION S/B/M
12                                     NATIONAL CITY MORTGAGE")

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ANDREW S. ELLIOTT (State Bar No. 254757)
ase@severson.com
BENJAMIN J. HOWARD (State Bar No. 320682)
bjh@severson.com
SEVERSON & WERSON
A Professional Corporation
595 Market Street, Suite 2600
San Francisco, California 94105
Telephone: (415) 398-3344
Facsimile: (415) 956-0439

Attorneys for Defendant PNC BANK, N.A. (sued
as "PNC BANK, NATIONAL ASSOCIATION
S/B/M NATIONAL CITY MORTGAGE")

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION

| | |
|---|---|
| GENET HABTEMARIAM,<br><br>Plaintiff,<br><br>vs.<br><br>VIDA CAPITAL GROUP, LLC; US MORTGAGE RESOLUTION; PNC BANK, NATIONAL ASSOCIATION S/B/M NATIONAL CITY MORTGAGE and DOES 1 to 50, inclusive,<br><br>Defendants. | Case No. 2:16-CV-01189-DC-AC<br><br>**STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF PNC BANK, N.A.'S MOTION FOR SUMMARY JUDGMENT**<br><br>Filed concurrently with Notice of Motion; Supporting Memorandum, Declarations of Michael Bivens and Andrew S. Elliott<br><br>Date:  _____, 2025<br>Time:  1:30 p.m.<br>Crtrm.:  8, 13th Floor |

Pursuant to Local Rule 260(a), Defendant PNC BANK, N.A., sued as PNC BANK, NATIONAL ASSOCIATION S/B/M NATIONAL CITY MORTGAGE ("PNC"), submits this Statement of Undisputed Facts in support of its motion for summary judgment or in the alternative partial summary judgment on the claims of plaintiff Genet Habtemariam ("Plaintiff").

| Undisputed Material Fact | Supporting Evidence |
|---|---|
| 1.  In 2001, Plaintiff bought the house at 7 Shipman Court, Sacramento (the "Property"). | Declaration of Andrew S. Elliott, ¶4, Ex. 1; Deposition of Genet Habtemariam taken on September 11, 2019 ("Plaintiff Depo. I"), 13:18-22, 18:15-17.  Ex. 1, at 7, 10. |

| Undisputed Material Fact | Supporting Evidence |
|---|---|
| 2.  In March 2007, Plaintiff obtained a $348,000 loan from Gateway Bank secured by a first deed of trust on the Property. | Plaintiff Depo I, 15:7-22.  Ex. 1, at 8. |
| 3.  In June 2007, Plaintiff obtained a $43,500 loan from National City Bank ("National City Loan") secured by a second deed of trust on the Property. | Plaintiff Depo. I, 17:7-20.  Ex. 1, at 9. |
| 4.  In 2009, PNC merged with National City Bank, thereby acquiring the National City Loan. | Declaration of Michael Bivens ("Bivens Decl.", ¶3. |
| 5.  In April 2009, Plaintiff defaulted on the National City Loan. | Plaintiff Depo. I, 17:21-24.  Ex. 1, at 9. |
| 6.  In February 2010, PNC charged off the National City Loan. | Declaration of Bivens Decl, ¶5. |
| 7.  In June 2010, Plaintiff received a 1099-C form from PNC.  The form is titled "Cancellation of Debt."  It stated $46,134.46 as the "amount of debt canceled." | ECF No. 116-3, Ex. B; Plaintiff Depo. I, 24:15-23, 39:2-3.  Ex. 1, at 11, 13. |
| 8.  Since 2010, Plaintiff has checked her credit score at least once a year. | Declaration of Andrew S. Elliott, ¶5, Ex. 2; Deposition of Genet Habtemariam taken on July 26, 2024 ("Plaintiff Depo. II"), 25:12-17, 26:8-13.  Ex. 2, at 9-10. |
| 9.  In 2010, Plaintiff knew the PNC's reporting of the National City Loan was reflected on her credit report. | Plaintiff Depo. II, 26:20-27:16.  Ex. 2, at 10-11. |
| 10. Between 2010 and approximately 2017, PNC reported the National City Loan to the credit reporting agencies as "180 days past due," along with the outstanding balance. | Bivens Decl, ¶7. |
| 11.  PNC has never transmitted information to the credit reporting agencies that the National City Loan had been cancelled, waived, discharged, paid off or otherwise forgiven in any way. | Bivens Decl, ¶8. |
| 12. Apart from the National City Loan and a dispute about her loan from Gateway Bank, which was resolved in 2009, Plaintiff had no other "credit problems or issues" except for "the PNC debt." | Plaintiff Depo. II, 24:16-19, 28:13-21, 133:4-16. Ex. 2, at 8, 12, 16. |
| 13. In 2011, Plaintiff attempted to rent a property for her business but was unable to do so because of her "poor credit," which included PNC's reporting about the | Plaintiff Depo. II, 22:9-23:11.  Ex. 2, at 6-7. |

Statement of Undisputed Facts in Support of PNC Bank, N.A.'s Motion for Summary Judgment

| Undisputed Material Fact | Supporting Evidence |
|---|---|
| National City Loan. | |
| 14. Although she expected PNC would send her "some sort of clearance to give [her] deed [of trust] back", Plaintiff never received one. | Plaintiff Depo. II, 71:20-21, 70:23-72:9. Ex. 2, at 13-15. |
| 15. In May 2012, Plaintiff received a letter from PNC stating that the servicing of the Loan would be transferred to BSI Financial Services, Inc. | ECF No. 116-3, Ex. E; Plaintiff Depo. I, 36:9-11, 36:17-24. |
| 16.  Through a series of assignments, the loan and the second deed of trust was ultimately transferred to defendant Vida Capital Group, LLC ("Vida"). | ECF No. 44, ¶14. |
| 17.  In February 2016, Vida foreclosed on the Property in 2016 and a trustee's deed upon sale was recorded conveying the Property to Vida. | ECF No. 44, ¶14. |
| 18. Plaintiff filed this action in state court on April 19, 2016. | ECF No. 122, 4:4-5. |

DATED:  October 14, 2024

SEVERSON & WERSON
A Professional Corporation


By:  ___/s/ Andrew S. Elliott___
          ANDREW S. ELLIOTT

Attorneys for Defendant PNC BANK, N.A. (sued as "PNC BANK, NATIONAL ASSOCIATION S/B/M NATIONAL CITY MORTGAGE")

1  ANDREW S. ELLIOTT (State Bar No. 254757)
   ase@severson.com
2  BENJAMIN J. HOWARD (State Bar No. 320682)
   bjh@severson.com
3  SEVERSON & WERSON
   A Professional Corporation
4  595 Market Street, Suite 2600
   San Francisco, California 94105
5  Telephone: (415) 398-3344
   Facsimile: (415) 956-0439
6
7  Attorneys for Defendant PNC BANK, N.A. (sued
   as "PNC BANK, NATIONAL ASSOCIATION
   S/B/M NATIONAL CITY MORTGAGE")
8
9                      UNITED STATES DISTRICT COURT
10         EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION
11

| | |
|---|---|
| 12  GENET HABTEMARIAM, | Case No. 2:16-CV-01189-DC-AC |
| 13         Plaintiff, | **DECLARATION OF ANDREW S. ELLIOTT IN SUPPORT OF PNC BANK, N.A.'S MOTION FOR SUMMARY JUDGMENT** |
| 14     vs. | |
| 15  VIDA CAPITAL GROUP, LLC; US MORTGAGE RESOLUTION; PNC BANK, | *Filed concurrently with Notice of Motion, Supporting Memorandum, Statement of Undisputed Facts, Declaration of Michael Bivens* |
| 16  NATIONAL ASSOCIATION S/B/M NATIONAL CITY MORTGAGE and DOES | |
| 17  1 to 50, inclusive, | |
| 18         Defendants. | Date:      _____, 2025 |
| 19 | Time:      1:30 p.m.\nCrtrm.:   8, 13th Floor |

20       I, Andrew S. Elliott, declare:

21       1.     I am an attorney licensed to practice before this Court.

22       2.     I am a member of the law firm of Severson & Werson, P.C., attorneys of record for

23  Defendant PNC BANK, N.A., sued as PNC BANK, NATIONAL ASSOCIATION S/B/M

24  NATIONAL CITY MORTGAGE ("PNC"), in this action.

25       3.     I make this declaration in support of PNC's Motion for Summary Judgment.  I have

26  personal knowledge of the matters set forth in this declaration, and if called upon to do so, I could

27  and would testify competently to same.

28  / / /

4.      On September 11, 2019, PNC's former counsel, Jonathan Cahill of the Wolfe & Wyman LLP firm, took the deposition of plaintiff Genet Habtemariam.  Attached hereto as **Exhibit 1** are true and correct copies of the beginning and ending pages of the transcript of that deposition together with true and correct copies of the pages of the transcript cited in the statement of undisputed facts and memorandum support the summary judgment motion.

5.      On July 26, 2024, I took the deposition of plaintiff Genet Habtemariam.  Attached hereto as **Exhibit 2** are true and correct copies of the beginning and ending pages of the transcript of that deposition together with true and correct copies of the pages of the transcript cited in the statement of undisputed facts and memorandum support the summary judgment motion.

6.      PNC has complied with Local Rule 133(j) by submitting electronic copies of the entire transcripts of plaintiff's September 11, 2019 and July 26, 2024 depositions to Judge England's email box and concurrently emailing the transcript to all other parties.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  This Declaration was executed on October 14, 2024, in Phoenix, Arizona.


Andrew S. Elliott

Declaration of Andrew S. Elliott in Support of PNC Bank, N.A.'s Motion for Summary Judgment

# Exhibit 1

# (Elliott Declaration)

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA


GENET HABTEMARIAM,                    )
                                      )
              Plaintiff,              )
                                      )
        vs.                           ) Case No.
                                      )
VIDA CAPITAL GROUP, LLC; US           ) 2:16-cv-01189
MORTGAGE RESOLUTION; PNC BANK,        ) -MCE-AC
NATIONAL ASSOCIATION S/B/M            )
NATIONAL CITY MORTGAGE and            )
DOES 1 to 50, inclusive,             )
                                      )
              Defendants.             )
_____)




DEPOSITION OF GENET HABTEMARIAM

SACRAMENTO, CALIFORNIA

Wednesday, September 11, 2019







REPORTED BY:
Theresa Nadeau, CSR No. 10526

JOB NO.: 45212

GENET HABTEMARIAM

September 11, 2019

```
 1              UNITED STATES DISTRICT COURT

 2            EASTERN DISTRICT OF CALIFORNIA

 3
     GENET HABTEMARIAM,                )
 4                                     )
                    Plaintiffs,        )
 5                                     )
                    vs.                ) Case No.
 6                                     )
     VIDA CAPITAL GROUP, LLC; US       ) 2:16-cv-01189
 7   MORTGAGE RESOLUTION; PNC BANK,    ) -MCE-AC
     NATIONAL ASSOCIATION S/B/M        )
 8   NATIONAL CITY MORTGAGE and        )
     DOES 1 to 50, inclusive,          )
 9                                     )
                    Defendants.        )
10   _____)

11

12

13

14

15

16

17

18            Deposition of GENET HABTEMARIAM taken on

19   behalf of Defendants, at the Law Offices of Wolfe

20   & Wyman, 980 9th Street, Suite 1750, Sacramento,

21   California, at 10:11 a.m. on Wednesday,

22   September 11, 2019, before Theresa Nadeau,

23   Certified Shorthand Reporter No. 10526.

24

25
```

GENET HABTEMARIAM
September 11, 2019

```
 1                           APPEARANCES

 2
      FOR THE PLAINTIFF:
 3
              LAW OFFICES OF TED GREENE, INC.
 4            BY:  MATTHEW ENGEBRETSON
              1912 F Street, Suite 110
 5            Sacramento, California  95811
              (916) 442-6400
 6            mengebretson@tedgreenelaw.com

 7    FOR THE DEFENDANT PNC BANK, N.A.:

 8            WOLFE & WYMAN LLP
              BY:  JONATHAN C. CAHILL
 9            980 9th Street, Suite 1750
              Sacramento, California 95814
10            (916) 912-4700
              jccahill@wolfewyman.cm
11

12

13                         --oOo--

14

15

16

17

18

19

20

21

22

23

24

25
```

EX 1 - 03

GENET HABTEMARIAM

September 11, 2019

```
 1                    I N D E X

 2   WITNESS

 3   GENET HABTEMARIAM

 4   Examination by:                          Page

 5    Mr. Cahill                                6

 6    Mr. Engebretson                          68

 7

 8

 9

10                 E X H I B I T S

11   Defendants'    Description               Page

12   Exhibit 1    September 4, 2009 letter to    16
                  Ms. Habtemariam from Gateway Bank
13
     Exhibit 2    April 8, 2009 letter to        20
14                Ms. Habtemariam from National City
                  Mortgage
15
     Exhibit 3    June 16, 2009 letter to Ms.    21
16                Habtemariam from National City
                  Mortgage
17
     Exhibit 4    July 17, 2009 two-page letter to  21
18                Dear Customer from Customer
                  Counseling Department
19
     Exhibit 5    2010 1099-C                    24
20
     Exhibit 6    2010 Form 1040 U.S. Individual  26
21                Income Tax Return
22   Exhibit 7    April 26, 2010 two-page letter to  29
                  Dear Mortgagor from PNC Mortgage
23
     Exhibit 8    May 18, 2010 letter to Ms.     34
24                Habtemariam from Beverly Gilen,
                  PNC Mortgage
25
```

EX 1 - 04

GENET HABTEMARIAM

September 11, 2019

```
 1                    E X H I B I T S (Continued)

 2     Defendants'      Description                        Page

 3     Exhibit 9        Notice of Assignment, Sale or        36
                        Transfer of Servicing Rights,
 4                      six pages

 5     Exhibit 10       July 17, 2012 notice from US         40
                        Mortgage Resolution
 6
       Exhibit 11       July 23, 2012 notice from US         43
 7                      Mortgage Resolution

 8     Exhibit 12       July 23, 2012 notice from US         45
                        Mortgage Resolution
 9
       Exhibit 13       July 25, 2012 notice from US         46
10                      Mortgage Resolution

11     Exhibit 14       December 23, 2012 letter to Dear     47
                        Borrower from BSI Financial Services
12
       Exhibit 15       December 18, 2014 letter to Mrs.     49
13                      Habtemariam from Esther Bell,
                        Diversified Loan Services
14
       Exhibit 16       January 5, 2015 letter to Mrs.       51
15                      Habtemariam from Martha van Gastel,
                        Diversified Loan Services, Inc.
16
       Exhibit 17       January 15, 2015 to Mrs. Habtemariam 55
17                      from Esther Bell

18     Exhibit 18       February 17, 2015 letter to Mrs.     56
                        Habtemariam from Esther Bell
19
       Exhibit 19       E-mail correspondence between Genet  58
20                      Habtemariam and Cherie Maples

21     Exhibit 20       Documents produced by plaintiff at   64
                        deposition
22

23
                            --oOo--
24

25
```

EX 1 - 05

GENET HABTEMARIAM
September 11, 2019

```
 1                    SACRAMENTO, CALIFORNIA

 2        Wednesday, September 11, 2019, 10:11 a.m.-12:54 p.m.

 3

 4                    GENET HABTEMARIAM,

 5              a witness herein, after having been

 6              administered the oath by the Certified

 7              Shorthand Reporter, was examined and

 8              testified as follows:

 9

10              E X A M I N A T I O N

11   BY MR. CAHILL:

12        Q.   Good morning, Ms. Habtemariam.

13        A.   Good morning.

14        Q.   If you could please spell your name for the

15   record.

16        A.   G-e-n-e-t.

17        Q.   And your last name?

18        A.   Habtemariam, H-a-b-t-e-m-a-r-i-a-m.

19        Q.   And have you ever been deposed before?

20        A.   No.

21        Q.   So since you haven't been deposed before, I'd

22   like to go over some of the basic ground rules for this

23   deposition.  First, you've just been put under oath,

24   under penalty of perjury, as if you were testifying in a

25   court of law.  Do you understand this?
```

GENET HABTEMARIAM

September 11, 2019

```
 1        Q.    Did you talk to anyone in preparation for this
 2   deposition?  And before you answer, if you discussed
 3   this deposition with your counsel, that's fine, you can
 4   tell me you met with him and for how long, but I don't
 5   want to know the substance.
 6        A.    I talked with my lawyer.  That's it.
 7        Q.    Did you do anything else to prepare for this
 8   deposition today?
 9        A.    No.
10        Q.    Do you currently live at 7 Shipman Court in
11   Sacramento, California 95823?
12        A.    Yes.
13        Q.    Going forward I might just refer to that as the
14   property, okay?
15        A.    Yes.
16        Q.    How long have you lived there?
17        A.    Since 2005.
18        Q.    Is that when you bought the property?
19        A.    No.  I bought it in 2001.
20        Q.    Were you using it as a rental from 2001 to
21   2005?
22        A.    I did.
23        Q.    And does anyone else live with you at the
24   property?
25        A.    Yes.
```

EX 1 - 07

GENET HABTEMARIAM

September 11, 2019

1      Q.    Any children?

2      A.    One.

3      Q.    And how old is that child?

4      A.    He's 45.

5      Q.    And what's his name?

6      A.    Gideon.

7      Q.    And at some point you took out a first loan

8    with Gateway Bank against the property; is that correct?

9      A.    Yes.

10      Q.    Do you know approximately when you took out

11   that loan?

12      A.    In 2007.

13      Q.    Does March 2007 sound about right?

14      A.    Yes.

15      Q.    And what was the balance of the loan that you

16   took out?

17          MR. ENGEBRETSON:  Objection, vague as to time.

18   At the time she took it out?

19   BY MR. CAHILL:  That's fine.

20      Q.    At the time that you took out the loan with

21   Gateway, how much did you borrow?

22      A.    348.

23      Q.    And did that ever -- did that loan ever go into

24   default?

25      A.    Yes.

EX 1 - 08

GENET HABTEMARIAM

September 11, 2019

1      Q.    This is a letter you received from Gateway Bank

2   regarding that loan modification, correct?

3      A.    Yes.

4      Q.    And it states that the new loan balance would

5   be $389,999.65, correct?

6      A.    Yes, I see that.

7      Q.    Thank you.  Now, you also took out a second

8   loan with PNC, correct?

9      A.    Yes.

10     Q.    At the time it was called National City Bank.

11  Sometimes I'll use that interchangeably because they

12  merged.  Do you know when you took out that loan?

13     A.    In 2007, same year.

14     Q.    Does June 2007 sound correct?

15     A.    Yes.

16     Q.    What was the amount of the loan that you took

17  out?

18     A.    46,000.  I mean 43,000 maybe.

19     Q.    Does 43,500 sound correct?

20     A.    Yes.

21     Q.    And did that loan ever go into default?

22     A.    Yes.

23     Q.    Do you know approximately when?

24     A.    In 2009 maybe.  April of 2009.

25     Q.    Did you ever receive a loan modification on

EX 1 - 09

GENET HABTEMARIAM

September 11, 2019

1   that loan?

2        A.    I asked, but I wasn't qualified.

3        Q.    So you received letters denying loan

4   modifications?

5        A.    Yes.

6        Q.    Did you ever attempt a short sale of the

7   property?

8        A.    I did.

9        Q.    And what was the outcome of that?

10       A.    The first mortgage wouldn't allow me to sell

11   for the short sale.

12       Q.    So Gateway Bank didn't consent to the short

13   sale?

14       A.    No.

15       Q.    You said that you purchased the property in

16   2001.  How much did you pay for the property?

17       A.    210,000.

18       Q.    I'm sorry.  One more time?

19       A.    210,000.

20       Q.    And in 2007, when you took out the Gateway loan

21   and the PNC loan, do you know approximately what the

22   value of the property was?

23       A.    I believe it was 460,000.

24       Q.    And earlier we discussed you attempted to short

25   sell the property.  Did you receive any offers on that

GENET HABTEMARIAM
September 11, 2019

```
 1   transfer the loan to other people?
 2       A.   Yes.
 3            MR. ENGEBRETSON:  Sorry.  Belated objection.
 4   I'm presuming these are general questions, not tied to a
 5   specific time, because obviously in this case we --
 6            MR. CAHILL:  Yes.  I'm more talking about at
 7   the time the loan was originated.
 8            MR. ENGEBRETSON:  Got it.  In that case I'm
 9   perfectly fine with the question.
10            MR. CAHILL:  I'm going to hand you another
11   document that we'll mark as Exhibit 5.
12            (Defendants' Exhibit 5 was marked for
13            identification.)
14   BY MR. CAHILL:
15       Q.   Do you recognize this document?
16       A.   Yes.
17       Q.   Did you receive this document in the mail?
18       A.   Yes.
19       Q.   And did you read it?
20       A.   Yes.
21       Q.   And to be clear, this appears to be an IRS form
22   1099-C, correct?
23       A.   Correct.
24       Q.   Now, if I could direct your attention to the
25   top of the instructions, it states, "You may not have to
```

EX 1 - 11

GENET HABTEMARIAM

September 11, 2019

1      Q.   Thank you.  That's not a problem.  They merged,

2  so I'm using them interchangeably.

**3      A.   Okay.**

4      Q.   I'm going to hand you another document that

5  we'll mark as Exhibit 9.

6           (Defendants' Exhibit 9 was marked for

7           identification.)

8  BY MR. CAHILL:

9      Q.   This is a letter from PNC to yourself dated May

10  5th, 2012, correct?

**11      A.   Correct.**

12      Q.   Did you receive this letter?

**13      A.   I believe so.**

14      Q.   And I assume you read the letter if you

15  received it, correct?

**16      A.   Yes.**

17      Q.   And I'll direct your attention to the first

18  paragraph of this letter, and it states that the

19  servicing of your loan has been assigned, sold or

20  transferred from PNC Mortgage, division of PNC Bank,

21  National Association, to BSI Financial Services, Inc.,

22  effective with your next payment due on or after May 1,

23  2012, correct?

**24      A.   Correct.**

25      Q.   So prior to this letter, PNC was still

EX 1 - 12

GENET HABTEMARIAM

September 11, 2019

1    **debt.**

2        Q.   When did you receive that 1099?

3        A.   In June 2010.

4        Q.   Besides the 1099-C, has PNC ever told you that

5    the loan had been forgiven?

6        **A.   No.**

7        Q.   Has PNC ever told you that the loan had been

8    discharged?

9        **A.   Yes.  When I get the 1099-C.**

10        Q.   And outside of the 1099-C, has PNC ever told

11    you that the loan has been discharged?

12        **A.   No.**

13        Q.   And outside of the 1099-C, has PNC ever told

14    you that the loan has been canceled?

15        **A.   No.**

16        Q.   Has PNC ever told you that the loan was

17    unenforceable?

18            MR. ENGEBRETSON:  Outside of the 1099-C?

19            MR. CAHILL:  Outside of the 1099-C.

20            **THE WITNESS:  What does enforceable mean?**

21    BY MR. CAHILL:

22        Q.   Good question.  I might need to break that

23    down.

24        **A.   Okay.  I'm sorry.**

25        Q.   Did PNC ever tell you that it no longer had a

GENET HABTEMARIAM
September 11, 2019

```
 1      A.   Yes.
 2      Q.   Does the fact that you offered to pay mean that
 3  you believed you had a loan that had to be repaid or was
 4  it your attempt to just make the problem go away?
 5      A.   I just want to get rid of those, you know,
 6  people who are coming who want my title, so I want to
 7  pay them and get rid of that problem, so that was it.
 8      Q.   But you believe the loan itself had
 9  been canceled -- or the obligation --
10      A.   The loan was canceled, yeah.
11           MR. ENGEBRETSON:  I don't think I have any
12  further questions.  Thank you.  He may have some.
13           MR. CAHILL:  Nothing further.
14           THE REPORTER:  Counsel, did you want a copy?
15           MR. ENGEBRETSON:  I want a copy, but I don't
16  need it quite as fast as he does.
17  //
18           (Whereupon, the deposition of GENET
19  HABTEMARIAM concluded at 12:54 p.m.)
20                     --o0o--
21
22
23
24
25
```

GENET HABTEMARIAM
September 11, 2019

```
 1              I have read the foregoing transcript, and I
 2     declare under penalty of perjury the testimony therein
 3     to be true and correct.
 4              Executed this _____ day of _____,
 5     2019 at _____, California.
 6
 7
 8                                 GENET HABTEMARIAM
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

EX 1 - 15

GENET HABTEMARIAM

September 11, 2019

```
 1   STATE OF CALIFORNIA,      )
                               :  ss.
 2   COUNTY OF MERCED          )

 3

 4           I, Theresa Nadeau, do hereby certify:

 5           That I am a licensed, Certified Shorthand

 6   Reporter, duly qualified and certified as such by the

 7   State of California;

 8           That prior to being examined, the witness

 9   named in the foregoing deposition was by me duly sworn

10   to testify to the truth, the whole truth and nothing but

11   the truth;

12           That the said deposition was by me recorded

13   stenographically at the time and place first therein

14   mentioned; and the foregoing pages constitute a full,

15   true, complete and correct record of the testimony given

16   by the said witness;

17           That I am a disinterested person, not being in

18   any way interested in the outcome of said action, nor

19   connected with, nor related to any of the parties in

20   said action, or to their respective counsel, in any

21   manner whatsoever.

22           Dated this 16th day of September, 2019.

23

24   _____
         Theresa Nadeau, CSR No. 10526
25
```

# Exhibit 2

# (Elliott Declaration)

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION

-oOo-


GENET HABTEMARIAM,

        Plaintiff,

v.                          Case No. 2:16-CV-01189-MCE-AC

VIDA CAPITAL GROUP, LLC; US

MORTGAGE RESOLUTION; PNC BANK,

NATIONAL ASSOCIATION S/B/M

NATIONAL CITY MORTGAGE and

Does 1 to 50, inclusive,

        Defendants.

_____/




Deposition of:

GENET HABTEMARIAM

_____

Friday, July 26, 2024




Magna Legal Services                Reported by:

866-624-6221                        Donielle Del Carlo

www.MagnaLS.com                     CSR No. 10476



Page 2

```
 1                    I N D E X
 2
 3              INDEX OF EXAMINATIONS
 4
 5                                         Page
 6  Examination by Mr. Elliott              05
 7  Examination by Mr. Rigonan              79
 8
 9                    - - -
10
11          I N D E X   O F   E X H I B I T S
12
13  Defendants'
14  Exhibits:                              Page:
15  Exhibit 21   PNC Bank, N.A.'s Second Amended . . . . 09
                 Notice of Deposition of Plaintiff
16               Genet Habtemariam
17  Exhibit 22   Plaintiff's Responses to Special . . . .18
18  Exhibit 23   Addendum to April 1, 2016 . . . . . . . 33
                 Attorney-Client Legal Services
19               Agreement
20  Exhibit 24   Plaintiff's Responses to Requests . . . 36
                 for Production of Documents (Set Two)
21
    Exhibit 25   Letter dated March 19, 2015 from . . . .41
22               HERA Attn: Vida Capital Group,
                 Malcolm Durham, Diversified Loan
23               Services
24  Exhibit 26   Letter dated April 01, 2015 from . . . .48
                 PNC Mortgage to Genet Habtemariam
25
```



Page 3

1    Index of Exhibits (cont'd.)
2    Defendants'
3    Exhibits:                                           Page:
4    Exhibit 27    Letter dated October 16, 2015 from . . .67
                   HERA to Vida Capital Group,
5                  Malcolm Durham, Christopher Bauer, Law
                   Offices of Michelle Ghidotti
6
     Exhibit 28    Wells Fargo Bank document dated . . . . 72
7                  01-May-24 to Genet Habtemariam
8    Exhibit 29    California Association of Realtors . . .98
                   Residential Lease or Month-to-Month
9                  Rental Agreement dated 07/14/2019
10   Exhibit 30    California Association of Realtors . . .113
                   Residential Lease or Month-to-Month
11                 Rental Agreement term beginning 08/1/20
12   Exhibit 31    California Association of Realtors . . .121
                   Residential Lease or Month-to-Month
13                 Rental Agreement term beginning 07/1/22
14   Exhibit 32    Report, Listing History, 7 Shipman Ct.  128
                   Sacramento, CA
15
     Exhibit 33    Listing - 7 Shipman Ct., Sacramento, CA 131
16
     Exhibit 34    Listing - 7 Shipman Ct., Sacramento, CA 136
17
     Exhibit 35    Listing - 7 Shipman Ct., Sacramento, CA 139
18
     Exhibit 36    Listing - 7 Shipman Ct., Sacramento, CA 143
19
     Exhibit 37    California Association of Realtors . . .145
20                 Residential Listing Agreement
                   beginning dated December 3, 2015
21
     Exhibit 38    Listing - 7 Shipman Ct., Sacramento, CA 152
22
23                              -oOo-
24
25



Page 4

```
 1                A P P E A R A N C E S

 2

 3   FOR PLAINTIFF:

 4         GREENE & MALONEY

 5         BY:  MICHAEL MALONEY, ESQ.

 6         1912 F Street, Suite 110

 7         Sacramento, California 95811

 8         916.442.6400

 9         mmaloney@tedgreenelaw.com

10   FOR PLAINTIFF, VIDA CAPITAL GROUP, LLC:

11         BPR LAW GROUP

12         BY:  BRIAN P. RIGONAN, ESQ.

13         885 Oak Grove Avenue, Suite 102-4

14         Menlo Park, California 94025

15         650.704.7641398.3344

16         brian.rigonan@bprlawgroup.com

17   FOR DEFENDANT, PNC BANK, N.A., (sued as "PNC BANK,

18   NATIONAL ASSOCIATION S/B/M NATIONAL CITY MORTGAGE"):

19         SEVERSON & WERSON

20         BY:  ANDREW S. ELLIOTT, ESQ.

21         595 Market Street, Suite 2600

22         San Francisco, California 94105

23         415.398.3344

24         ase@severson.com

25    Also present:  Malcolm Durham, Vida Capital Group
```



Ex. 2 - 04

Page 5

1        BE IT REMEMBERED that, pursuant to Notice of

2   Taking Deposition, and on Wednesday, March 8, 2024,

3   commencing at the hour of 9:59 a.m., at 595 Market

4   Street, Suite 2600, San Francisco, California 94105,

5   before me, DONIELLE DEL CARLO, a Certified Shorthand

6   Reporter in the State of California, appeared

7                        GENET HABTEMARIAM,

8   called as a witness herein; and the said witness, being

9   by me first duly sworn was thereupon examined and

10  testified as is hereinafter set forth.

11                        -oOo-

12                        EXAMINATION

13  BY MR. ELLIOTT:

14      Q    Thank you, Ms. Habtemariam, for making your

15  way to San Francisco for today's deposition.

16           Other than your 2019 deposition, have you

17  given any other depositions?

18      A    Yes.

19      Q    Can you tell me about those depositions?

20      A    Oh, you mean deposition?  No.

21      Q    Deposition, yes.

22      A    This is it.  No.

23      Q    Okay.  So this is the second time --

24      A    Yeah.

25      Q    -- that you've been deposed?



```
 1      Q     Okay.  I'm confused.  And I'm sure it's on my
 2  end --
 3      A     Yeah, for the business.
 4      Q     -- but.
 5      MR. MALONEY:  Wait.
 6      MR. ELLIOTT:  Let me try again.
 7      THE WITNESS:  Okay.
 8  BY MR. ELLIOTT:
 9      Q     When I asked if you had applied for credit and
10  been denied, I think your response was no, but then you
11  also mentioned something about trying to rent a house.
12      A     Rent a house for the business, I mean.
13      Q     Right.
14      Q     What the credit has make me, I couldn't do it
15  without the credit, that's what I was trying to mention,
16  you know, trying to rent.
17      Q     Right.
18      A     Or to buy cars.
19      Q     Yeah.
20      A     I can't do it without the credit score.
21      Q     Did you try to rent a house and the landowner,
22  the property owner said no?
23      A     That's, yes, of course.
24      Q     That did happen?
25      A     It did happen long time.
```



1      Q      When did that happen?

2      A      Maybe 2011 or so.  I don't remember.  Because

3   houses were really down then, so the price was better.

4      Q      Okay.

5      A      I tried different places.

6      Q      So you tried to rent a house in 2011, and you

7   were denied, I guess, the ability to rent that house

8   because of poor credit?

9      A      Yes.

10      Q      And that included the PNC loan debt, correct?

11      A      That's correct.

12      Q      Okay.  Do you know where that property was

13   located, do you remember?  I know it was a long time

14   ago.

15      A      It's a long time ago, but I know it's in San

16   Jose, you know.

17      Q      Do you remember what the landowner told you

18   when he or she denied your rental application?

19      A      It's a long time, so I don't remember.

20      Q      Okay.  And, again, I don't remember is a

21   perfectly fine answer.

22      A      Okay.

23      Q      You don't need to apologize for that.  The

24   property was in San Jose, you can't remember what the

25   landowner said.  Can you remember any other specifics of



Page 24

```
 1    that application and ultimate rejection?

 2         A    No, I don't remember.

 3         Q    Okay.  Okay.  Other than the 2011 rental

 4    application, did you try to apply for -- to rent

 5    property for a caregiving business after 2011?

 6         A    No, I didn't.

 7         Q    Okay.  You had mentioned vehicles.  Have you

 8    tried to apply for financing for a vehicle since 2010?

 9         A    I didn't.  Because I knew it's because of my

10    credit I would not get the loan, so I didn't.

11         Q    Okay.  Fair enough.  I'm sorry.  Let's go back

12    to the 2011 rental application.

13              After your application was denied, did you try

14    to contest that at all with the landowner?

15         A    No.

16         Q    In 2011, did you have any other credit

17    problems or issues at the time besides the PNC debt?

18         A    I don't remember.  I forgot, but I don't think

19    so.

20         Q    Okay.  So we mentioned a rental application

21    for real property.

22         A    Mm-hmm.

23         Q    We went over vehicles.  Can you recall any

24    other instances in which you applied for credit in rent,

25    lease, or buy anything, that you were denied credit for?
```



```
1      A    No.

2      Q    Okay.

3      A    Because I knew because of my credit I would

4  not get, and that's what I assumed, so.

5      Q    Okay.  I think in your last deposition you

6  mentioned that you check your credit, I think it was

7  every now and then.  Can you be a little more specific

8  on how often you check your credit?  Is it a monthly,

9  you know, is it a monthly thing, is it every six months

10 thing, is it an annual thing?

11     A    Are we talking from 2010 or?

12     Q    Sure.  Let's start from 2010 to the present.

13 I'm just trying to get a sense as to how often you check

14 your credit.

15     A    I don't remember then.  But I'm still checking

16 it once a month or so.  I have Credit Karma, so it's

17 easy to check, so I check it every now and then.

18     Q    Okay.  And would you say -- is it fair to say

19 that if you're checking it roughly once a month now,

20 were you also doing that back in 2010 all the way

21 through to today?

22     A    I don't know if I started in 2010, but I'm

23 checking more, you know.  I have -- like I said, I have

24 that Credit Karma, it's easy for me to check.

25     Q    Okay.  Let me ask a more general question
```



```
 1   then.  Because say the 2010 to 2020 timeframe, those ten

 2   years, were you checking -- fair to say you were

 3   checking your credit at least once a year during that

 4   timeframe?

 5        A    I think maybe, yes.

 6        Q    Okay.

 7        A    Not sure though.

 8        Q    Okay.  But going back even to 2010, you know,

 9   were you generally aware of your credit score because

10   you were checking once a year at least?

11        A    I would say, yeah.

12        Q    That's a fair statement?

13        A    Yes.

14        Q    Okay.  And when you check your credit, either

15   now or in the past, you had mentioned Credit Karma,

16   which you can go online and punch in your information

17   and get the score.  Do you ever print out those reports

18   or maintain hard copies of those reports?

19        A    No.

20        Q    And when you would check your credit score,

21   going even back to 2010 up to today, it would show the

22   PNC debt, right?

23        A    It's not there now.

24             MR. MALONEY:  Okay.

25             MR. ELLIOTT:  Okay.
```



```
 1            MR. MALONEY:  If you know, so.

 2            MR. ELLIOTT:  Yeah.  All my questions are if

 3    you know.

 4            THE WITNESS:  Yeah.

 5    BY MR. ELLIOTT:

 6        Q    Not now.  When did the PNC debt drop off?

 7        A    I believe it was from 2000 -- seven years

 8    later after that, 2010, so.

 9        Q    Gotcha.

10        A    It's 2017 or so.

11        Q    I see.  So --

12        A    '16 or '17.

13        Q    So 2010 to roughly 2016-2017 --

14        A    Yes.

15        Q    -- the PNC debt always showed up, right?

16        A    Yes.

17        Q    Okay.  Did you ever dispute the PNC debt on

18    your credit with PNC?  Did you ever dispute it with PNC?

19        A    Dispute mean?

20        Q    Did you ever call PNC and say, Hey, I'm

21    looking at my credit report, this debt's still on there,

22    it shouldn't be?

23        A    No, I didn't.

24        Q    Did you ever dispute the PNC debt on your

25    credit report to any of the credit reporting agencies?
```



Page 28

```
 1      A    No, I didn't.

 2      Q    And you understand the credit reporting

 3 agencies are like Experian and Equifax?

 4      A    I know that but I didn't.

 5      Q    Okay.  Have you ever filed for bankruptcy?

 6      A    No.

 7      Q    In 2009-2010 I believe that you had some

 8 issues with the Gateway loan.  And by "issues," there

 9 was some defaults and maybe a modification request made

10 to Gateway, which was the senior lender on the Shipman

11 property; is that accurate?

12      A    Yes.

13      Q    And we don't need to get into those specifics.

14 I think Mr. Rigonan may address the Gateway loan, but

15 other than your dispute with Gateway in the 2009-2010

16 timeframe, did you have any other credit problems at the

17 time?

18      A    No.

19      Q    Okay.  No defaults on any credit facilities, a

20 car loan or another property?

21      A    No.

22      Q    Okay.  All right.  Let's get back to Exhibit

23 22 under Emotional Distress.  It's on page 2.  And let

24 me just start general, and then we can get into

25 specific.
```



1      A    Yes.

2      Q    Okay.  So after a loan has been paid off, a

3   lender will record what's called a reconveyance of deed

4   of trust, which means they're recording something in the

5   recorder's office, telling the world, this loan has been

6   satisfied, you know, there's no more money due on the

7   loan, and so we're giving up our security, okay.

8         So do you generally know that after a loan is

9   paid off, the lender will record something like that, a

10  reconveyance of the deed of the trust, saying there's no

11  more security here, no more mortgage on the property?

12     A    Yeah.  Now I understand.  But I didn't know it

13  before.

14     Q    Okay.  Fair enough.

15        So you're not -- you didn't have any

16  understanding generally of that process before we just

17  talked here?

18     A    I believe once I paid off the debt they

19  would -- you know, I wouldn't be liable to anything, so

20  the house would be clear.

21     Q    Right.  But --

22     A    Yeah.

23     Q    You didn't have an understanding -- you tell

24  me, did you have an understanding that if you do pay off

25  a loan that the lender is supposed to take an additional



1    step and record a reconveyance of the deed of trust, or,

2    you know, record something that says the loan is done,

3    it's been satisfied, or waived, canceled or whatever?

4        A    I think so, yeah.

5        Q    Okay.  So you did have a general understanding

6    that the lender would -- would take that additional step

7    after the loan has been satisfied or canceled or

8    whatever?

9        A    Yes.  Yeah.

10       Q    Right.  So you did understand that?

11       A    Yes.

12       Q    Okay.  You never received any sort of

13   notification from PNC or anyone else after the 1099 was

14   issued in 2010 that PNC had recorded a reconveyance or

15   anything else telling the world that the loan's been

16   satisfied or waived, canceled, correct?

17       A    No, I didn't.

18       Q    Okay.  But you expected PNC to do that if the

19   debt had been canceled, right?

20       A    I was expecting to clear, some kind of

21   clearance to give me the deed back, yes.

22       Q    Okay.  But you never received the deed back?

23       A    I didn't.

24       Q    Okay.  Did you ever ask PNC for the deed back?

25       A    No, I didn't.  I thought they would send it to



Ex. 2 - 14

Page 72

```
 1   me.

 2        Q    And after a period of time, 2010, 2011, when

 3   you didn't receive the deed back, or some other kind of

 4   notification from PNC that they were reconveying the

 5   deed of trust, canceling the deed of trust, you never

 6   followed up with PNC, correct?

 7        A    No, I didn't.

 8        Q    Okay.  But you were expecting it, right?

 9        A    I was, yes.

10             MR. ELLIOTT:  Okay.  Let's move on to Exhibit

11   28.  I may have figured out a mystery, at least I had in

12   my mind.

13                         (Exhibit 28 marked

14                          for identification.)

15             MR. ELLIOTT:  Okay.  This is another document

16   that you recently produced in response to the request

17   for documents from PNC and Vida.

18             Exhibit 28, for the record, is a package of

19   Wells Fargo documents with a cover sheet here from Wells

20   Fargo dated May 1st, 2024.

21   BY MR. ELLIOTT:

22        Q    The first question I had, if you flip to page

23   2, in the upper left-hand corner it identifies the

24   account holders as yourself and then Frehiwot -- am I

25   pronouncing that --
```



1    A    That's when the house value starts to --
2    begins to get low, but I might have attempted, but I
3    didn't know if it was really on MLS.
4    Q    Okay.  So in 2008 you were having trouble
5    paying at least your Gateway mortgage; is that correct?
6    A    Correct.  Yeah.
7    Q    And did you enter into some negotiations with
8    Gateway around that time to modify your -- your loan
9    with them?
10    A    In 2009 we modify the loan.  Because my loan
11    has a negative amortization, and the value of the house
12    was going down, and my -- you know, the money I owe them
13    was going up, so I refused to do that.  They have to
14    help me with that one.  So they changed it.  They lower
15    interest from 7.325 to 3.5 percent then we came to a
16    negotiation in 2009.
17    Q    And the financial -- I'll just call them
18    financial difficulties.
19    A    Yeah.
20    Q    In 2008.
21    A    Yeah.
22    Q    Or 2009.  Was that in any way related to
23    activity by PNC?
24    A    I lost my client, and I had a hardship, you
25    know.  I wasn't able to pay my mortgage.  So I didn't



Page 165

```
 1              MR. RIGONAN:  With that, we'll continue and go

 2  off the record, yes.

 3              MR. ELLIOTT:  Yeah.  I don't think there's

 4  anything else we need to say.  All right.

 5              THE REPORTER:  Before we go off the record,

 6  I'd just like to get copy orders on the record.

 7              MR. RIGONAN:  I do want a rough, just, you

 8  know, like, what was it, ASCII or something.  Rough

 9  draft ASCII.

10              THE REPORTER:  Okay.  Does anyone else want a

11  rough?

12              MR. MALONEY:  I'm going to wait until it's

13  complete.

14              MR. ELLIOTT:  I'm going to wait.

15              THE REPORTER:  Okay.  Thank you.

16                      (Whereupon, the deposition adjourned

17                      at 2:48 p.m.)

18                              *  *  *

19

20

21

22

23

24

25
```



Ex. 2 - 17

Page 166

1                        PENALTY OF PERJURY

2

3            I hereby declare under penalty of perjury that

4    I have read the foregoing and it is true and correct to

5    the best of my knowledge, including any corrections that

6    I have made.

7

8

9    DATED _____at

10   _____, California

11

12

13

14   _____

15          Genet Habtemariam

16

17

18

19

20

21

22

23

24

25



Page 167

1                    CERTIFICATE OF REPORTER

2              I, DONIELLE DEL CARLO, a Certified Shorthand

3    Reporter, hereby certify that the witness in the

4    foregoing deposition was by me duly sworn to tell the

5    truth, the whole truth, and nothing but the truth in the

6    within-entitled cause;

7              That said deposition was taken down in

8    shorthand by me, a disinterested person at the time and

9    place therein stated, and that the testimony of the said

10   witness was thereafter reduced to typewriting, by

11   computer, under my direction and supervision;

12             I further certify that I am not of counsel or

13   attorney for either or any of the parties to the said

14   deposition, nor in any way interested in the event of

15   this cause, and that I am not related to any of the

16   parties thereto.

17             DATED:  August 7, 2024

18

19   _____

20             DONIELLE DEL CARLO, CSR No.

21

22

23

24

25



Ex. 2 - 19

ANDREW S. ELLIOTT (State Bar No. 254757)
ase@severson.com
BENJAMIN J. HOWARD (State Bar No. 320682)
bjh@severson.com
SEVERSON & WERSON
A Professional Corporation
595 Market Street, Suite 2600
San Francisco, California 94105
Telephone: (415) 398-3344
Facsimile: (415) 956-0439

Attorneys for Defendant PNC BANK, N.A. (sued
as "PNC BANK, NATIONAL ASSOCIATION
S/B/M NATIONAL CITY MORTGAGE")

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION

| | |
|---|---|
| GENET HABTEMARIAM,<br><br>            Plaintiff,<br><br>      vs.<br><br>VIDA CAPITAL GROUP, LLC; US MORTGAGE RESOLUTION; PNC BANK, NATIONAL ASSOCIATION S/B/M NATIONAL CITY MORTGAGE and DOES 1 to 50, inclusive,<br><br>            Defendants. | Case No. 2:16-CV-01189-DC-AC<br><br>**DECLARATION OF MICHAEL BIVENS IN SUPPORT OF PNC BANK, N.A.'S MOTION FOR SUMMARY JUDGMENT**<br><br>Filed concurrently with Notice of Motion, Supporting Memorandum, Statement of Undisputed Facts, Declaration of Andrew S. Elliott<br><br>Date:      _____, 2025<br>Time:      1:30 p.m.<br>Crtrm.:    8, 13th Floor |

I, Michael Bivens, declare:

1.      I am employed by defendant PNC BANK, N.A., sued as PNC BANK, NATIONAL ASSOCIATION S/B/M NATIONAL CITY MORTGAGE ("PNC"), as Officer.  I was previously employed by National City Bank when it merged with PNC in 2009.  In total, I have been employed by PNC/National City Bank for 35 years. As part of my job duties, I am familiar with account-level data maintained in PNC's systems of record for monthly transmission to consumer credit reporting agencies. I am knowledgeable about PNC's policies and procedures governing this process. As Officer, I am authorized to make this Declaration on behalf of PNC.

2.      My duties at PNC include serving as custodian of records on behalf of PNC.  I am

familiar with the manner and procedures by which the records, letters and memoranda contained in PNC's files are prepared and maintained. Those records, letters and memoranda are prepared by agents or employees of PNC in performance of their regular business duties. Those records, letters and memoranda are made either by persons with knowledge of the matters they record or from information supplied by persons with such knowledge. It is PNC's regular business practice to maintain such records, letters or memoranda in the course of its business. The documents herein contained and referenced are business records produced and maintained in this above described manner. Except as otherwise specifically stated in this Declaration, the facts set forth herein are based on personal knowledge obtained from my years of working at PNC and familiarity with its practices, policies, and procedures, as well as my review of PNC's business records for plaintiff Genet Habtemariam's ("Plaintiff") mortgage loan (the "National City Loan").

3. In 2009, PNC merged with National City Bank, thereby acquiring the National City Loan.

4. PNC's records reflect that on February 16, 2010, the National City Loan was approved to be charged-off for accounting purposes. A "charge-off" means a lender has written off the account as a loss and that the account no longer incurs additional charges. However, the customer is still obligated to pay the debt, and the lender by sell the charged-off loan to a debt buyer. See also https://www.equifax.com/personal/education/credit/report/articles/-/learn/charge-offs-faq/ (last visited Oct. 11, 2024).

5. PNC's servicing notes reflect the following entry dated February 19, 2010: "charge off...with lien retained." A true and correct copy of PNC's servicing notes is attached as **Exhibit A** and incorporated by reference.

6. From November 2009 until February 2010, PNC reported the National City Loan to credit reporting agencies with a code "84," which would be reflected in Plaintiff's credit report as "180 days past due" along with the outstanding balance.

7. On February 19, 2010, PNC suspended credit reporting relating to the National City Loan and did not transmit any additional credit-related information to the credit reporting agencies. Consequently, from March 2010 until the National City Loan was purged from

1  Plaintiff's credit report approximately seven years later, Plaintiff's credit report would have

2  identified the National City Loan as "180 days past due," along with the outstanding balance.

3      8.      PNC has never transmitted information to the credit reporting agencies that the

4  National City Loan had been cancelled, waived, discharged, paid off or otherwise forgiven in any

5  way.

6

7      I declare under penalty of perjury under the laws of the United States of America that the

8  foregoing is true and correct.  This Declaration was executed on October 11, 2024, in Jacksonville,

9  Florida.

10

11

12  Michael Bevins

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit A

## (Bivens Declaration)

Case 2:16-cv-01189-DC-AC   Document 183-1   Filed 10/14/24   Page 61 of 62   (CONT.)

```
------------------------------------------------------------------------------------------------------------
LOAN        MORTGAGOR           ADDRESS                      ORIG AMT    INT RATE  LOAN TYPE
NUMBER      NAME                CITY           ST ZIP        PRIN BAL    TOTAL PMT  AGE
------------------------------------------------------------------------------------------------------------
0005497500  GENET HABTEMARIAM   7 SHIPMAN CT                 43500.00    8.37500 33  2ND-CONV. R
                                SACRAMENTO     CA 95823      46134.46    330.64  05Y 00M

                                -----------------------------------------------------------------------------
                                ENTRY               LTR ID/
                                TYPE    DATE   USER  CMT CODE  ACTVITY DESCRIPTION
                                -----------------------------------------------------------------------------
                                LET  12/30/11  ***   YE111    A00 - GENET HABTEMARIAM
                                COL  08/03/11  ***            SCORE     080211 AGT EINS DAYS DEL 824 RISK A
                                COL  07/05/11  ***            SCORE     070311 AGT EINS DAYS DEL 795 RISK A
                                LOG  06/02/11  LXH            FROM MEM1:
                                                              LITIGATION FILE ON IMAGE. ATTORNEY FEES/COSTS IN
                                                              THE AMOUNT OF .0
                                TSK  06/02/11  LXH   CLOSED   DEF - 3RD PARTY LITIGATION
                                LET  06/02/11  LXH   FC127    017 - LEGAL EXPENSES ADDED
                                COL  05/04/11  ***            SCORE     050411 AGT EINS DAYS DEL 733 RISK A
                                COL  12/03/10  ***            SCORE     120310 AGT EINS DAYS DEL 581 RISK A
                                COL  10/08/10  LEV                      CERT RCPT REC'D
                                COL  10/05/10  ***            SCORE     100410 AGT EINS DAYS DEL 522 RISK A
                                COL  09/03/10  ***            SCORE     090210 AGT EINS DAYS DEL 490 RISK A
                                COL  08/04/10  ***            SCORE     080410 AGT EINS DAYS DEL 460 RISK A
                                COL  07/09/10  ***            SCORE     070210 AGT EINS DAYS DEL 434 RISK A
                                COL  07/06/10  ***            SCORE     070210 AGT EINS DAYS DEL 431 RISK A
                                COL  06/03/10  ***            SCORE     060210 AGT EINS DAYS DEL 398 RISK A
                                COL  05/18/10  DJO                      CERT RCPT REC'D
                                COL  05/14/10  LBX            PMT AT PSTOFC PMT IN TRANSIT    TO LOCKBOX
                                                                  05-17
                                COL  05/14/10  TDX            CON'T- RESEARCH. SENT E-MAIL TO KRAIG FOR INFO.
                                COL  05/14/10  TDX            BORROWER CALLED WANTING A COPY OF THE DENIAL LETTER
                                                              FOR THE LOAN MOD. ONE WAS NEVER PRODUCED DUE TO THE
                                                              CHARGE OFF PROCESS AT THE SAME TIME. ADVISED WILL
                                COL  05/14/10  TDX            RIGHT PARTY B
                                COL  05/05/10  ***            SCORE     050510 AGT EINS DAYS DEL 369 RISK A
                                COL  04/27/10  EMP            FCSTOP TASK OPEN. LOAN NOT ACTIVE IN F/C OR NEWTRAK
                                                              CLOSED TASK.  DT
                                LOG  04/23/10  UPA   ADJTLN   IECTLN TASK BEING PROCESSED
                                LOG  04/22/10  UPA   ADJTLN   IECTLN TASK BEING PROCESSED
                                LOG  04/21/10  UPA   ADJTLN   IECTLN TASK BEING PROCESSED
                                COL  04/16/10  LBX            PMT AT PSTOFC PMT IN TRANSIT    TO LOCKBOX
                                                                  04-19
                                COL  04/05/10  ***            SCORE     040210 AGT EINS DAYS DEL 339 RISK A
                             *  COL  03/04/10  ***            SCORE     030310 AGT EINS DAYS DEL 307 RISK A
                             *  LOG  02/19/10  ULP            FROM MEM1:
                             *                                CHARGE OFF APPROVED 2/16 WITH LEIN RETAINED
                             *  COL  02/17/10  OHE            QUIT SENT TO SAFEGUARD, CLOSED P&P TASKS, OPENED UT
                             *                                LSTP TASK FOR UTILITY SHUT OFF
                             *  COL  02/08/10  TDX            TEL POE -MRS. L/M ON RECORDER
                             *  COL  02/05/10  ***             ORIGINAL OWNER      CONDITION ON 020310   SPI
                             *  COL  02/04/10  ***            SCORE     020310 AGT EINS DAYS DEL 279 RISK A
```

Ex. A - 01

ICCSFICH-433    PNC MORTGAGE, A DIVISION OF PNC BANK, NATIONAL ASSOCIATION    04/07/12
        COLLECTIONS/CUSTOMER SERVICE LOAN ACTIVITY ARCHIVE    PAGE 1871297

Case 2:16-cv-01189-DC-AC TIME FRAME 01/01/13 THRU 06/30/13  Document 183-1    Filed 10/14/24    Page 62 of 62

```
------------------------------------------------------------------------------------------------------------
LOAN          MORTGAGOR            ADDRESS                          ORIG AMT    INT RATE  LOAN TYPE
NUMBER        NAME                 CITY            ST ZIP           PRIN BAL    TOTAL PMT  AGE
------------------------------------------------------------------------------------------------------------
0005497500                      *  COL   01/11/10  TDX                                             CURTAILMNT OF INCOME
                                *  COL   01/07/10  ***              SCORE       010610 AGT EINS DAYS DEL 251 RISK A
                                *  COL   01/06/10  ***               ORIGINAL OWNER        CONDITION ON 010310   SPI
                                   DCH   04/03/09  ***      C/B     CURR CR SCORE 0099 SOURCE E16N
                                   DCH   03/04/09  ***      C/B     CURR CR SCORE 0099 SOURCE E16N
                                   DCH   02/04/09  ***      C/B     CURR CR SCORE 0099 SOURCE E16N
```